# Exhibit C



**U.S. Department of Justice**
950 Pennsylvania Avenue NW
Washington, D.C. 20530

March 20, 2025

Honorable John Koeltl
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Delivered Via Email
**REQUEST SEALING**

Dear Judge Koeltl:

      Pursuant to 28 U.S.C. § 636(b)(1)(A), the United States Department of Justice respectfully asks this Court for review and reversal of Chief Magistrate Judge Netburn's denial of the Government's search warrant application submitted on March 15 and revised on March 16, 2025. Because Judge Netburn's ruling significantly impedes an ongoing investigation into credible threats of violence against an individual, prompt reversal is necessary. The Government respectfully requests that this letter be filed under seal as it relates to a non-public search warrant application submitted in connection with a covert investigation.

**I.      Introduction**

      The United States seeks review and reversal of Chief Magistrate Judge Netburn's denial of the Government's application for a search warrant related to threats communicated via Instagram account @cuapartheiddivest. The magistrate judge's denial reflects critical misapplications of law, fundamentally misunderstanding the Fourth Amendment's probable cause standard and improperly applying First Amendment concerns.

Under well-settled law, probable cause exists where facts demonstrate a fair probability—not absolute certainty—that evidence of a crime will be found. Here, the magistrate judge erred by demanding a heightened evidentiary threshold more akin to proof beyond reasonable doubt, essentially requiring the Government to conclusively demonstrate now what it seeks evidence to determine:  that the symbolism and rhetoric used by the Target Account is a crime – a "true threat." – Such certainty is neither required nor appropriate at the warrant application stage.

Additionally, the court incorrectly invoked First Amendment concerns to deny the warrant, disregarding established precedent that true threats—statements that a reasonable person would interpret as serious expressions of intent to commit violence—fall categorically outside constitutional protection. The March 14, 2025, Instagram post at issue explicitly targeted Columbia University's President, Katrina Armstrong, directly naming her, using symbols associated with violent attacks, and depicting imagery suggestive of bloodshed. Viewed contextually alongside the group's established history of endorsing and engaging in violent conduct within the United States, this communication meets the threshold of a true threat under controlling Supreme Court and appellate precedent.

The magistrate judge's denial thus rests on a clear misinterpretation of the standards governing both probable cause and protected speech and is thus clearly erroneous and contrary to law. Because her ruling significantly impedes an ongoing investigation into credible threats of violence, immediate corrective action is warranted. The United States therefore respectfully urges this Court to reverse the magistrate judge's ruling, reaffirming the correct legal standards and authorizing the requested warrant to ensure the Government can appropriately investigate and mitigate these threats.

## II.    Factual Background

This case arises from an ongoing criminal investigation into threats communicated through Columbia University Apartheid Divest's ("CUAD") Instagram account @cuapartheiddivest (the "Target Account"). Specifically, on March 14, 2025, the Target

Account posted an image depicting Columbia University President Katrina Armstrong's residence defaced with a bright red substance resembling blood and marked with a black inverted triangle[1] and the words "FREE THEM ALL." The accompanying caption explicitly targeted President Armstrong, stating, among other things:

> the Columbia President's mansion has been redecorated. The people will not stand for Columbia University's shameless complicity in genocide! The University's repression has only bred more resistance, and Columbia has lit a flame it can't control. Katrina Armstrong you will not be allowed peace as you sic NYPD officers and ICE agents on your own students for opposing the genocide of the Palestinian people. WALKOUT AT 12:30PM. COLUMBIA MAIN GATES (Broadway/116).



This post, investigated as a potential violation of 18 U.S.C. § 875(c), forms the basis of the Government's probable cause assertion.

## III.    PROCEDURAL HISTORY

On March 15, 2025, the Government applied for a search warrant pursuant to the

---

[1] As described below, an inverted triangle is a symbol used by militants affiliated with the terrorist organization Hamas to designate targets for violence.

Electronic Communications Privacy Act ("ECPA")[2] and Federal Rule of Criminal Procedure 41, asserting probable cause to believe the Target Account had violated 18 U.S.C. § 875(c). A copy of the original affidavit is attached as Exhibit 1. The magistrate judge, acknowledging the probable cause determination as a "close call," requested further information on the symbolism and context of the posting. In short, the court asked for three things. First, she asked that the offending posts be placed in the body of the warrant rather than exhibits. Second, she sought more information about whether CUAD's posts advocated for violence *only* in the middle east, as opposed to in *also in the United States*. Third, she said Section 875(c) requires a threat to injure a person and that she did not read what CUAD wrote alongside the photograph to be a threat on its own because while she appreciated that the inverted triangle symbol is used by Hamas to designate structures and individuals as targets for violent attack, she wanted to know what evidence there was that the marker had the same meaning *in the United States*.

On March 16, 2025, the Government provided a supplemental application with the requested additional context and facts. A copy of the affidavit accompanying the supplemental application is attached here as Exhibit 2 and referred to here as "Search Warrant Affidavit" or "SW Affidavit." Despite the Government's thorough response to each of the judge's three requests, she ultimately denied the application concluding that she did not think there was probable cause to find that the post constituted a threat to a person under § 875; that the "no peace" language seemed to concern what the president was dealing with now (protests, etc.,); and that she was not comfortable saying that the upside-down triangle was a statement of violence.  She further stated that she had been reviewing the First Amendment case law and said that this seemed like protected speech.

As detailed below, the supplemental application and this appeal fully address these issues, demonstrating probable cause under the totality of circumstances.

---

[2] 18 U.S.C. §§ 2701-2713

## IV.    LEGAL STANDARD

District courts review magistrate judges' denial of search warrants[3] under a "clearly erroneous or contrary to law" standard.[4] The "clearly erroneous" prong requires reversal where the reviewing court is left with a definite and firm conviction that a mistake has been committed.[5] Meanwhile, the "contrary to law" prong demands reversal if the magistrate judge has misinterpreted or misapplied relevant statutes, precedent, or constitutional principles.[6]

Here, this standard underscores the necessity of reversal, as the magistrate judge's denial rested on fundamental misapplications of the law regarding probable cause and First Amendment protections. Her decision erroneously heightened the probable cause standard and improperly shielded a credible threat under the guise of protected speech—errors precisely within the scope of this Court's corrective review under 28 U.S.C. § 636(b)(1)(A).

## V.    ARGUMENT

### A.    The Magistrate Judge Erred by Imposing an Unduly High Standard for Probable Cause

The Fourth Amendment explicitly mandates that warrants shall issue only "upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."[7] Probable cause exists when, considering the totality of the circumstances, law enforcement officials possess sufficient information or reliable facts that would lead a reasonably cautious person to conclude that an offense has been or is being committed.[8] Critically, courts evaluating probable cause must avoid isolating each suspicious fact in a vacuum. Instead, they must examine the collective weight of the circumstances

---

[3] *See Gomez v. United States*, 490 U.S. 858, 868 n.16 (1989) ("A table in a Committee Report listed the following as criminal pretrial matters handled by magistrates: arrest warrants, search warrants, bail hearings, preliminary examinations, removal hearings, post indictment arraignments, pretrial conferences, and pretrial motions.").

[4] 28 U.S.C. § 636(b)(1)(A) ("A judge of the court may reconsider any pretrial matter under this subparagraph (A) where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law."); *See, e.g., Matter of White Google Pixel 3 XL Cellphone in a Black Incipio Case*, 398 F. Supp. 3d 785, 788 (D. Idaho 2019) (holding that, under the Act, the district court had authority to review the magistrate's denial of a search warrant for biometric information).

[5] *Weiss v. La Suisse*, 161 F.Supp.2d 305, 320-21 (S.D. N.Y. 2001).

[6] *Id.*

[7] U.S. Const. amend. IV.

[8] *United States v. Patrick*, 899 F.2d 169, 171 (2d Cir. 1990).

presented.[9] The mere existence of potentially innocent explanations does not negate the presence of probable cause.[10]

The magistrate judge misapplied the standard for probable cause by demanding a level of certainty and clarity far beyond what the law requires. Specifically, she indicated that in order to obtain the requested warrant, the Government must provide more conclusive evidence directly linking CUAD's symbolism and rhetoric to imminent violent action within the United States, effectively requiring proof beyond reasonable doubt or the complete elimination of any innocent explanations.

This demand fundamentally misinterprets the governing standard. Probable cause does not require absolute certainty, nor must it exclude all innocent interpretations of suspicious facts. Rather, probable cause exists whenever the totality of circumstances establishes a fair probability—not absolute certainty—that a crime has been or is being committed. The Supreme Court has explicitly rejected the notion that probable cause is defeated simply because facts could also have an innocent explanation.

The magistrate judge essentially required that the Government conclusively prove that the inverted triangle symbol was a statement of intent to perpetrate violence, thereby improperly elevating the standard. The appropriate inquiry is whether the evidence presented—CUAD's documented advocacy of violence, explicit threats against President Armstrong, violent imagery, and escalating conduct—provided a reasonable basis for concluding that there is a fair probability that evidence of a crime will be found.[11] By applying a higher standard that exceeds probable cause, the court committed clear error and misapplied the law, requiring reversal.

---

[9] *Illinois v. Gates*, 462 U.S. 213, 230–31 (1983).
[10] See *United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985) ("The fact that an innocent explanation may be consistent with the facts as alleged . . . does not negate probable cause.").
[11] *Gates*, 462 U.S. at 238.

### B.    What Constitutes a True Threat?

Statements constituting "true threats" lie outside First Amendment protections and are subject to criminal prosecution.[12] Society has a compelling interest in "protecting individuals from the fear of violence, the disruption that fear engenders, and the possibility that the threatened violence will occur."[13] A true threat is a communication that a reasonable person would interpret as a serious expression of intent to commit unlawful violence against a particular individual or group.[14] Such threats do not include mere hyperbole, jest, or rhetorical excesses that lack genuine potential for violence.[15]

The presence of political or religious elements within a threat does not negate its status as a true threat. Rather, once a statement is found to be threatening, its accompanying rhetoric does not furnish a constitutional defense.[16] Critically, context matters significantly in evaluating true threats. In *United States v. Hart*,[17] for instance, the Eighth Circuit emphasized contextual factors by upholding a jury determination that placing a Ryder truck at abortion clinic entrances was a true threat of force, given the timing coinciding with the President's visit following the Oklahoma City bombing.

The Supreme Court has clarified the mental state required to establish a violation of federal threat statutes. In 2015, in *Elonis v. United States*, the U.S. Supreme Court held that the government must show the defendant intended the communication to be threatening or knew that it would be perceived as such.[18] Eight years later, in *Counterman v. Colorado*, the Supreme Court confirmed that the requisite mental state is satisfied by recklessness, meaning the

---

[12] *Counterman v. Colorado*, 600 U.S. 66, 69 (2023).
[13] *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992).
[14] *Virginia v. Black*, 538 U.S. 343, 359 (2003).
[15] *Watts v. United States*, 394 U.S. 705, 708 (1969).
[16] *See Heller v. Bedford Cent. Sch. Dist.*, 665 F. App'x 49, 52 (2d Cir. 2016) (statements that people in government deserved to die, and identifying airplanes as targets, were not simply "off-the-cuff political hyperbole written in the context of friendly social media banter."); *see also United States v. Rahman*, 189 F.3d 88, 117 (2d Cir. 1999) ("Notwithstanding that political speech and religious exercise are among the activities most jealously guarded by the First Amendment, one is not immunized from prosecution for such speech-based offenses merely because one commits them through the medium of political speech or religious preaching.")
[17] 212 F.3d 1067, 1072 (8th Cir. 2000).
[18] 575 U.S. 723 (2015).

defendant consciously disregarded a substantial risk that their communication would be viewed as threatening. [19]

**C.    Probable Cause Exists That Target Account Contains Evidence of a True Threat**

The Target Account's Instagram post of March 14, 2025, including the accompanying photograph, contains specific details that, viewed in the context of CUAD's escalating pattern of conduct, would lead a reasonable person to fear imminent violence against Columbia University President Katrina Armstrong, the individual explicitly named and targeted in the post. The following key facts, drawn from the Search Warrant Affidavit, establish the threatening nature of the post and its broader context.

**1.    CUAD's Explicitly Endorses Violence, Including in the United States**

CUAD, via the Target Account, has repeatedly endorsed violence as a legitimate means to achieve its objectives, extending beyond the Middle East to the U.S. context. On October 8, 2024, the Target Account posted an open letter stating, "we support liberation by any means necessary, including armed resistance," and "in the face of violence from the oppressor equipped with the most lethal military force on the planet, where you've exhausted all peaceful means of resolution, violence is the only path forward." [20] This rhetoric, paired with CUAD's self-description as "Westerners fighting for the total eradication of Western civilization," [21] demonstrates an intent to pursue violent resistance domestically, not solely abroad. Their invocation of "Globalize the Intifada," [22] which is a phrase tied to Hamas's violent campaign, further signals a call to export such violence globally, including to the United States.

**2.    CUAD Has a History of Intimidating and Violent Actions on U.S. Campuses**

CUAD has claimed responsibility for a series of disruptive and aggressive acts at Columbia and Barnard, evidencing a pattern of intimidation and physical confrontation. These

---

[19] *Counterman*, 600 U.S. at 69.
[20] SW Affidavit ¶ 14.
[21] SW Affidavit ¶ 15.
[22] SW Affidavit ¶ 22.

include the January 21, 2025, classroom disruption by masked individuals distributing flyers with the inverted triangle and the phrase "THE ENEMY WILL NOT SEE TOMORROW;"[23] the February 26, 2025, forcible entry into Milbank Hall, injuring a security guard and leaving graffiti with inverted triangles and martyrdom rhetoric;[24] and the March 5, 2025, occupation of the Milstein Center, resulting in another injured guard and physical clashes with NYPD officers.[25] These incidents, all claimed by the Target Account, demonstrate CUAD's willingness to employ force and intimidation on U.S. soil.

### 3. The Inverted Triangle Is a Symbol of Imminent Violence in the U.S. Context

The March 14 post's photograph prominently features an inverted triangle—a symbol explicitly linked to Hamas's targeting of structures and individuals for violent attack.[26] The Search Warrant Affidavit details its use by Hamas's al-Qassam Brigades to mark targets in propaganda videos[27] and its adoption in U.S. campus protests, including by CUAD.[28] The Search Warrant Affidavit includes, among others, the following examples from Hamas propaganda:



*An inverted red triangle marking an Israeli tank as a target (Source: Echoroukonline.com, November 14, 2023)*

---

[23] SW Affidavit ¶¶ 16-17.
[24] SW Affidavit ¶¶ 18-20.
[25] SW Affidavit ¶¶ 24-25.
[26] SW Affidavit ¶¶ 10-11.
[27] SW Affidavit ¶ 10.
[28] SW Affidavit ¶¶ 12-14, 19.



*The triangle marking an Israeli tank before it is hit (Source: T.me/Qassambrigades, February 26, 2024)*

*Israeli soldiers marked by red triangles (Source: T.me/Qassambrigades, February 12, 2024)*

Notably, CUAD's own actions—e.g., the January 21 flyer and February 26 graffiti—pair the triangle with violent imagery and rhetoric, establishing its threatening connotation in this domestic context, not merely as a foreign symbol. Common sense demonstrates that any reasonable person, even more so a reasonable person with access to the internet, would interpret the inverted triangle as a target for violence.

### 4.    Direct Targeting of President Armstrong with Denial of Peace

The March 14 caption singles out "Katrina Armstrong," declaring, "you will not be allowed peace as you sic NYPD officers and ICE agents on your own students for opposing the

genocide of the Palestinian people."[29] This personalized warning, that attributes violent actions to Armstrong and is tied to her official residence, escalates beyond abstract criticism into a specific threat, particularly when read alongside CUAD's prior statements and actions. The fact that this threating communication was posted on a public facing social media account does not insulate it from scrutiny. [30]

### 5.    The Red Splatter Is a Visceral Threat of Harm

The photograph in the post at issue depicts President Armstrong's residence at 60 Morningside Drive defaced with a "bright red substance" resembling blood.[31] Paired with the inverted triangle and CUAD's violent rhetoric, this imagery evokes a reasonable inference of bloodshed, amplifying the post's menacing intent.

Taken together, these elements—the group's avowed support for violence in the U.S., its history of aggressive campus actions, the inverted triangle's established use as a marker of attack, the direct naming of President Armstrong with a denial of peace, and the blood-like splatter—form a mosaic that a reasonable person would interpret as a serious expression of intent to harm. This is not mere political hyperbole; it mirrors the contextual menace upheld as a true threat in *United States v. Hart*, where a Ryder truck's placement at abortion clinics, post-Oklahoma City bombing, was deemed threatening due to its symbolic weight. Here, the inverted triangle and red splatter carry similar gravity given CUAD's actions and Hamas's precedent.

Moreover, the Supreme Court's recklessness standard in *Counterman v. Colorado* is satisfied: CUAD consciously disregarded a substantial risk that this post would be perceived as threatening violence, evidenced by its prior use of the triangle in violent contexts and its explicit embrace of "armed resistance."[32] Whether this rises to a jury-worthy true threat is not the issue at

---

[29] SW Affidavit ¶ 8.
[30] *United States v. Kelner*, 534 F.2d 1020, 1023 (2d Cir. 1976) (holding statement was a threat despite the fact that it was made to the media during a press conference); *Planned Parenthood of Columbia/Willamette, Inc. v. American Coalition of Life Activists*, 290 F.3d 1058, 1086 (9th Cir. 2002) (finding true threats on "guilty" posters which had been "publicly distributed, but personally targeted."); *United States v. Morales*, 272 F.3d 284, 288 (5th Cir. 2001) (finding that statements made to a third party in an internet chat room were, nevertheless, true threats under 18 U.S.C. § 875(c));
[31] SW Affidavit ¶¶ 8-9.
[32] SW Affidavit ¶ 14

this stage—probable cause requires only a fair probability, not certainty.

Thus, the Government has established probable cause to believe that unknown persons associated with the Target Account violated 18 U.S.C. § 875(c) by transmitting this interstate threat. The magistrate judge's denial misapplied the probable cause standard by isolating the post's elements and demanding more conclusive evidence of U.S.-specific symbolism, rather than assessing the totality of circumstances.

### D.    The Magistrate Judge's Decision Improperly Elevated First Amendment Concerns

The magistrate judge's denial rested in part on "First Amendment concerns," implying the March 14, 2025, Instagram post might be protected political speech. This misreads the law: true threats are categorically unprotected by the First Amendment due to society's compelling interest in preventing fear and violence.[33] A true threat is "a serious expression of an intent to commit an act of unlawful violence" against a specific target, distinguishable from hyperbole or abstract advocacy.[34] In *Watts v. United States*, the Supreme Court clarified this boundary.[35] There, an 18-year-old Vietnam War protestor stated at a 1966 rally, "If they ever make me carry a rifle the first man I want in my sights is L.B.J.," adding that he would refuse induction.[36] The Court deemed this protected speech, not a true threat, because it was expressly conditional ("if they ever make me"), uttered in a political debate, and met with laughter, signaling no serious intent.[37] The Court emphasized that "debate on public issues should be uninhibited, robust, and wide-open," tolerating "vehement, caustic" attacks unless they cross into credible threats.[38]

CUAD's post starkly contrasts with the speech at issue in *Watts*. Unlike Watts's hypothetical, conditional remark tied to an event he vowed to avoid, CUAD's caption ("Katrina Armstrong, you will not be allowed peace") is direct, immediate, and unqualified, targeting a specific individual with no contingency. Far from a political rally's spontaneous exchange, it

---

[33] *R.A.V.*, 505 U.S. at 388.
[34] *Virginia*, 538 U.S. at 359.
[35] 394 U.S. 705 (1969).
[36] *Id.* at 706.
[37] *Id.* at 707-08.
[38] *Id.* at 708.

accompanies an image of Armstrong's residence, defaced with blood-like splatter and an inverted triangle—a symbol CUAD itself has linked to violence in prior U.S. actions.[39] Where Watts's audience laughed, CUAD's post follows a pattern of aggressive acts—classroom disruptions, forcible entries that injured guards, and martyrdom graffiti—suggesting menace, not jest, hyperbole, or inflated rhetoric.[40] CUAD's endorsement of "armed resistance" and calls to "globalize the Intifada" further frame this as a serious threat, not "crude political opposition."[41] Thus, while *Watts* shields abstract dissent, CUAD's post, with its specificity and violent context, falls outside that protection.[42]

Nor does the First Amendment bar a warrant here. Determining a "true threat" is a jury question, not a magistrate's premature merits call.[43] The magistrate judge overstepped by seeking a higher standard of evidence than required to assess probable cause—a "fair probability" under the totality of circumstances.[44] Her First Amendment concern misapplied *Watts*, ignoring that even political speech loses protection when it conveys intent to cause imminent harm.[45] Crucially, "an application for a warrant authorizing the seizure of materials presumptively protected by the First Amendment should be evaluated under the same standard of probable cause used to review warrant applications generally."[46] The magistrate judge did not adhere to this well-established law.

## VI.    CONCLUSION

Judge Netburn's denial, by imposing an unduly high threshold and misreading the threat's context, was clearly erroneous and contrary to law. We urge this Court to reverse and issue the warrant, enabling investigation of this credible threat.

---

[39] SW Affidavit ¶¶ 8, 10, 16, 19.
[40] SW Affidavit ¶¶ 16-25.
[41] SW Affidavit ¶¶ 14, 22; cf. *Watts*, 394 U.S. at 708.
[42] Even assuming arguendo that the speech was protected, "[t]he First Amendment. . . does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993).
[43] *United States v. Stock*, 728 F.3d 287, 298 (3d Cir. 2013); *Syring*, 522 F. Supp. 2d at 134.
[44] *Illinois v. Gates*, 462 U.S. at 238.
[45] *See Heller*, 665 F. App'x at 52.
[46] *See New York v. P.J. Video, Inc.*, 475 U.S. 868, 875 (1986).

Respectfully submitted,


MAC WARNER
Deputy Assistant Attorney General
Civil Rights Division
United States Department of Justice


By:      */s/ Alec C. Ward*
         Alec C. Ward
         Trial Attorney
         United States Department of Justice
         Civil Rights Division, Criminal Section
         150 M St. NE Washington, DC 20002
         ████████████
         ████████████████████

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH INSTAGRAM ACCOUNT @CUAPARTHEIDDIVEST THAT IS STORED AT PREMISES CONTROLLED BY META PLATFORMS, INC. | **TO BE FILED UNDER SEAL**<br><br>**AGENT AFFIDAVIT** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**
**FOR STORED ELECTRONIC COMMUNICATIONS**

I, ▮▮▮▮▮▮▮, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I make this affidavit in support of an application for a search warrant for information associated with a certain Instagram account that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), an electronic communications service and/or remote computing service provider headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A to the proposed warrant.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Meta to disclose to the government copies of the information (including the content of communications) further described in Section II of Attachment A.  Upon receipt of the information described in Section II of Attachment A, government-authorized persons will review that information to locate the items described in Section III of Attachment A.

2.    

3.      This affidavit is based on my personal knowledge, information from other law enforcement officials, and documents reviewed during this investigation.  This affidavit contains information necessary to support this application.  It is not intended to include every fact observed by me or known to U.S. law enforcement personnel conducting this investigation.

4.      This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that a violation of 18 U.S.C. § 875(c) have been committed by unknown persons associated with the Instagram account @cuapartheiddivest (the "Target Account").  There is also probable cause to search the information described in Section I of Attachment A for evidence, instrumentalities, contraband, and/or fruits of these crimes further described in Section II of Attachment A.

## JURISDICTION

6.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

7.     I am investigating and an alleged interstate transmission of threats to injure a person or persons.

8.     On March 14, 2025, the Instagram account @cuapartheiddivest (the "Target Account") posted an image of a building spattered with a bright red substance and marked in black spray paint with an inverted triangle and the words "FREE THEM ALL." The caption accompanying the post read: "anonymous submission: the Columbia President's mansion has been redecorated. The people will not stand for Columbia University's shameless complicity in genocide! The University's repression has only bred more resistance and Columbia has lit a flame it can't control. Katrina Armstrong you will not be allowed peace as you sic NYPD officers and ICE agents on your own students for opposing the genocide of the Palestinian people. WALKOUT AT 12:30PM. COLUMBIA MAIN GATES (Broadway/116)" A screen capture image of the image and caption ("the post") is included below as Figure 1.

3



cuapartheiddivest • Follow
Columbia University

cuapartheiddivest anonymous
submission: the Columbia President's
mansion has been redecorated 🐷🐷🐷

The people will not stand for
Columbia University's shameless
complicity in genocide! The
University's repression has only bred
more resistance and Columbia has lit
a flame it can't control.

Katrina Armstrong you will not be
allowed peace as you sic NYPD
officers and ICE agents on your own
students for opposing the genocide of
the Palestinian people.

3,066 likes
4 hours ago

Log in to like or comment.

9.      From my review of open-source materials on the Columbia University website, I
know that Katrina Armstrong is the interim President of Columbia University. I know that the
Columbia President's Mansion is located at 60 Morningside Drive, New York, New York 10027,
within the Southern District of New York. From reviewing open-source Google Street View geo-
located imaging data related to that address, I believe that the structure depicted in the post is, in
fact, the south-facing façade of that address.

10.      Based on my training and experience, I know that a spray-painted inverted
triangle is a symbol that has been used by militants affiliated with the terrorist organization
Hamas in the ongoing Israel-Hamas conflict to designate homes and buildings as targets for
attack.

11.      From my review of public postings on the Target Account, I know that the Target
Account purports to be the official Instagram account of Columbia University Apartheid Divest
("CUAD"). From review of the Target Account and from review of open-source media reports,

4

in particular a November 14, 2023 op-ed in the Columbia Spectator student newspaper authored under CUAD's organizational byline, I know that CUAD is a student-run organization, that, in its own words, "work[s] toward achieving a liberated Palestine and the end of Israeli apartheid by urging Columbia to divest all economic and academic stakes in Israel."

12.     From my review of postings on the Target Account, I know that CUAD expressly endorses and advocates the use of violence in furtherance of its organizational objectives. Specifically, I have reviewed an October 8, 2024 post made by the Target Account which included the statements: "we support liberation by any means necessary, including armed resistance" and "in the face of violence from the oppressor equipped with the most lethal military force on the planet, where you've exhausted all peaceful means of resolution, violence is the only path forward." From reviewing open-source media reporting, including an October 1, 2024 Columbia Spectator article, I know that the Target Account made these statements as part of an open letter, posted to the Target Account, in support of a Columbia student named Khymani James, who had been disciplined by Columbia University for stating, during an Instagram live stream, that "Zionists don't deserve to live" and "Be grateful that I'm not just going out and murdering Zionists."

13.     I have also reviewed open-source media reports that included photographs of an image posted to the Target Account that is no longer publicly-viewable and that stated, in the context of a broad expression of support for a student movement in Bangladesh, that CUAD "is fighting for the total eradication of Western civilization."

14.     From reviewing public posts on the Target Account and various open-source media reports, I also know that the Target Account has taken credit, on behalf of CUAD, for organizing several disruptive events, during which individuals engaged in allegedly assaultive

5

conduct. For example, from reviewing a February 27, 2025 article in the Barnard Bulletin (the student newspaper of Barnard College), I know that, on February 26, 2025, a group of masked individuals forced entry into a Barnard College administration building, allegedly causing injury by means of physical assault to a Barnard College employee who attempted to block them from entering. I also know, from review of a March 5, 2025, article in the Columbia Spectator, that on March 5, 2025, a group of masked individuals entered a multi-purpose building at Barnard College and interfered with the normal use of that building, refusing instructions from Barnard College officials to disperse. While inside, members of the group distributed paper leaflets purporting to be authored by the Hamas Media Office which purported to articulate reasons why the October 7, 2023 mass killings of Israeli civilians were morally justified. When officers of the New York Police Department arrived to remove the group, members of the group physically resisted police efforts to disperse it, resulting in the arrest of nine individuals on charges of "obstructing government administration." From reviewing public posts on the Target Account, I know that the Target Account took credit, on behalf of CUAD, for organizing and carrying out these events.

15.     Based on these facts, I submit that there is probable cause to believe that the Target Account's March 14, 2025, transmission of the above-described photograph and caption constitutes interstate communication of a threat to injure, in violation of 18 U.S.C. § 875(c). The Target Account purports to speak on behalf of a group that has expressly endorsed the use of violence for the accomplishment of its stated goals. The post includes the inverted triangle symbol, which is used by Hamas to designate structures as targets for violent attack. In the post, the inverted triangle is displayed alongside a bright red substance applied to the official residence

of the Columbia president, who is designated by name in the post and whom the post warns "will not be allowed peace."

## BACKGROUND CONCERNING INSTAGRAM[1]

16.     Instagram is a service owned by Meta, a United States company and a provider of an electronic communications service as defined by 18 U.S.C. §§ 3127(1) and 2510. Specifically, Instagram is a free-access social networking service, accessible through its website and its mobile application, that allows subscribers to acquire and use Instagram accounts, like the target account(s) listed in Attachment A, through which users can share messages, multimedia, and other information with other Instagram users and the general public.

17.     Meta collects basic contact and personal identifying information from users during the Instagram registration process.  This information, which can later be changed by the user, may include the user's full name, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, credit card or bank account number, and other personal identifiers.  Meta keeps records of changes made to this information.

18.     Meta also collects and retains information about how each user accesses and uses Instagram.  This includes information about the Internet Protocol ("IP") addresses used to create and use an account, unique identifiers and other information about devices and web browsers used to access an account, and session times and durations.

---

[1] The information in this section is based on information published by Meta on its Instagram website, including, but not limited to, the following webpages: "Privacy Policy," https://privacycenter.instagram.com/policy/; "Information for Law Enforcement," https://help.instagram.com/494561080557017; and "Help Center," https://help.instagram.com.

19.     Each Instagram account is identified by a unique username chosen by the user. Users can change their usernames whenever they choose but no two users can have the same usernames at the same time.  Instagram users can create multiple accounts and, if "added" to the primary account, can switch between the associated accounts on a device without having to repeatedly log-in and log-out.

20.     Instagram users can also connect their Instagram and Facebook accounts to utilize certain cross-platform features, and multiple Instagram accounts can be connected to a single Facebook account.  Instagram accounts can also be connected to certain third-party websites and mobile apps for similar functionality.  For example, an Instagram user can "tweet" an image uploaded to Instagram to a connected Twitter account or post it to a connected Facebook account, or transfer an image from Instagram to a connected image printing service.  Meta maintains records of changed Instagram usernames, associated Instagram accounts, and previous and current connections with accounts on Meta and third-party websites and mobile apps.

21.     Instagram users can "follow" other users to receive updates about their posts and to gain access that might otherwise be restricted by privacy settings (for example, users can choose whether their posts are visible to anyone or only to their followers).  Users can also "block" other users from viewing their posts and searching for their account, "mute" users to avoid seeing their posts, and "restrict" users to hide certain activity and prescreen their comments.  Instagram also allows users to create a "close friends list" for targeting certain communications and activities to a subset of followers.

22.     Users have several ways to search for friends and associates to follow on Instagram, such as by allowing Meta to access the contact lists on their devices to identify which contacts are Instagram users.  Meta retains this contact data unless deleted by the user and

8

periodically syncs with the user's devices to capture changes and additions.  Users can similarly

allow Meta to search an associated Facebook account for friends who are also Instagram users.

Users can also manually search for friends or associates.

23.    Each Instagram user has a profile page where certain content they create and

share ("posts") can be viewed either by the general public or only the user's followers,

depending on privacy settings.  Users can customize their profile by adding their name, a photo,

a short biography ("Bio"), and a website address.

24.    One of Instagram's primary features is the ability to create, edit, share, and

interact with photos and short videos.  Users can upload photos or videos taken with or stored on

their devices, to which they can apply filters and other visual effects, add a caption, enter the

usernames of other users ("tag"), or add a location.  These appear as posts on the user's profile.

Users can remove posts from their profiles by deleting or archiving them.  Archived posts can be

reposted because, unlike deleted posts, they remain on Meta's servers.

25.    Users can interact with posts by liking them, adding or replying to comments, or

sharing them within or outside of Instagram.  Users receive notification when they are tagged in

a post by its creator or mentioned in a comment (users can "mention" others by adding their

username to a comment followed by "@").  An Instagram post created by one user may appear

on the profiles or feeds of other users depending on a number of factors, including privacy

settings and which users were tagged or mentioned.

26.    An Instagram "story" is similar to a post but can be viewed by other users for only

24 hours.  Stories are automatically saved to the creator's "Stories Archive" and remain on

Meta's servers unless manually deleted.  The usernames of those who viewed a story are visible

to the story's creator until 48 hours after the story was posted.

27.    Instagram allows users to broadcast live video from their profiles.  Viewers can like and add comments to the video while it is live, but the video and any user interactions are removed from Instagram upon completion unless the creator chooses to send the video to IGTV, Instagram's long-form video app.

28.    Instagram Direct, Instagram's messaging service, allows users to send private messages to select individuals or groups.  These messages may include text, photos, videos, posts, videos, profiles, and other information.  Participants to a group conversation can name the group and send invitations to others to join.  Instagram users can send individual or group messages with "disappearing" photos or videos that can only be viewed by recipients once or twice, depending on settings.  Senders can't view their disappearing messages after they are sent but do have access to each message's status, which indicates whether it was delivered, opened, or replayed, and if the recipient took a screenshot.  Instagram Direct also enables users to video chat with each other directly or in groups.

29.    Instagram offers services such as Instagram Checkout and Facebook Pay for users to make purchases, donate money, and conduct other financial transactions within the Instagram platform as well as on Facebook and other associated websites and apps.  Instagram collects and retains payment information, billing records, and transactional and other information when these services are utilized.

30.    Instagram has a search function which allows users to search for accounts by username, user activity by location, and user activity by hashtag.  Hashtags, which are topical words or phrases preceded by a hash sign (#), can be added to posts to make them more easily searchable and can be "followed" to generate related updates from Instagram.  Meta retains records of a user's search history and followed hashtags.

10

31.     Meta collects and retains location information relating to the use of an Instagram account, including user-entered location tags and location information used by Meta to personalize and target advertisements.

32.     Meta uses information it gathers from its platforms and other sources about the demographics, interests, actions, and connections of its users to select and personalize ads, offers, and other sponsored content.  Meta maintains related records for Instagram users, including information about their perceived ad topic preferences, interactions with ads, and advertising identifiers.  This data can provide insights into a user's identity and activities, and it can also reveal potential sources of additional evidence.

33.     In some cases, Instagram users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

34.     For each Instagram user, Meta collects and retains the content and other records described above, sometimes even after it is changed by the user (including usernames, phone numbers, email addresses, full names, privacy settings, email addresses, and profile bios and links).

35.     In my training and experience, evidence of who was using Instagram and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above.  This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to

11

establish and prove each element or, alternatively, to exclude the innocent from further suspicion. Specifically, the evidence may establish who authored and transmitted the posts containing the above-discussed threatening statements.

36. Specifically, the user's account activity, logs, stored electronic communications, and other data retained by Meta can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, messaging logs, photos, and videos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

37. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

38. Therefore, Meta's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Instagram. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## REQUEST FOR NON-DISCLOSURE AND SEALING

39.     The existence and scope of this ongoing criminal investigation is not publicly

known.  As a result, premature public disclosure of this affidavit or the requested warrant could

alert potential criminal targets that they are under investigation, causing them to destroy

evidence, flee from prosecution, or otherwise seriously jeopardize the investigation.   Some of

the evidence in this investigation is stored electronically.  If alerted to the existence of the

warrant, the subjects under investigation could destroy that evidence, including information

saved to their personal computers.  Pursuant to 18 U.S.C. § 2705(b), I therefore respectfully

request that the Court direct the Provider not to notify any person of the existence of the warrant

for a period of one year from issuance, subject to extension upon application to the Court, if

necessary.

40.     For similar reasons, I respectfully request that this affidavit and all papers

submitted herewith be maintained under seal until the Court orders otherwise, except that the

Government be permitted without further order of this Court to provide copies of the warrant and

affidavit as need be to personnel assisting it in the investigation and prosecution of this matter,

and to disclose those materials as necessary to comply with discovery and disclosure obligations

in any prosecutions related to this matter.

## CONCLUSION

41.     Based on the forgoing, I request that the Court issue the proposed search warrant.

42.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not

required for the service or execution of this warrant.  The government will execute this warrant

by serving the warrant on Meta.  Because the warrant will be served on Meta, who will then

13

compile the requested records at a time convenient to it, reasonable cause exists to permit the

execution of the requested warrant at any time in the day or night.

Respectfully submitted,

_____

████████████
Federal Bureau of Investigation


Sworn to me through the transmission of this Affidavit by reliable electronic means,
pursuant to Federal Rules of Criminal Procedure 41(d)(3) and 4.1,
on _____, 2025


_____
Honorable Sarah Netburn
United States Magistrate Judge
Southern District of New York

14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN THE MATTER OF THE SEARCH
OF INFORMATION ASSOCIATED
WITH INSTAGRAM ACCOUNT
@CUAPARTHEIDDIVEST THAT IS
STORED AT PREMISES
CONTROLLED BY META
PLATFORMS, INC.

## SEARCH WARRANT AND NON-DISCLOSURE ORDER

TO:    Meta Platforms, Inc. ("Provider")

Federal Bureau of Investigation ("Investigative Agency")

**1. Warrant.** Upon an affidavit of ███████████████████ of the Federal

Bureau of Investigation, and pursuant to the provisions of the Stored Communications Act, 18

U.S.C. § 2703(b)(1)(A) and § 2703(c)(1)(A), and the relevant provisions of Federal Rule of

Criminal Procedure 41, the Court hereby finds there is probable cause to believe the Instagram

account @cuapartheiddivest, maintained at premises controlled by Meta Platforms Inc., contains

evidence, fruits, and instrumentalities of crime, all as specified in Attachment A hereto.

Accordingly, the Provider is hereby directed to provide to the Investigative Agency, within 14

days of the date of service of this Warrant and Order, the records specified in Section II of

Attachment A hereto, for subsequent review by law enforcement personnel as authorized in

Section III of Attachment A.  The Government is required to serve a copy of this Warrant and

Order on the Provider within 14 days of the date of issuance.  The Warrant and Order may be

served via electronic transmission or any other means through which the Provider is capable of

accepting service.

**2. Non-Disclosure Order.** Pursuant to 18 U.S.C. § 2705(b), the Court finds that there is reason to believe that notification of the existence of this warrant will result in destruction of or tampering with evidence and/or flight from prosecution, or otherwise will seriously jeopardize an ongoing investigation.  Accordingly, it is hereby ordered that the Provider shall not disclose the existence of this Warrant and Order to the listed subscriber or to any other person for a period of one year from the date of this Order, subject to extension upon application to the Court if necessary, except that Provider may disclose this Warrant and Order to an attorney for Provider for the purpose of receiving legal advice.

**3. Sealing.** It is further ordered that this Warrant and Order, and the Affidavit upon which it was issued, be filed under seal, except that the Government may without further order of this Court serve the Warrant and Order on the Provider; provide copies of the Affidavit or Warrant and Order as need be to personnel assisting the Government in the investigation and prosecution of this matter; and disclose these materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

 Dated: New York, New York

_____            _____

Date Issued                                     Time Issued

_____

UNITED STATES MAGISTRATE JUDGE

2

**Attachment A**

**I. Subject Account and Execution of Warrant**

This warrant is directed to Meta Platforms, Inc. (the "Provider"), headquartered at 1 Meta Way, Menlo Park, CA 94025, and applies to all content and other information within the Provider's possession, custody, or control associated with the Instagram account @cuapartheiddivest (active on, but not limited to, March 13, 2025) (the "Subject Account").

A law enforcement officer will serve this warrant by transmitting it via email or another appropriate manner to the Provider. The Provider is directed to produce to the law enforcement officer an electronic copy of the information specified in Section II below.  Upon receipt of the production, law enforcement personnel will review the information for items falling within the categories specified in Section III below.

**II. Information to be Produced by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, and including any messages, records, files, logs, or other information that has been deleted but is still available to Meta, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for each account or identifier listed in Attachment A:

    A.    All business records and subscriber information, in any form kept, pertaining to the account, including:

        1.    Identity and contact information (past and current), including full name, e-mail addresses, physical address, date of birth, phone numbers, gender, hometown, occupation, websites, and other personal identifiers;

        2.    All Instagram usernames (past and current) and the date and time each username was active, all associated Instagram and Facebook accounts

(including those linked by machine cookie), and all records or other information about connections with Facebook, third-party websites, and mobile apps (whether active, expired, or removed);

3.  Length of service (including start date), types of services utilized, purchases, and means and sources of payment (including any credit card or bank account number) and billing records;

4.  Devices used to login to or access the account, including all device identifiers, attributes, user agent strings, and information about networks and connections, cookies, operating systems, and apps and web browsers;

5.  All advertising information, including advertising IDs, ad activity, and ad topic preferences;

6.  Internet Protocol ("IP") addresses used to create, login, and use the account, including associated dates, times, and port numbers, from January 1, 2024, to present;

7.  Privacy and account settings, including change history; and

8.  Communications between Meta and any person regarding the account, including contacts with support services and records of actions taken;

B.  All content (whether created, uploaded, or shared by or with the account), records, and other information relating to videos (including live videos and videos on IGTV), images, stories and archived stories, past and current bios and profiles, posts and archived posts, captions, tags, nametags, comments, mentions, likes, follows, followed hashtags, shares, invitations, and all associated logs and metadata, from January 1, 2024, to present;

C.  All content, records, and other information relating to communications sent from or received by the account from January 1, 2024, to present, including but not limited to:

1.  The content of all communications sent from or received by the account, including direct and group messages, and all associated multimedia and metadata, including deleted and draft content if available;

2.  All records and other information about direct, group, and disappearing messages sent from or received by the account, including dates and times, methods, sources and destinations (including usernames and account numbers), and status (such as delivered, opened, replayed, screenshot);

3.  All records and other information about group conversations and video chats, including dates and times, durations, invitations, and participants (including usernames, account numbers, and date and time of entry and exit); and

2

4.       All associated logs and metadata;

D.       All content, records, and other information relating to all other interactions between the account and other Instagram users from January 1, 2024, to present, including but not limited to:

      1.       Interactions by other Instagram users with the account or its content, including posts, comments, likes, tags, follows (including unfollows, approved and denied follow requests, and blocks and unblocks), shares, invitations, and mentions;

      2.       All users the account has followed (including the close friends list), unfollowed, blocked, unblocked, muted, restricted, or denied a request to follow, and of users who have followed, unfollowed, blocked, unblocked, muted, restricted, or denied a request to follow the account;

      3.       All contacts and related sync information; and

      4.       All associated logs and metadata;

E.       All records of searches performed by the account from January 1, 2024, to present; and

F.       All location information, including location history, login activity, information geotags, and related metadata from January 1, 2024, to present.

Meta is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

III. **Information to be seized by the government**

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. § 875(c) including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

A.       Evidence indicating how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the account owner;

B.       Evidence indicating the account owner's state of mind as it relates to the crime under investigation;

C.       The identity of the person(s) who created or used the account, including records that help reveal the whereabouts of such person(s).

3

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
INSTAGRAM ACCOUNT
@CUAPARTHEIDDIVEST THAT IS
STORED AT PREMISES CONTROLLED
BY META PLATFORMS, INC.

**TO BE FILED UNDER SEAL**

**AGENT AFFIDAVIT**

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**
**FOR STORED ELECTRONIC COMMUNICATIONS**

I, ▮▮▮▮▮▮▮, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for

information associated with a certain Instagram account that is stored at premises owned,

maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), an electronic

communications service and/or remote computing service provider headquartered in Menlo Park,

California.  The information to be searched is described in the following paragraphs and in

Attachment A to the proposed warrant.  This affidavit is made in support of an application for a

search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Meta to

disclose to the government copies of the information (including the content of communications)

further described in Section II of Attachment A.  Upon receipt of the information described in

Section II of Attachment A, government-authorized persons will review that information to

locate the items described in Section III of Attachment A.

2.    

3.     This affidavit is based on my personal knowledge, information from other law enforcement officials, and documents reviewed during this investigation.  This affidavit contains information necessary to support this application.  It is not intended to include every fact observed by me or known to U.S. law enforcement personnel conducting this investigation.

4.     This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that a violation of 18 U.S.C. § 875(c) have been committed by unknown persons associated with the Instagram account @cuapartheiddivest (the "Target Account").  There is also probable cause to search the information described in Section I of Attachment A for evidence, instrumentalities, contraband, and/or fruits of these crimes further described in Section II of Attachment A.

## JURISDICTION

6.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

7.      I am investigating an alleged interstate transmission of threats to injure a person or persons.

8.      On March 14, 2025, the Instagram account @cuapartheiddivest (the "Target Account") posted an image of a building spattered with a bright red substance and marked in black spray paint with an inverted triangle and the words "FREE THEM ALL." The caption accompanying the post read: "anonymous submission: the Columbia President's mansion has been redecorated. The people will not stand for Columbia University's shameless complicity in genocide! The University's repression has only bred more resistance and Columbia has lit a flame it can't control. Katrina Armstrong you will not be allowed peace as you sic NYPD officers and ICE agents on your own students for opposing the genocide of the Palestinian people. WALKOUT AT 12:30PM. COLUMBIA MAIN GATES (Broadway/116)" A screen capture image of the image and caption ("the post") is included below as Figure 1.



9.     From my review of open-source materials on the Columbia University website, I know that Katrina Armstrong is the interim President of Columbia University. I know that the Columbia President's Mansion is located at 60 Morningside Drive, New York, New York 10027, within the Southern District of New York. From reviewing open-source Google Street View geo-located imaging data related to that address, I believe that the structure depicted in the post is, in fact, the south-facing façade of that address.

10.     Based on my training and experience, I know that an inverted triangle is a symbol that has been used by militants affiliated with the terrorist organization Hamas in the ongoing Israel-Hamas conflict to designate targets for attack.  Since the October 7, 2023 Hamas attack on Israel, in which approximately 1200 people were killed and approximately 250 people were taken hostage, Hamas's military wing, the Izz Al-Din Al-Qassam Brigades ("al-Qassam Brigades"), has regularly published videos from the fighting in Gaza in which Israeli military

4

forces about to be attacked are marked with a moving inverted red triangle[1]. The below

screenshots are examples from Hamas propaganda showing use of the inverted triangle:



*An inverted red triangle marking an Israeli tank as a target (Source: Echoroukonline.com, November 14, 2023)*



*The triangle marking an Israeli tank before it is hit (Source: T.me/Qassambrigades, February 26, 2024)*

---

[1] www.memri.org/reports/inverted-red-triangle-symbol-identified-hamas (last viewed March 15, 2025)



*Israeli soldiers marked by red triangles (Source: T.me/Qassambrigades, February 12, 2024)*

11.    I also know the inverted triangle is frequently used in pro-Hamas memes and graphics on social media. For example, the screenshot below from a February 21, 2024 post on X shows Abu Obaida, the spokesman for the al-Qassam Brigades, emerging from an inverted triangle:



6

12.    I also know the inverted triangle has been used in demonstrations on campuses in the United States.  The inverted triangle, as shown below, has been used on posters, and can also be made by individuals joining their fingers together to make the triangle symbol:

 

13.    From my review of public postings on the Target Account, I know that the Target Account purports to be the official Instagram account of Columbia University Apartheid Divest ("CUAD"). From review of the Target Account and from review of open-source media reports, in particular a November 14, 2023 op-ed in the Columbia Spectator student newspaper authored under CUAD's organizational byline, I know that CUAD is a student-run organization, that, in its own words, "work[s] toward achieving a liberated Palestine and the end of Israeli apartheid by urging Columbia to divest all economic and academic stakes in Israel."

14.     From my review of postings on the Target Account, I know that CUAD expressly endorses and advocates the use of violence in furtherance of its organizational objectives. Specifically, I have reviewed an October 8, 2024 post made by the Target Account which included the statements: "we support liberation by any means necessary, including armed resistance" and "in the face of violence from the oppressor equipped with the most lethal military force on the planet, where you've exhausted all peaceful means of resolution, violence is the only path forward." From reviewing open-source media reporting, including an October 1, 2024 Columbia Spectator article, I know that the Target Account made these statements as part of an open letter, posted to the Target Account, in support of a Columbia student named Khymani James, who had been disciplined by Columbia University for stating, during an Instagram live stream, that "Zionists don't deserve to live" and "Be grateful that I'm not just going out and murdering Zionists." Images of the open letter posted on the Target Account, taken on March 15, 2025, are included below:

## A Letter from CUAD Leadership to Khymani James and Our Comrades in Solidarity

Last spring, in the midst of the encampments, Columbia University Apartheid Divest (CUAD) posted a statement framed as an apology on behalf of Khymani James. It is of the utmost importance that we clear the record regarding this statement. The statement was written by several CUAD organizers, not Khymani, and does not represent Khymani or CUAD's values or political lines. However, all CUAD organizers were complicit in *not maintaining our political line, keeping the statement public on our instagram, and in neglecting the mental and physical safety of Khymani.*

In light of this, we, as CUAD organizers, want to apologize first and foremost to Khymani. We caused irrevocable harm to you by contributing to the ostracization you experienced from your fellow students, fellow organizers, the media, and the public. **The anti-blackness and queerphobia that Khymani experienced, and continues to experience, from neo-liberals, neo-liberal media, and fascists is disgusting.** By issuing a so-called "apology," CUAD exposed Khymani to even more hatred from white supremacist and queerphobic liberals and fascists, along with the neo-liberal media. We deliberately misrepresented your experiences and your words, and *we let you down by purposefully playing into the media and the public's neo-liberal co-optation of our encampments and our movement for Palestinian liberation.*



We also want to issue a public apology to all those fighting for Palestinian liberation that we alienated by **compromising our values and tailoring our actions and narrative to the mainstream media**. As an organization, we set our movement back. We alienated members of our community, utilizing the same tactics the state uses to isolate organizers working to push the boundaries of what is acceptable. Who keeps us safe? We keep us safe. But in recent months, we have failed Khymani and others in keeping them safe. And for that, we sincerely apologize and will continue working towards holding ourselves accountable by **keeping true to our political lines, learning in public, refusing to treat one another as disposable, and not bending to neo-liberal media.**

## We support liberation by any means necessary, including armed resistance.

Part of our collective liberation includes recognizing that pandering to liberal media to make the movement for liberation palatable and digestible sets us back. *Everyday, neo-liberal media commits acts of violence against Palestinians by dehumanizing Palestinians as people who deserve to experience genocide, twisting narratives to frame Palestinian freedom fighters as terrorists, and neglecting to publicize the violent realities of Israeli apartheid and occupation.*



9



15.      I have also reviewed open-source media reports that included photographs of an image posted to the Target Account that is no longer publicly-viewable and that stated, in the context of a broad expression of support for a student movement in Bangladesh, that CUAD "is fighting for the total eradication of Western civilization." A screen-capture of the since-deleted post, as reported in an August 8, 2024 open-source news article on the website Campus Reform, is included below:



16.     On January 21, 2025, four masked individuals entered a "History of Modern Israel" class at Columbia University. Refusing the professor's requests to leave, the group handed out printed flyers while one member read a prepared statement, preventing the class from proceeding. According to open-source media reports and social media posts purporting to be authored by students present in the classroom at the time, one of the flyers that the group distributed consisted of a picture of three armed militants, wearing similar masks to those worn by the disruptors, and bearing the superimposed text "THE ENEMY WILL NOT SEE TOMORROW." The first "O" in the word "TOMORROW" was replaced by an inverted triangle, as shown here:

11



17.    On February 23, 2025, Barnard University announced that it would expel two students for their role in the January 21 class disruption. On the same day, CUAD took credit for the Jan 21 disruption in an Instagram post on the Target Account. The post contains a video of the event that is approximately 30 seconds long and contains sub-titles that read "Israel is backed by the world's most violent imperialist forces and they attempt to erase the truth from our collective consciousness. To make this occupation seem moral and okay. To make it seem like a world without Israel can't exist but we know it can and has. Hopefully we got here in time to go over the syllabus and we can find out what modern Israel even is… There are Palestinian grandmothers who are older than the state itself." A still shot of the video from the Target Account is shown here:



18.     On February 26, 2025, a group of masked individuals forced entry into Milbank Hall, a building at Barnard that includes the Dean's office and other administrative offices. A Barnard security employee sustained minor injuries while trying to block the group's entry to the building. The group staged a sit-in in the hallway outside the Dean's Office and circulated a written list of demands that included the recission of the two students expelled in connection with the January 21 class disruption. A photograph of the group is shown here:



19.    Before eventually leaving the building several hours after entering, unidentified members of the group vandalized the walls of the hallway they had been occupying. The graffiti included four upside-down triangles alongside Arabic script, as shown below:



20.    A preliminary translation of the Arabic text shown indicates the following:  The green ink to the left of the doors says "Free Palestine! Revolution! Revolution!" The green and black text written on the doors says "Oh martyr, relax/rest easy, relax/rest easy." I know from training and experience that individuals who carry out suicide bombing attacks or who die while fighting on behalf of a terrorist organization, such as Hamas, are often praised by the terrorist organization as "martyrs."

21.    A preliminary translation of the black text on the door surrounded by the four inverted triangles says, "Freedom has a red door that is knocked on by every stained/bloodied hand". Of note, this is a line from a poem written by Ahmed Shawqi, an Egyptian poet, in 1926. In January 2025, Al Jazeera broadcast a video of Yahya Sinwar reciting the line. Sinwar was one of the senior Hamas leaders who orchestrated the October 7, 2023 attack on Israel, and was charged via complaint in the Southern District of New York with numerous terrorism offenses

resulting in death[2]. In a September 3, 2024 press release, the Attorney General at the time said "The Justice Department has charged Yahya Sinwar and other senior leaders of Hamas for financing, directing, and overseeing a decades-long campaign to murder American citizens and endanger the national security of the United States[3]." Sinwar was killed in Gaza in October 2024.

22.    The photo above also shows the phrase "GLOBALIZE THE INTIFADA" in English. I know from training and experience "intifada" refers to Hamas's decades-long campaign of violence against Israel that has resulted in death and injury to hundreds of people. The phrase "GLOBALIZE THE INTIFADA" appears to be a call to use the same violence employed by Hamas in other regions of the world, including the United States.  As noted above in paragraph 14, the October 8, 2024 post to the Target Account includes the phrase "long live the intifada."

23.    The Target Account claimed credit for the February 26 event on behalf of CUAD on February 27.

24.    On March 5, 2025, a group of masked individuals forced entry into the lobby of the Milstein Center, a multi-use building at Barnard which includes the main college library. The group obstructed normal usage of the building facilities and refused administrators' directions to leave. Another security guard sustained minor injuries during the event. While inside, members of the group distributed more leaflets, one of which purported to be authored by the "Hamas Media Service" and to offer Hamas' justification for the October 7 terror attacks. Most of the

---

[2] ECF No. 2 1:24-mj-00438 (SDNY Feb 1, 2024)

[3] www.justice.gov/archives/opa/pr/justice-department-announces-terrorism-charges-agaisnt-senior-leaders-hamas

group left the building as SRG officers entered, and then reformed in the outdoor courtyard outside the lobby. NYPD-SRG attempted to disperse this re-formed group, and a number of physical confrontations between group members and SRG officers ensued, resulting in the arrest of nine individuals.

25.    The Target Account took credit for the March 5 occupation in a post the same day, as shown here:



26.    Based on these facts, I submit that there is probable cause to believe that the Target Account's March 14, 2025, transmission of the above-described photograph and caption constitutes interstate communication of a threat to injure, in violation of 18 U.S.C. § 875(c). The Target Account purports to speak on behalf of a group that has expressly endorsed the use of violence for the accomplishment of its stated goals. The post includes the inverted triangle

symbol, which is used by Hamas to designate structures and individuals as targets for violent

attack. In the post, the inverted triangle is displayed alongside a bright red substance applied to

the official residence of the Columbia president, who is designated by name in the post and

whom the post warns "will not be allowed peace."

## BACKGROUND CONCERNING INSTAGRAM[4]

27.     Instagram is a service owned by Meta, a United States company and a provider of

an electronic communications service as defined by 18 U.S.C. §§ 3127(1) and 2510.

Specifically, Instagram is a free-access social networking service, accessible through its website

and its mobile application, that allows subscribers to acquire and use Instagram accounts, like the

target account(s) listed in Attachment A, through which users can share messages, multimedia,

and other information with other Instagram users and the general public.

28.     Meta collects basic contact and personal identifying information from users

during the Instagram registration process.  This information, which can later be changed by the

user, may include the user's full name, birth date, gender, contact e-mail addresses, physical

address (including city, state, and zip code), telephone numbers, credit card or bank account

number, and other personal identifiers.  Meta keeps records of changes made to this information.

29.     Meta also collects and retains information about how each user accesses and uses

Instagram.  This includes information about the Internet Protocol ("IP") addresses used to create

---

[4] The information in this section is based on information published by Meta on its Instagram
website, including, but not limited to, the following webpages: "Privacy Policy,"
https://privacycenter.instagram.com/policy/; "Information for Law Enforcement,"
https://help.instagram.com/494561080557017; and "Help Center," https://help.instagram.com.

and use an account, unique identifiers and other information about devices and web browsers used to access an account, and session times and durations.

30.    Each Instagram account is identified by a unique username chosen by the user. Users can change their usernames whenever they choose but no two users can have the same usernames at the same time. Instagram users can create multiple accounts and, if "added" to the primary account, can switch between the associated accounts on a device without having to repeatedly log-in and log-out.

31.    Instagram users can also connect their Instagram and Facebook accounts to utilize certain cross-platform features, and multiple Instagram accounts can be connected to a single Facebook account. Instagram accounts can also be connected to certain third-party websites and mobile apps for similar functionality. For example, an Instagram user can "tweet" an image uploaded to Instagram to a connected Twitter account or post it to a connected Facebook account, or transfer an image from Instagram to a connected image printing service. Meta maintains records of changed Instagram usernames, associated Instagram accounts, and previous and current connections with accounts on Meta and third-party websites and mobile apps.

32.    Instagram users can "follow" other users to receive updates about their posts and to gain access that might otherwise be restricted by privacy settings (for example, users can choose whether their posts are visible to anyone or only to their followers). Users can also "block" other users from viewing their posts and searching for their account, "mute" users to avoid seeing their posts, and "restrict" users to hide certain activity and prescreen their comments. Instagram also allows users to create a "close friends list" for targeting certain communications and activities to a subset of followers.

19

33.    Users have several ways to search for friends and associates to follow on Instagram, such as by allowing Meta to access the contact lists on their devices to identify which contacts are Instagram users.  Meta retains this contact data unless deleted by the user and periodically syncs with the user's devices to capture changes and additions.  Users can similarly allow Meta to search an associated Facebook account for friends who are also Instagram users. Users can also manually search for friends or associates.

34.    Each Instagram user has a profile page where certain content they create and share ("posts") can be viewed either by the general public or only the user's followers, depending on privacy settings.  Users can customize their profile by adding their name, a photo, a short biography ("Bio"), and a website address.

35.    One of Instagram's primary features is the ability to create, edit, share, and interact with photos and short videos.  Users can upload photos or videos taken with or stored on their devices, to which they can apply filters and other visual effects, add a caption, enter the usernames of other users ("tag"), or add a location.  These appear as posts on the user's profile. Users can remove posts from their profiles by deleting or archiving them.  Archived posts can be reposted because, unlike deleted posts, they remain on Meta's servers.

36.    Users can interact with posts by liking them, adding or replying to comments, or sharing them within or outside of Instagram.  Users receive notification when they are tagged in a post by its creator or mentioned in a comment (users can "mention" others by adding their username to a comment followed by "@").  An Instagram post created by one user may appear on the profiles or feeds of other users depending on a number of factors, including privacy settings and which users were tagged or mentioned.

20

37.     An Instagram "story" is similar to a post but can be viewed by other users for only 24 hours.  Stories are automatically saved to the creator's "Stories Archive" and remain on Meta's servers unless manually deleted.  The usernames of those who viewed a story are visible to the story's creator until 48 hours after the story was posted.

38.     Instagram allows users to broadcast live video from their profiles.  Viewers can like and add comments to the video while it is live, but the video and any user interactions are removed from Instagram upon completion unless the creator chooses to send the video to IGTV, Instagram's long-form video app.

39.     Instagram Direct, Instagram's messaging service, allows users to send private messages to select individuals or groups.  These messages may include text, photos, videos, posts, videos, profiles, and other information.  Participants to a group conversation can name the group and send invitations to others to join.  Instagram users can send individual or group messages with "disappearing" photos or videos that can only be viewed by recipients once or twice, depending on settings.  Senders can't view their disappearing messages after they are sent but do have access to each message's status, which indicates whether it was delivered, opened, or replayed, and if the recipient took a screenshot.  Instagram Direct also enables users to video chat with each other directly or in groups.

40.     Instagram offers services such as Instagram Checkout and Facebook Pay for users to make purchases, donate money, and conduct other financial transactions within the Instagram platform as well as on Facebook and other associated websites and apps.  Instagram collects and retains payment information, billing records, and transactional and other information when these services are utilized.

41.     Instagram has a search function which allows users to search for accounts by username, user activity by location, and user activity by hashtag.  Hashtags, which are topical words or phrases preceded by a hash sign (#), can be added to posts to make them more easily searchable and can be "followed" to generate related updates from Instagram.  Meta retains records of a user's search history and followed hashtags.

42.     Meta collects and retains location information relating to the use of an Instagram account, including user-entered location tags and location information used by Meta to personalize and target advertisements.

43.     Meta uses information it gathers from its platforms and other sources about the demographics, interests, actions, and connections of its users to select and personalize ads, offers, and other sponsored content.  Meta maintains related records for Instagram users, including information about their perceived ad topic preferences, interactions with ads, and advertising identifiers.  This data can provide insights into a user's identity and activities, and it can also reveal potential sources of additional evidence.

44.     In some cases, Instagram users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

45.     For each Instagram user, Meta collects and retains the content and other records described above, sometimes even after it is changed by the user (including usernames, phone

numbers, email addresses, full names, privacy settings, email addresses, and profile bios and links).

46.     In my training and experience, evidence of who was using Instagram and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above.  This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.  Specifically, the evidence may establish who authored and transmitted the posts containing the above-discussed threatening statements.

47.     Specifically, the user's account activity, logs, stored electronic communications, and other data retained by Meta can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, subscriber information, messaging logs, photos, and videos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the account at a relevant time.  As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account.  Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

48.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation.  For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a

23

plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

49.     Therefore, Meta's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Instagram.  In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## REQUEST FOR NON-DISCLOSURE AND SEALING

50.     The existence and scope of this ongoing criminal investigation is not publicly known.  As a result, premature public disclosure of this affidavit or the requested warrant could alert potential criminal targets that they are under investigation, causing them to destroy evidence, flee from prosecution, or otherwise seriously jeopardize the investigation.   Some of the evidence in this investigation is stored electronically.  If alerted to the existence of the warrant, the subjects under investigation could destroy that evidence, including information saved to their personal computers.  Pursuant to 18 U.S.C. § 2705(b), I therefore respectfully request that the Court direct the Provider not to notify any person of the existence of the warrant for a period of one year from issuance, subject to extension upon application to the Court, if necessary.

51.     For similar reasons, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise, except that the Government be permitted without further order of this Court to provide copies of the warrant and affidavit as need be to personnel assisting it in the investigation and prosecution of this matter,

and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

## CONCLUSION

52.    Based on the forgoing, I request that the Court issue the proposed search warrant.

53.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  The government will execute this warrant by serving the warrant on Meta.  Because the warrant will be served on Meta, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

Federal Bureau of Investigation

Sworn to me through the transmission of this Affidavit by reliable electronic means, pursuant to Federal Rules of Criminal Procedure 41(d)(3) and 4.1, on _____, 2025

Honorable Sarah Netburn
United States Magistrate Judge
Southern District of New York

25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN THE MATTER OF THE SEARCH
OF INFORMATION ASSOCIATED
WITH INSTAGRAM ACCOUNT
@CUAPARTHEIDDIVEST THAT IS
STORED AT PREMISES
CONTROLLED BY META
PLATFORMS, INC.

## SEARCH WARRANT AND NON-DISCLOSURE ORDER

TO:    Meta Platforms, Inc. ("Provider")

      Federal Bureau of Investigation ("Investigative Agency")

      **1. Warrant.** Upon an affidavit of ███████████████ of the Federal Bureau of Investigation, and pursuant to the provisions of the Stored Communications Act, 18 U.S.C. § 2703(b)(1)(A) and § 2703(c)(1)(A), and the relevant provisions of Federal Rule of Criminal Procedure 41, the Court hereby finds there is probable cause to believe the Instagram account @cuapartheiddivest, maintained at premises controlled by Meta Platforms Inc., contains evidence, fruits, and instrumentalities of crime, all as specified in Attachment A hereto. Accordingly, the Provider is hereby directed to provide to the Investigative Agency, within 14 days of the date of service of this Warrant and Order, the records specified in Section II of Attachment A hereto, for subsequent review by law enforcement personnel as authorized in Section III of Attachment A.  The Government is required to serve a copy of this Warrant and Order on the Provider within 14 days of the date of issuance.  The Warrant and Order may be served via electronic transmission or any other means through which the Provider is capable of accepting service.

**2. Non-Disclosure Order.** Pursuant to 18 U.S.C. § 2705(b), the Court finds that there is reason to believe that notification of the existence of this warrant will result in destruction of or tampering with evidence and/or flight from prosecution, or otherwise will seriously jeopardize an ongoing investigation. Accordingly, it is hereby ordered that the Provider shall not disclose the existence of this Warrant and Order to the listed subscriber or to any other person for a period of one year from the date of this Order, subject to extension upon application to the Court if necessary, except that Provider may disclose this Warrant and Order to an attorney for Provider for the purpose of receiving legal advice.

**3. Sealing.** It is further ordered that this Warrant and Order, and the Affidavit upon which it was issued, be filed under seal, except that the Government may without further order of this Court serve the Warrant and Order on the Provider; provide copies of the Affidavit or Warrant and Order as need be to personnel assisting the Government in the investigation and prosecution of this matter; and disclose these materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

Dated: New York, New York

_____          _____

Date Issued                               Time Issued



_____

UNITED STATES MAGISTRATE JUDGE

2

**Attachment A**

**I. Subject Account and Execution of Warrant**

This warrant is directed to Meta Platforms, Inc. (the "Provider"), headquartered at 1 Meta Way, Menlo Park, CA 94025, and applies to all content and other information within the Provider's possession, custody, or control associated with the Instagram account @cuapartheiddivest (active on, but not limited to, March 13, 2025) (the "Subject Account").

A law enforcement officer will serve this warrant by transmitting it via email or another appropriate manner to the Provider. The Provider is directed to produce to the law enforcement officer an electronic copy of the information specified in Section II below.  Upon receipt of the production, law enforcement personnel will review the information for items falling within the categories specified in Section III below.

**II. Information to be Produced by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, and including any messages, records, files, logs, or other information that has been deleted but is still available to Meta, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for each account or identifier listed in Attachment A:

    A.    All business records and subscriber information, in any form kept, pertaining to the account, including:

        1.    Identity and contact information (past and current), including full name, e-mail addresses, physical address, date of birth, phone numbers, gender, hometown, occupation, websites, and other personal identifiers;

        2.    All Instagram usernames (past and current) and the date and time each username was active, all associated Instagram and Facebook accounts

(including those linked by machine cookie), and all records or other information about connections with Facebook, third-party websites, and mobile apps (whether active, expired, or removed);

3.    Length of service (including start date), types of services utilized, purchases, and means and sources of payment (including any credit card or bank account number) and billing records;

4.    Devices used to login to or access the account, including all device identifiers, attributes, user agent strings, and information about networks and connections, cookies, operating systems, and apps and web browsers;

5.    All advertising information, including advertising IDs, ad activity, and ad topic preferences;

6.    Internet Protocol ("IP") addresses used to create, login, and use the account, including associated dates, times, and port numbers, from January 1, 2024, to present;

7.    Privacy and account settings, including change history; and

8.    Communications between Meta and any person regarding the account, including contacts with support services and records of actions taken;

B.    All content (whether created, uploaded, or shared by or with the account), records, and other information relating to videos (including live videos and videos on IGTV), images, stories and archived stories, past and current bios and profiles, posts and archived posts, captions, tags, nametags, comments, mentions, likes, follows, followed hashtags, shares, invitations, and all associated logs and metadata, from January 1, 2024, to present;

C.    All content, records, and other information relating to communications sent from or received by the account from January 1, 2024, to present, including but not limited to:

1.    The content of all communications sent from or received by the account, including direct and group messages, and all associated multimedia and metadata, including deleted and draft content if available;

2.    All records and other information about direct, group, and disappearing messages sent from or received by the account, including dates and times, methods, sources and destinations (including usernames and account numbers), and status (such as delivered, opened, replayed, screenshot);

3.    All records and other information about group conversations and video chats, including dates and times, durations, invitations, and participants (including usernames, account numbers, and date and time of entry and exit); and

2

      4.     All associated logs and metadata;

D.     All content, records, and other information relating to all other interactions between the account and other Instagram users from January 1, 2024, to present, including but not limited to:

      1.     Interactions by other Instagram users with the account or its content, including posts, comments, likes, tags, follows (including unfollows, approved and denied follow requests, and blocks and unblocks), shares, invitations, and mentions;

      2.     All users the account has followed (including the close friends list), unfollowed, blocked, unblocked, muted, restricted, or denied a request to follow, and of users who have followed, unfollowed, blocked, unblocked, muted, restricted, or denied a request to follow the account;

      3.     All contacts and related sync information; and

      4.     All associated logs and metadata;

E.     All records of searches performed by the account from January 1, 2024, to present; and

F.     All location information, including location history, login activity, information geotags, and related metadata from January 1, 2024, to present.

Meta is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

## III. Information to be seized by the government

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. § 875(c) including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

A.     Evidence indicating how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the account owner;

B.     Evidence indicating the account owner's state of mind as it relates to the crime under investigation;

C.     The identity of the person(s) who created or used the account, including records that help reveal the whereabouts of such person(s).

3

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.