# Exhibit H



**U.S. Department of Justice**
950 Pennsylvania Avenue NW
Washington, D.C. 20530

---

April 11, 2025

Honorable John Koeltl
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Dear Judge Koeltl:

Pursuant to 28 U.S.C. § 636(b), the United States Department of Justice respectfully asks this Court for review and reversal of Chief Magistrate Judge Sarah Netburn's March 28, 2025, denial of a Second Amended Application for a Search Warrant submitted in connection with an ongoing criminal investigation into an online threat made against former Columbia University President Katrina Armstrong. The government previously withdrew a similar request after we last appeared before you, determining that the matter was not ripe for review. We are now confident that a sufficient final ruling is in place for this Court to exercise review. As with previous correspondence in this matter, the government asks that the Court seal this letter, as it relates to an ongoing covert criminal investigation.

### I.    Factual Background

As detailed in the government's prior letter to this Court of March 20, 2025 (attached as Exhibit 5), this matter arises from an ongoing criminal investigation into threatening communications transmitted through the Instagram account @cuapartheiddivest (the "Target Account"). The Target Account purports to make public statements on behalf of Columbia University Apartheid Divest, a coalition of student groups at Columbia University and other

Manhattan-based colleges and universities. On March 14, 2025, the Target Account posted an image depicting Columbia University President Katrina Armstrong's residence defaced with a bright red substance resembling blood and marked with a black inverted triangle[1] and the words "FREE THEM ALL." The accompanying caption explicitly targeted President Armstrong, stating, among other things:

> the Columbia President's mansion has been redecorated. The people will not stand for Columbia University's shameless complicity in genocide! The University's repression has only bred more resistance, and Columbia has lit a flame it can't control. Katrina Armstrong you will not be allowed peace as you sic NYPD officers and ICE agents on your own students for opposing the genocide of the Palestinian people. WALKOUT AT 12:30PM. COLUMBIA MAIN GATES (Broadway/116).



## II.    PROCEDURAL HISTORY

The Magistrate Judge has declined to grant three applications for a warrant to search the

---

[1] As discussed in the government's Applications and elsewhere in the record, an inverted triangle is a symbol used by militants affiliated with the terrorist organization Hamas to designate targets for violence.

Target Account pursuant to the Electronic Communications Privacy Act ("ECPA")[2] and Federal Rule of Criminal Procedure 41. The government first applied for a warrant on March 15, 2025. In an off-the-record phone call with an Assistant U.S. Attorney, the Magistrate Judge requested additional information on several topics discussed in the probable cause section of the warrant application. The following day, March 16, the government submitted an Amended Application that included additional facts bearing on the topics about which the Magistrate Judge had inquired. In a second off-the-record phone call, the Magistrate Judge informed the Assistant U.S. Attorney that she would not grant the Amended Application, expressing that she did not believe that the application established probable cause and that she believed the Target Post constituted First Amendment-protected speech.

The government thereafter submitted a letter to this Court requesting review and reversal of the Magistrate Judge's decision not to grant the Amended Application.

At a telephonic hearing before this Court on March 24, 2025, procedural questions were raised about the mechanics of a review by this Court, and, as a result, the government elected to re-present its Application to the Magistrate Judge, along with a request that a formal ruling be made on the record. *See* Ex. 4.

On March 26, 2025, the government conveyed its request to the Magistrate Judge in an off-the-record phone call. The Magistrate Judge solicited written briefing on the government's request, but the government requested leave instead to present its arguments orally, in order to expedite its progress on this ongoing investigation. The Magistrate Judge indicated that she was willing to entertain oral argument in lieu of written briefing.[3]

---

[2] 18 U.S.C. §§ 2701-2713.

[3] After further consideration following the March 25 hearing before this Court, the government elected not to present its March 20 letter to this Court to the Magistrate for consideration in connection with its Second

On March 28, 2025, the government presented a Second Amended Application to the Magistrate Judge at an on-the-record telephonic hearing. An FBI agent was placed under oath and swore to the contents of the Second Amended Application, which were identical to those of the First Amended Application except for an additional screen-capture image.

After receiving the affiant's testimony and hearing argument from the government, the Magistrate Judge formally denied the Second Amended Application, finding that the government had failed to meet its burden to establish probable cause of an offense under 18 U.S.C. § 875(c). The Magistrate Judge also advised the government that she did not believe her denial to be reviewable by this Court, *see* Ex. 2 at 8-9 and 12, and directed the government, if it were to seek any review, reconsideration, or appeal of its application, to (1) identify the legal authority for any such review, reconsideration, or appeal and (2) to notify the relevant court of her decision and make a transcript of the March 28 telephonic hearing a part of the record in those proceedings. *See* Ex. 2 at 10.

The government is now confident that the Magistrate Judge's decision is ripe for review and seeks such review from this Court.

## III.    LEGAL STANDARD

As explained below, it is well established that district courts have the authority to review magistrates' search warrant denials under the Federal Magistrates Act, 28 U.S.C. § 636, and ECPA. A contrary understanding would prevent the government from challenging such a ruling under any circumstance, including when a magistrate opinion is clearly contrary to law or

---

Amended Application, because the legal analysis therein focused not on the first-instance question of probable cause, but on whether this Court could and should reverse a decision that, in the government's view at the time, had not been made final. No disrespect was intended by that decision; a transcript of the March 25 hearing, at which the March 20 letter was repeatedly discussed, was provided to the Magistrate Judge on March 27, and a copy of the March 20 letter was provided by email to the Magistrate Judge on March 29 to complete the record.

influenced by improper factors. Further, it is undisputed that district courts have the authority to issue warrants in the first instance. *See, e.g.*, *United States v. Villegas*, 899 F.2d 1324, 1333–35 (2d Cir. 1990) (discussing "inherent" power of courts to issue warrants); 18 U.S.C. § 3102 ("Authority to issue search warrants -- Federal, State or Territorial Judges, or U.S. magistrate judges authorized to issue search warrants, Rule 41(a)."). Accordingly, this Court can either review the Magistrate Judge's decision for clear error or issue the government's requested warrant under its own authority.

### A. District Courts Have Authority to Review Magistrate Judges' Search Warrant Denials

The Federal Magistrates Act ("the Act") "governs the jurisdiction and authority of federal magistrates." *United States v. Reyna-Tapia*, 328 F.3d 1114, 1118 (9th Cir. 2003). The Act provides for referral of non-dispositive pretrial matters to magistrates for decision, subject to review under a "clearly erroneous or contrary to law standard," *see* § 636(b)(1)(A), and referral of dispositive matters to magistrates for proposed findings and recommendations, subject to *de novo* review, *see* § 636(b)(1)(B). The Act also provides that a magistrate judge may be "assigned such additional duties as are not inconsistent with the Constitution and laws of the United States." § 636(b)(3).

The Act covers magistrate denials of search warrants. Although courts have disagreed on which subsection applies to warrant denials, they agree that review is proper when the government requests it. *See, e.g.*, *Matter of White Google Pixel 3 XL Cellphone in a Black Incipio Case*, 398 F. Supp. 3d 785, 788 (D. Idaho 2019) (reviewing search warrant denial under § 636(b)(1)(A) as a pretrial matter); *In the Matter of Search of Info. Associated with Email Addresses Stored at Premises Controlled by the Microsoft Corp.*, 212 F. Supp. 3d 1023, 1030

(D. Kan. 2016) (same); *United States v. Matter of Search of Info. Associated With Fifteen Email Addresses Stored at Premises Owned*, No. 2:17-CM-3152-WC, 2017 WL 4322826, at *3 (M.D. Ala. Sept. 28, 2017) (same); *Matter of the Search of Twenty-Six (26) Digital Devices & Mobile Device Extractions That Are Currently in the Possession of L. Enf't In Washington D.C.*, No. 21-SW-233 (GMH), 2022 WL 998896, at *6 (D.D.C. Mar. 14, 2022) (reviewing warrant denial under § 636(b)(3)'s "additional duties" provision because it had not been referred by a district court); *cf. LoSacco v. City of Middletown*, 71 F.3d 88, 91 (2d Cir. 1995) (noting that matters heard by a magistrate under § 636(b)(1)(A) and § 636(3) must be reviewed by a district court before appealing to Second Circuit).

It is also established that district courts can review magistrate denials of applications under ECPA's Stored Communications Act, 18 U.S.C. § 2703. *See, e.g.*, *Matter of Search of Info. Associated with [redacted]@mac.com that is Stored at Premises Controlled by Apple, Inc.*, 13 F. Supp. 3d 157, 162 (D.D.C. 2014); *In re Search Warrant*, No. 6:05MC168ORL31JGG, 2005 WL 3844032, at *1 (M.D. Fla. Feb. 13, 2006). Indeed, *district court* decisions on applications under § 2703 are reviewable, *see, e.g.*, *United States v. Thompson*, No. 19-3173, 2021 WL 3826532, at *2 (10th Cir. Aug. 27, 2021), and it would be illogical for a district court's decision to be reviewable, but not the same decision by a magistrate judge.[4]

---

[4] Even assuming—contrary to much reasoned case law—that Rule 41 and Section 636 do not provide for district court review of search warrant denials, such authority must exist independently. *See, e.g.*, *United States v. Lopez*, 710 F. Supp. 3d 849, 853 (D. Nev. 2024) ("Although the Federal Magistrates Act does not provide an avenue for a district judge to review a magistrate judge's probable-cause determination on a supervised-release violation, the Supreme Court's longstanding recognition that district judges retain jurisdiction over all aspects of a case does."); *United States v. Steele*, 2020 WL 4726704 (W.D. Wash. Aug. 13, 2020) ("Although the government asserts that there is no statutory or rule-based 'right to appeal' a magistrate judge's probable cause finding, it concedes that the Court may, in its discretion, exercise its 'general supervisory authority to review the decisions of a federal magistrate judge acting pursuant to 28 U.S.C. § 636(b).'"). This accords with the Supreme Court's view that a "magistrate acts subsidiary to and only in aid of the district court" and "the entire process takes place under the

Moreover, it is beyond doubt that district courts have the authority to issue search warrants in the first instance. *See* 18 U.S.C. § 2703(a) (authorizing warrants issued by "a court of competent jurisdiction," defined as, *inter alia*, "any district court of the United States"); 18 U.S.C. § 3102 ("Authority to issue search warrants -- Federal, State or Territorial Judges, or U.S. magistrate judges authorized to issue search warrants, Rule 41(a)."). Although Rule 41 refers only to magistrate judges, Federal Rule of Criminal Procedure 1(c) provides that "[w]hen these rules authorize a magistrate judge to act, any other federal judge may also act." FED. R CRIM. P. 1(c). Courts have thus applied Rule 41 to district courts. *See, e.g.*, *United States v. New York Tel. Co.*, 434 U.S. 159, 168–69 (1977) ("The Court of Appeals . . .  concluded that district courts have the power, either inherently or as a logical derivative of Fed. Crim. Proc. 41, to authorize pen register surveillance upon an adequate showing of probable cause" and agreeing that "the District Court was empowered to issue [the pen register order] by Rule 41"); *United States v. Falls*, 34 F.3d 674, 678 (8th Cir. 1994) (discussing warrant application to district court and noting that "Rule 41(b) authorizes the district court to issue a warrant based upon probable cause for [various purposes]."). Further, as emphasized by the Second Circuit, district courts have inherent power to issue search warrants. *Villegas*, 899 F.2d at 1334 ("[C]ourts must be deemed to have inherent power to issue a warrant when the requirements of [the Fourth] Amendment are met."); *United States v. Wharton*, 153 F. Supp. 2d 878, 882 (W.D. La. 2001) (collecting cases

---

district court's total control and jurisdiction." *United States v. Raddatz*, 447 U.S. 667, 681 (1980); *cf. Branch v. Umphenour*, 936 F.3d 994, 1001 (9th Cir. 2019) ("[I]n upholding the magistrate judge system against constitutional attack, this Court observed that Article III judges retained 'continuing, plenary responsibility for the administration of the judicial business of the United States.'") (internal citation omitted).

reasoning that "United States District Courts have a common law right to issue warrants even when statutory authorization is lacking.").

Accordingly, to the extent the Magistrate Judge suggested that, instead of appealing her decision, the government instead should request that this Court simply issue the warrant under its own authority, *see* Ex. 2 at 9–10 (directing government to provide authority for district courts to issue warrants), the government invites this court to construe this letter as a request for it to independently issue a warrant.

### B.    District Courts Review Search Warrant Denials for Clear Error

District courts review magistrate judges' denials of search warrants under a "clearly erroneous or contrary to law" standard. This standard applies whether the reviewing court locates search warrant denials under § 636(b)(1)(A)'s non-dispositive pre-trial matters, *see, e.g.*, *Matter of White Google Pixel*, 398 F. Supp. 3d at 788, or as non-dispositive matters under § 636(b)(3)'s "additional duties" subsection, *see, e.g.*, *In re Search Warrant No. 16-960-M-1 to Google*, 275 F. Supp. 3d 605, 608 n.5 (E.D. Pa. 2017).[5] The Southern District of New York's Local Civil Rule 72.1 (applicable in criminal proceedings per Local Criminal Rule 59.1) also provides that "[a] party may serve and file objections to a magistrate judge's order on non-dispositive matters, as provided in Fed. R. Civ. P. 72(a)," and the 2024 Committee Notes reiterate that "§ 636(b)(1)(A) provides that a district judge may reconsider any pretrial matter 'where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law.'"

---

[5] The government has found no cases suggesting a more deferential standard of review applies. Indeed, some courts apply an even less deferential standard to warrant denials under § 636(b)(3), reasoning that all matters handled under this provision require *de novo* review. *See, e.g.*, *In re Search of Info. Associated with [redacted]@gmail.com that is Stored at Premises Controlled by Google, Inc.*, No. 16-MJ-00757 (BAH), 2017 WL 3445634, at *4 & n.5 (D.D.C. July 31, 2017) (describing conflicting approaches and reasoning that *de novo* review is the majority and "most persuasive" view).

"A finding is 'clearly erroneous' when[,] although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Weiss v. La Suisse*, 161 F. Supp. 2d 305, 320–21 (S.D.N.Y. 2001); *United States v. Matter of Search of Info. Associated With Fifteen Email Addresses Stored at Premises Owned*, 2017 WL 4322826, at *3 (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). The "contrary to law" prong requires reversal if the magistrate judge has "fail[ed] to apply or misapplie[d] relevant statutes, case law or rules of procedure." *Catskill Dev., L.L.C. v. Park Place Ent. Corp.*, 206 F.R.D. 78, 86 (S.D.N.Y. 2002) (internal quotation marks omitted).

Of course, even under a clearly erroneous standard, reviewing courts apply less deference to questions of law. *See, e.g.*, *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720 (MKB), 2018 WL 4158290, at *9 (E.D.N.Y. Aug. 30, 2018) ("In reviewing issues of law, as is the case here, there is also no practical difference between a court's application of the 'contrary to law' standard and the de novo standard under Rule 72(b)."); *In re Search Warrant No. 16-960-M-1 to Google*, 275 F. Supp. 3d at 608 ("[T]his case turns on a question of law, and even under the clearly erroneous or contrary to law standard, such questions are subject to plenary review."); *Equal Emp. Opportunity Comm'n v. Peters' Bakery*, 301 F.R.D. 482, 484 (N.D. Cal. 2014) ("[T]he magistrate's legal conclusions are reviewed *de novo* to determine whether they are contrary to law.").

## IV.    ARGUMENT

### A.    The Magistrate Judge's Finding of No Probable Cause was Clearly Erroneous and Contrary to Law

The government respectfully submits that the Magistrate Judge's decision cannot stand, even under the deferential review provided for by § 636, because a review of the Second

Amended Application demonstrates that a clear mistake was made by the Magistrate Judge when she failed to issue the warrant. The contents of the Second Amended Application more than satisfy the low, nontechnical requirements of probable cause, which at this stage requires only a fair probability that the proposed search will yield evidence of a crime. Furthermore, the denial was contrary to law because the decision rested on the Magistrate Judge's premature imposition of a burden on the government to prove unprotected speech.

> **1.    The Government's Evidence Was Sufficient to Establish Probable Cause of a Violation of § 875(c)**

Section 875(c) criminalizes the interstate transmission of communications that are or contain threats to injure the person of another, otherwise known as "true threats." Statements constituting "true threats" lie outside First Amendment protections and are subject to criminal prosecution. *Counterman v. Colorado*, 600 U.S. 66, 69 (2023). Society has a compelling interest in "protecting individuals from the fear of violence, the disruption that fear engenders, and the possibility that the threatened violence will occur." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992). A true threat is a communication that a reasonable person would interpret as a "serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343, 359 (2003). Such threats do not include mere hyperbole, jest, or rhetorical excesses that lack genuine potential for violence. *Watts v. United States*, 394 U.S. 705, 708 (1969).

The presence of political or religious elements within a threat does not negate its status as a true threat. Rather, once a statement is found to be threatening, its accompanying rhetoric does not furnish a constitutional defense. *See Heller v. Bedford Cent. Sch. Dist.*, 665 F. App'x 49, 52 (2d Cir. 2016) (statements that people in government deserved to die, and identifying airplanes as targets, were not simply "off-the-cuff political hyperbole written in the context of friendly social media banter."); *see also United States v. Rahman*, 189 F.3d 88, 117 (2d Cir. 1999) ("Notwithstanding that political speech and religious exercise are among the activities most jealously guarded by the First Amendment, one is not immunized from prosecution for such

speech-based offenses merely because one commits them through the medium of political speech or religious preaching."). Critically, context matters significantly in evaluating true threats. In *United States v. Hart*, 212 F.3d 1067, 1072 (8th Cir. 2000), for instance, the Eighth Circuit emphasized contextual factors by upholding a jury determination that placing a Ryder truck at abortion clinic entrances was a true threat of force given the timing of the act coincided with the President's visit following the Oklahoma City bombing.

The Supreme Court has clarified the mental state required to establish a violation of federal threat statutes. In 2015, in *Elonis v. United States*, 575 U.S. 723 (2015), the Supreme Court held that the government must show the defendant intended the communication to be threatening or knew that it would be perceived as such. Eight years later, in *Counterman*, the Supreme Court confirmed that the requisite mental state is satisfied by recklessness, meaning the defendant consciously disregarded a substantial risk that their communication would be viewed as threatening. *Counterman*, 600 U.S. at 69.

Turning to probable cause, to obtain a search warrant, the government has no burden to produce evidence of every element of the crime under investigation, or to satisfy the kind of mechanical analysis called for in the context of a motion for a judgment of acquittal or to dismiss an indictment as insufficient. As the Supreme Court has repeatedly emphasized, "probable cause is a flexible, common-sense standard. It merely requires that the facts available [. . . ] would warrant a man of reasonable caution in the belief that certain items may be [. . .] useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false. A practical, nontechnical probability that incriminating evidence is involved is all that is required." *Texas v. Brown*, 460 U.S. 730, 742 (1983) (citing *Carroll v. United States,* 267 U.S. 132, 162 (1925) and *Brinegar v. United States,* 338 U.S. 160, 176, (1949)). Probable cause

to believe an offense has occurred may exist even in the total absence of evidence on one or more elements of that offense. *Ganek v. Leibowitz*, 874 F.3d 73, 86 (2d Cir. 2017) ("The law has long recognized that probable cause does not demand evidence of every element of a crime—not even to support a person's arrest.") (*citing Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013)).

Here, the government has demonstrated that there is probable cause to believe that the March 14, 2025, Instagram post containing an image of a university administrator's home,[6] splashed with a red substance which can be inferred to be fake blood, defaced with a symbol used to designate military targets in the Israel-Hamas conflict, and accompanied by a written warning that the administrator "will not know peace," was posted online with the intent to place the administrator in fear of bodily harm. At the warrant stage, nothing more is required, and the Second Amended Application easily clears the probable cause bar. The Magistrate Judge therefore clearly erred and reversal is necessary.

### 2.    The Magistrate Judge Construed the Government's Allegation Too Narrowly and Failed to Consider All Relevant Evidence

As the government's Applications make clear, the potentially unlawful communication about which the government seeks additional information is the Target Post, consisting of a photograph of the Columbia University President's residence defaced with a red substance, spray

---

[6] Courts have treated the involvement of homes and addresses in threatening communications as a particularly weighty factor in distinguishing unprotected threats from protected rhetoric. *See, e.g., United States v. Turner*, 720 F.3d 411, 422 (2d Cir. 2013) (finding sufficient evidence of a true threat where website posts included victims' names, photographs, work addresses, and maps of work location, noting that "the seriousness of the threat . . . was further shown by Turner's posting of the judges' photographs and work addresses."); *United States v. Muoio*, 221 F.3d 1353 (10th Cir. 2000) (finding letter mailed to judge's home, including a flyer with the judge's home address, which the defendant threatened to distribute to the public, constituted threatening communication under 18 U.S.C. § 876; court emphasized that the defendant "made it clear he knew where the district judge and his wife lived and worked.").

paint with the command to "FREE THEM ALL" accompanied by an inverted triangle symbol associated with Hamas violence, alongside a text caption that includes the phrases, "The Columbia President's mansion has been redecorated . . . Columbia has lit a flame it can't control. Katrina Armstrong you will not be allowed peace."

However, at the March 28 hearing, despite the government's urging to consider the Target Post as a whole, the Magistrate Judge expressly constrained her analysis of probable cause to two discrete aspects. *See* Ex. 2 at 17 ("I will consider the communication at issue to be the statement 'you will not be allowed peace' and the inverted triangle that was depicted on the video.").

As the government made clear at the hearing, *see* Ex. 2 at 16–17, its contention here is that the probable cause sufficient to issue a search warrant arises from the transmission of the Target Post in its entirety, not merely on the two discrete aspects considered by the Magistrate Judge. The inverted triangle and the statement "Katrina Armstrong you will not know peace" are certainly important aspects of the Target Post that, in the government's view, contribute strongly to probable cause of a violation of § 875(c). But those two aspects do not constitute or capture the entirety of the "communication" at issue here, and by expressly limiting her consideration of probable cause to them, the Magistrate Judge erred in excluding from her consideration other crucially important aspects of the Target Post and the contextual information included in the Second Amended Application. The Magistrate Judge did not, for instance, expressly analyze the fact that the Target Post contained a photograph of President Armstrong's residence, and specifically identified it as such, although maps and photographs of personally significant locations such as homes and worksites are routinely considered by courts analyzing true threats. *See supra* note 6. She also did not expressly weigh the presence of simulated blood or the

designation of a specific individual by name, although both contribute to the threatening nature of the Target Post.

Indeed, the Magistrate Judge appears to have taken the position that the definition of a "communication," for purposes of § 875(c), is limited to words and symbols. *See* Ex. 2 at 16–17. But § 875(c)'s scope is not limited to "statements," or "symbols"—it prohibits "communications." And as the Supreme Court has expressly recognized, the "communication" that constitutes a threat need not be verbal. *United States v. Taylor*, 596 U.S. 845, 855 (2022) ("Of course, threats can be <u>communicated</u> verbally or nonverbally—pointing a gun at a cashier conveys a threat no less effectively than passing a note reading 'your money or your life.' But one way or another some form of <u>communication</u> is usually required.") (emphasis added).

Moreover, the Magistrate Judge did not expressly weigh the contextual information provided in the Applications. The government explained in detail that the Target Account is affiliated with a New York-based organization that has both openly endorsed political violence and has organized, very near the residence depicted in the Target Post, mass trespass events at which university employees have been injured. It goes without saying that a group's history, ideology, and activities can give threatening content to its communications. An email reading simply "we plan to visit you soon" has one meaning if the sender is a door-to-door sales agency, and quite another if it is the Ku Klux Klan. Similarly, the statement "you will not be allowed peace" has an altogether different connotation coming from a group that endorses political violence and has taken credit for mass-trespass events that recently injured university employees than it would coming from a group vocally committed to, and with a history of, nonviolent protest.

But instead of considering that context, the Magistrate Judge questioned the government on evidence that was not included in its Applications, such as the subjective reaction of then-President Armstrong to the Target Post. *See* Ex. 2 at 18–19. While the government does not deny that evidence of a threat victim's subjective reaction is relevant to the true threats analysis, it is certainly not a *sine qua non* element of a probable cause showing in a threats case. Furthermore, the Magistrate Judge's focus on potential evidence not presented to her shows that her review took a more rigorous, technical, and formulaic form than appropriate in probable cause determinations.

### V.    Conclusion

The government's Second Amended Application clearly establishes probable cause sufficient to authorize the issuance of a search warrant, and this Court has two methods at its disposal to properly resolve the issue.

First, as set forth above, this Court can exercise its inherent authority to issue the warrant where, as here, the requirements of the Fourth Amendment are met.  To the extent the Magistrate Judge suggested that, instead of appealing her decision, the government instead should request that this Court simply issue the warrant under its own authority, *see* Ex. 2 at 9–10, the government invites this court to independently issue a warrant.

 Alternatively, should this Court treat this matter as an appeal of the Magistrate Judge's denial of the Second Amended Application, this Court should find that the Magistrate's denial was clearly erroneous.  The Magistrate Judge clearly erred first by improperly limiting the scope of her review to two discrete aspects of the Target Post, rather than considering the entirety of the Target Post; and second by failing to appropriately consider the context in which the Target Post was made.  These clear errors led to the decision that the government had not met its exceedingly

low burden of establishing probable cause—that is, a "fair probability" that the execution of the warrant will lead to discovery of evidence relevant to a potential criminal offense (here, interstate communication of a "true threat"). Therefore, this Court should reverse the denial and issue the warrant.

Respectfully,
HARMEET K. DHILLON
Assistant Attorney General
Civil Division

By: *Alec Ward*
_____
Alec Ward
Trial Attorney
Civil Division

Exhibits:

1. Second Amended Application for Search Warrant
2. Transcript of March 28 Hearing before Magistrate Judge Netburn
3. March 27 Government E-mail to Judge Netburn
4. Transcript of March 25 District Court Hearing
5. March 20 Government Letter to District Court
6. Amended Application for Search Warrant
7. Application for Search Warrant

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
INSTAGRAM ACCOUNT
@CUAPARTHEIDDIVEST THAT IS
STORED AT PREMISES CONTROLLED
BY META PLATFORMS, INC.

**TO BE FILED UNDER SEAL**

**AGENT AFFIDAVIT**

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT
FOR STORED ELECTRONIC COMMUNICATIONS**

I, ▮▮▮▮▮, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.    I make this affidavit in support of an application for a search warrant for information associated with a certain Instagram account that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), an electronic communications service and/or remote computing service provider headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A to the proposed warrant.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Meta to disclose to the government copies of the information (including the content of communications) further described in Section II of Attachment A.  Upon receipt of the information described in Section II of Attachment A, government-authorized persons will review that information to locate the items described in Section III of Attachment A.

2. ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████

3.      This affidavit is based on my personal knowledge, information from other law enforcement officials, and documents reviewed during this investigation.  This affidavit contains information necessary to support this application.  It is not intended to include every fact observed by me or known to U.S. law enforcement personnel conducting this investigation.

4.      This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that a violation of 18 U.S.C. § 875(c) have been committed by unknown persons associated with the Instagram account @cuapartheiddivest (the "Target Account").  There is also probable cause to search the information described in Section I of Attachment A for evidence, instrumentalities, contraband, and/or fruits of these crimes further described in Section II of Attachment A.

**JURISDICTION**

6.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

**PROBABLE CAUSE**

7.     I am investigating an alleged interstate transmission of threats to injure a person or persons.

8.     On March 14, 2025, the Instagram account @cuapartheiddivest (the "Target Account") posted an image of a building spattered with a bright red substance and marked in black spray paint with an inverted triangle and the words "FREE THEM ALL." The caption accompanying the post read: "anonymous submission: the Columbia President's mansion has been redecorated. The people will not stand for Columbia University's shameless complicity in genocide! The University's repression has only bred more resistance and Columbia has lit a flame it can't control. Katrina Armstrong you will not be allowed peace as you sic NYPD officers and ICE agents on your own students for opposing the genocide of the Palestinian people. WALKOUT AT 12:30PM. COLUMBIA MAIN GATES (Broadway/116)" A screen capture image of the image and caption ("the post") is included below as Figure 1.



9.    From my review of open-source materials on the Columbia University website, I know that Katrina Armstrong is the interim President of Columbia University. I know that the Columbia President's Mansion is located at 60 Morningside Drive, New York, New York 10027, within the Southern District of New York. From reviewing open-source Google Street View geo-located imaging data related to that address, I believe that the structure depicted in the post is, in fact, the south-facing façade of that address.

10.    Based on my training and experience, I know that an inverted triangle is a symbol that has been used by militants affiliated with the terrorist organization Hamas in the ongoing Israel-Hamas conflict to designate targets for attack.  Since the October 7, 2023 Hamas attack on Israel, in which approximately 1200 people were killed and approximately 250 people were taken hostage, Hamas's military wing, the Izz Al-Din Al-Qassam Brigades ("al-Qassam Brigades"), has regularly published videos from the fighting in Gaza in which Israeli military

4

forces about to be attacked are marked with a moving inverted red triangle[1]. The below screenshots are examples from Hamas propaganda showing use of the inverted triangle:



*An inverted red triangle marking an Israeli tank as a target (Source: Echoroukonline.com, November 14, 2023)*



*The triangle marking an Israeli tank before it is hit (Source: T.me/Qassambrigades, February 26, 2024)*

---

[1] www.memri.org/reports/inverted-red-triangle-symbol-identified-hamas (last viewed March 15, 2025)



*Israeli soldiers marked by red triangles (Source: T.me/Qassambrigades, February 12, 2024)*

11.     I also know the inverted triangle is frequently used in pro-Hamas memes and graphics on social media. For example, the screenshot below from a February 21, 2024 post on X shows Abu Obaida, the spokesman for the al-Qassam Brigades, emerging from an inverted triangle:



6

12.     I also know the inverted triangle has been used in demonstrations on campuses in the United States.  The inverted triangle, as shown below, has been used on posters, and can also be made by individuals joining their fingers together to make the triangle symbol:

 

13.     From my review of public postings on the Target Account, I know that the Target Account purports to be the official Instagram account of Columbia University Apartheid Divest ("CUAD"). From review of the Target Account and from review of open-source media reports, in particular a November 14, 2023 op-ed in the Columbia Spectator student newspaper authored under CUAD's organizational byline, I know that CUAD is a student-run organization, that, in its own words, "work[s] toward achieving a liberated Palestine and the end of Israeli apartheid by urging Columbia to divest all economic and academic stakes in Israel."

14.    From my review of postings on the Target Account, I know that CUAD expressly endorses and advocates the use of violence in furtherance of its organizational objectives. Specifically, I have reviewed an October 8, 2024 post made by the Target Account which included the statements: "we support liberation by any means necessary, including armed resistance" and "in the face of violence from the oppressor equipped with the most lethal military force on the planet, where you've exhausted all peaceful means of resolution, violence is the only path forward." From reviewing open-source media reporting, including an October 1, 2024 Columbia Spectator article, I know that the Target Account made these statements as part of an open letter, posted to the Target Account, in support of a Columbia student named Khymani James, who had been disciplined by Columbia University for stating, during an Instagram live stream, that "Zionists don't deserve to live" and "Be grateful that I'm not just going out and murdering Zionists." Images of the open letter posted on the Target Account, taken on March 15, 2025, are included below:

### A Letter from CUAD Leadership to Khymani James and Our Comrades in Solidarity

Last spring, in the midst of the encampments, Columbia University Apartheid Divest (CUAD) posted a statement framed as an apology on behalf of Khymani James. It is of the utmost importance that we clear the record regarding this statement. The statement was written by several CUAD organizers, not Khymani, and does not represent Khymani or CUAD's values or political lines. However, all CUAD organizers were complicit in *not maintaining our political line, keeping the statement public on our instagram, and in neglecting the mental and physical safety of Khymani.*

In light of this, we, as CUAD organizers, want to apologize first and foremost to Khymani. We caused irrevocable harm to you by contributing to the ostracization you experienced from your fellow students, fellow organizers, the media, and the public. **The anti-blackness and queerphobia that Khymani experienced, and continues to experience, from neo-liberals, neo-liberal media, and fascists is disgusting.** By issuing a so-called "apology," CUAD exposed Khymani to even more hatred from white supremacist and queerphobic liberals and fascists, along with the neo-liberal media. We deliberately misrepresented your experiences and your words, and *we let you down by purposefully playing into the media and the public's neo-liberal co-optation of our encampments and our movement for Palestinian liberation.*



We also want to issue a public apology to all those fighting for Palestinian liberation that we alienated by **compromising our values and tailoring our actions and narrative to the mainstream media**. As an organization, we set our movement back. We alienated members of our community, utilizing the same tactics the state uses to isolate organizers working to push the boundaries of what is acceptable. Who keeps us safe? We keep us safe. But in recent months, we have failed Khymani and others in keeping them safe. And for that, we sincerely apologize and will continue working towards holding ourselves accountable by **keeping true to our political lines, learning in public, refusing to treat one another as disposable, and not bending to neo-liberal media.**

### We support liberation by any means necessary, including armed resistance.

Part of our collective liberation includes recognizing that pandering to liberal media to make the movement for liberation palatable and digestible sets us back. *Everyday, neo-liberal media commits acts of violence against Palestinians by dehumanizing Palestinians as people who deserve to experience genocide, twisting narratives to frame Palestinian freedom fighters as terrorists, and neglecting to publicize the violent realities of Israeli apartheid and occupation.*





15.     I have also reviewed open-source media reports that included photographs of an image posted to the Target Account that is no longer publicly-viewable and that stated, in the context of a broad expression of support for a student movement in Bangladesh, that CUAD "is fighting for the total eradication of Western civilization." A screen-capture of the since-deleted post, as reported in an August 8, 2024 open-source news article on the website Campus Reform, is included below:



16.    On January 21, 2025, four masked individuals entered a "History of Modern Israel" class at Columbia University. Refusing the professor's requests to leave, the group handed out printed flyers while one member read a prepared statement, preventing the class from proceeding. According to open-source media reports and social media posts purporting to be authored by students present in the classroom at the time, one of the flyers that the group distributed consisted of a picture of three armed militants, wearing similar masks to those worn by the disruptors, and bearing the superimposed text "THE ENEMY WILL NOT SEE TOMORROW." The first "O" in the word "TOMORROW" was replaced by an inverted triangle, as shown here:



17.     On February 23, 2025, Barnard University announced that it would expel two students for their role in the January 21 class disruption. On the same day, CUAD took credit for the Jan 21 disruption in an Instagram post on the Target Account. The post contains a video of the event that is approximately 30 seconds long and contains sub-titles that read "Israel is backed by the world's most violent imperialist forces and they attempt to erase the truth from our collective consciousness. To make this occupation seem moral and okay. To make it seem like a world without Israel can't exist but we know it can and has. Hopefully we got here in time to go over the syllabus and we can find out what modern Israel even is… There are Palestinian grandmothers who are older than the state itself." A still shot of the video from the Target Account is shown here:





18.    On February 26, 2025, a group of masked individuals forced entry into Milbank

Hall, a building at Barnard that includes the Dean's office and other administrative offices. A

Barnard security employee sustained minor injuries while trying to block the group's entry to the

building. The group staged a sit-in in the hallway outside the Dean's Office and circulated a

written list of demands that included the recission of the two students expelled in connection

with the January 21 class disruption. A photograph of the group is shown here:



19.    Before eventually leaving the building several hours after entering, unidentified

members of the group vandalized the walls of the hallway they had been occupying. The graffiti

included four upside-down triangles alongside Arabic script, as shown below:

14

20.     A preliminary translation of the Arabic text shown indicates the following:  The green ink to the left of the doors says "Free Palestine! Revolution! Revolution!" The green and black text written on the doors says "Oh martyr, relax/rest easy, relax/rest easy." I know from training and experience that individuals who carry out suicide bombing attacks or who die while fighting on behalf of a terrorist organization, such as Hamas, are often praised by the terrorist organization as "martyrs."

21.     A preliminary translation of the black text on the door surrounded by the four inverted triangles says, "Freedom has a red door that is knocked on by every stained/bloodied hand". Of note, this is a line from a poem written by Ahmed Shawqi, an Egyptian poet, in 1926. In January 2025, Al Jazeera broadcast a video of Yahya Sinwar reciting the line. Sinwar was one of the senior Hamas leaders who orchestrated the October 7, 2023 attack on Israel, and was charged via complaint in the Southern District of New York with numerous terrorism offenses

resulting in death[2]. In a September 3, 2024 press release, the Attorney General at the time said "The Justice Department has charged Yahya Sinwar and other senior leaders of Hamas for financing, directing, and overseeing a decades-long campaign to murder American citizens and endanger the national security of the United States[3]." Sinwar was killed in Gaza in October 2024.

22.     The photo above also shows the phrase "GLOBALIZE THE INTIFADA" in English. I know from training and experience "intifada" refers to Hamas's decades-long campaign of violence against Israel that has resulted in death and injury to hundreds of people. The phrase "GLOBALIZE THE INTIFADA" appears to be a call to use the same violence employed by Hamas in other regions of the world, including the United States.  As noted above in paragraph 14, the October 8, 2024 post to the Target Account includes the phrase "long live the intifada."

23.     The Target Account claimed credit for the February 26 event on behalf of CUAD on February 27.

---

[2] ECF No. 2 1:24-mj-00438 (SDNY Feb 1, 2024)

[3] www.justice.gov/archives/opa/pr/justice-department-announces-terrorism-charges-agaisnt-senior-leaders-hamas



24.     On March 5, 2025, a group of masked individuals forced entry into the lobby of

the Milstein Center, a multi-use building at Barnard which includes the main college library. The

group obstructed normal usage of the building facilities and refused administrators' directions to

leave. Another security guard sustained minor injuries during the event. While inside, members

of the group distributed more leaflets, one of which purported to be authored by the "Hamas

Media Service" and to offer Hamas' justification for the October 7 terror attacks. Most of the

group left the building as SRG officers entered, and then reformed in the outdoor courtyard

outside the lobby. NYPD-SRG attempted to disperse this re-formed group, and a number of

physical confrontations between group members and SRG officers ensued, resulting in the arrest

of nine individuals.

17

25.    The Target Account took credit for the March 5 occupation in a post the same

day, as shown here:



26.    Based on these facts, I submit that there is probable cause to believe that the

Target Account's March 14, 2025, transmission of the above-described photograph and caption

constitutes interstate communication of a threat to injure, in violation of 18 U.S.C. § 875(c). The

Target Account purports to speak on behalf of a group that has expressly endorsed the use of

violence for the accomplishment of its stated goals. The post includes the inverted triangle

symbol, which is used by Hamas to designate structures and individuals as targets for violent

attack. In the post, the inverted triangle is displayed alongside a bright red substance applied to

the official residence of the Columbia president, who is designated by name in the post and

whom the post warns "will not be allowed peace."

18

## BACKGROUND CONCERNING INSTAGRAM[4]

27.     Instagram is a service owned by Meta, a United States company and a provider of

an electronic communications service as defined by 18 U.S.C. §§ 3127(1) and 2510.

Specifically, Instagram is a free-access social networking service, accessible through its website

and its mobile application, that allows subscribers to acquire and use Instagram accounts, like the

target account(s) listed in Attachment A, through which users can share messages, multimedia,

and other information with other Instagram users and the general public.

28.     Meta collects basic contact and personal identifying information from users

during the Instagram registration process.  This information, which can later be changed by the

user, may include the user's full name, birth date, gender, contact e-mail addresses, physical

address (including city, state, and zip code), telephone numbers, credit card or bank account

number, and other personal identifiers.  Meta keeps records of changes made to this information.

29.     Meta also collects and retains information about how each user accesses and uses

Instagram.  This includes information about the Internet Protocol ("IP") addresses used to create

and use an account, unique identifiers and other information about devices and web browsers

used to access an account, and session times and durations.

30.     Each Instagram account is identified by a unique username chosen by the user.

Users can change their usernames whenever they choose but no two users can have the same

_____

[4] The information in this section is based on information published by Meta on its Instagram
website, including, but not limited to, the following webpages: "Privacy Policy,"
https://privacycenter.instagram.com/policy/; "Information for Law Enforcement,"
https://help.instagram.com/494561080557017; and "Help Center," https://help.instagram.com.

usernames at the same time. Instagram users can create multiple accounts and, if "added" to the primary account, can switch between the associated accounts on a device without having to repeatedly log-in and log-out.

31.    Instagram users can also connect their Instagram and Facebook accounts to utilize certain cross-platform features, and multiple Instagram accounts can be connected to a single Facebook account. Instagram accounts can also be connected to certain third-party websites and mobile apps for similar functionality. For example, an Instagram user can "tweet" an image uploaded to Instagram to a connected Twitter account or post it to a connected Facebook account, or transfer an image from Instagram to a connected image printing service. Meta maintains records of changed Instagram usernames, associated Instagram accounts, and previous and current connections with accounts on Meta and third-party websites and mobile apps.

32.    Instagram users can "follow" other users to receive updates about their posts and to gain access that might otherwise be restricted by privacy settings (for example, users can choose whether their posts are visible to anyone or only to their followers). Users can also "block" other users from viewing their posts and searching for their account, "mute" users to avoid seeing their posts, and "restrict" users to hide certain activity and prescreen their comments. Instagram also allows users to create a "close friends list" for targeting certain communications and activities to a subset of followers.

33.    Users have several ways to search for friends and associates to follow on Instagram, such as by allowing Meta to access the contact lists on their devices to identify which contacts are Instagram users. Meta retains this contact data unless deleted by the user and periodically syncs with the user's devices to capture changes and additions. Users can similarly

allow Meta to search an associated Facebook account for friends who are also Instagram users. Users can also manually search for friends or associates.

34.    Each Instagram user has a profile page where certain content they create and share ("posts") can be viewed either by the general public or only the user's followers, depending on privacy settings.  Users can customize their profile by adding their name, a photo, a short biography ("Bio"), and a website address.

35.    One of Instagram's primary features is the ability to create, edit, share, and interact with photos and short videos.  Users can upload photos or videos taken with or stored on their devices, to which they can apply filters and other visual effects, add a caption, enter the usernames of other users ("tag"), or add a location.  These appear as posts on the user's profile. Users can remove posts from their profiles by deleting or archiving them.  Archived posts can be reposted because, unlike deleted posts, they remain on Meta's servers.

36.    Users can interact with posts by liking them, adding or replying to comments, or sharing them within or outside of Instagram.  Users receive notification when they are tagged in a post by its creator or mentioned in a comment (users can "mention" others by adding their username to a comment followed by "@").  An Instagram post created by one user may appear on the profiles or feeds of other users depending on a number of factors, including privacy settings and which users were tagged or mentioned.

37.    An Instagram "story" is similar to a post but can be viewed by other users for only 24 hours.  Stories are automatically saved to the creator's "Stories Archive" and remain on Meta's servers unless manually deleted.  The usernames of those who viewed a story are visible to the story's creator until 48 hours after the story was posted.

38.    Instagram allows users to broadcast live video from their profiles.  Viewers can like and add comments to the video while it is live, but the video and any user interactions are removed from Instagram upon completion unless the creator chooses to send the video to IGTV, Instagram's long-form video app.

39.    Instagram Direct, Instagram's messaging service, allows users to send private messages to select individuals or groups.  These messages may include text, photos, videos, posts, videos, profiles, and other information.  Participants to a group conversation can name the group and send invitations to others to join.  Instagram users can send individual or group messages with "disappearing" photos or videos that can only be viewed by recipients once or twice, depending on settings.  Senders can't view their disappearing messages after they are sent but do have access to each message's status, which indicates whether it was delivered, opened, or replayed, and if the recipient took a screenshot.  Instagram Direct also enables users to video chat with each other directly or in groups.

40.    Instagram offers services such as Instagram Checkout and Facebook Pay for users to make purchases, donate money, and conduct other financial transactions within the Instagram platform as well as on Facebook and other associated websites and apps.  Instagram collects and retains payment information, billing records, and transactional and other information when these services are utilized.

41.    Instagram has a search function which allows users to search for accounts by username, user activity by location, and user activity by hashtag.  Hashtags, which are topical words or phrases preceded by a hash sign (#), can be added to posts to make them more easily searchable and can be "followed" to generate related updates from Instagram.  Meta retains records of a user's search history and followed hashtags.

22

42.     Meta collects and retains location information relating to the use of an Instagram account, including user-entered location tags and location information used by Meta to personalize and target advertisements.

43.     Meta uses information it gathers from its platforms and other sources about the demographics, interests, actions, and connections of its users to select and personalize ads, offers, and other sponsored content.  Meta maintains related records for Instagram users, including information about their perceived ad topic preferences, interactions with ads, and advertising identifiers.  This data can provide insights into a user's identity and activities, and it can also reveal potential sources of additional evidence.

44.     In some cases, Instagram users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

45.     For each Instagram user, Meta collects and retains the content and other records described above, sometimes even after it is changed by the user (including usernames, phone numbers, email addresses, full names, privacy settings, email addresses, and profile bios and links).

46.     In my training and experience, evidence of who was using Instagram and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above.  This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to

23

establish and prove each element or, alternatively, to exclude the innocent from further suspicion. Specifically, the evidence may establish who authored and transmitted the posts containing the above-discussed threatening statements.

47. Specifically, the user's account activity, logs, stored electronic communications, and other data retained by Meta can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, messaging logs, photos, and videos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

48. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

49. Therefore, Meta's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Instagram. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

24

## REQUEST FOR NON-DISCLOSURE AND SEALING

50.     The existence and scope of this ongoing criminal investigation is not publicly

known.  As a result, premature public disclosure of this affidavit or the requested warrant could

alert potential criminal targets that they are under investigation, causing them to destroy

evidence, flee from prosecution, or otherwise seriously jeopardize the investigation.   Some of

the evidence in this investigation is stored electronically.  If alerted to the existence of the

warrant, the subjects under investigation could destroy that evidence, including information

saved to their personal computers.  Pursuant to 18 U.S.C. § 2705(b), I therefore respectfully

request that the Court direct the Provider not to notify any person of the existence of the warrant

for a period of one year from issuance, subject to extension upon application to the Court, if

necessary.

51.     For similar reasons, I respectfully request that this affidavit and all papers

submitted herewith be maintained under seal until the Court orders otherwise, except that the

Government be permitted without further order of this Court to provide copies of the warrant and

affidavit as need be to personnel assisting it in the investigation and prosecution of this matter,

and to disclose those materials as necessary to comply with discovery and disclosure obligations

in any prosecutions related to this matter.

## CONCLUSION

52.     Based on the forgoing, I request that the Court issue the proposed search warrant.

53.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not

required for the service or execution of this warrant.  The government will execute this warrant

by serving the warrant on Meta.  Because the warrant will be served on Meta, who will then

compile the requested records at a time convenient to it, reasonable cause exists to permit the

execution of the requested warrant at any time in the day or night.

Respectfully submitted,

███████████

Special Agent
Federal Bureau of Investigation

Sworn to me through the transmission of this Affidavit by reliable electronic means,
pursuant to Federal Rules of Criminal Procedure 41(d)(3) and 4.1,
on _____, 2025

_____
Honorable Sarah Netburn
United States Magistrate Judge
Southern District of New York

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN THE MATTER OF THE SEARCH
OF INFORMATION ASSOCIATED
WITH INSTAGRAM ACCOUNT
@CUAPARTHEIDDIVEST THAT IS
STORED AT PREMISES
CONTROLLED BY META
PLATFORMS, INC.

# SEARCH WARRANT AND NON-DISCLOSURE ORDER

TO:    Meta Platforms, Inc. ("Provider")

Federal Bureau of Investigation ("Investigative Agency")

**1. Warrant.** Upon an affidavit of ███████████████████ of the Federal

Bureau of Investigation, and pursuant to the provisions of the Stored Communications Act, 18

U.S.C. § 2703(b)(1)(A) and § 2703(c)(1)(A), and the relevant provisions of Federal Rule of

Criminal Procedure 41, the Court hereby finds there is probable cause to believe the Instagram

account @cuapartheiddivest, maintained at premises controlled by Meta Platforms Inc., contains

evidence, fruits, and instrumentalities of crime, all as specified in Attachment A hereto.

Accordingly, the Provider is hereby directed to provide to the Investigative Agency, within 14

days of the date of service of this Warrant and Order, the records specified in Section II of

Attachment A hereto, for subsequent review by law enforcement personnel as authorized in

Section III of Attachment A.  The Government is required to serve a copy of this Warrant and

Order on the Provider within 14 days of the date of issuance.  The Warrant and Order may be

served via electronic transmission or any other means through which the Provider is capable of

accepting service.

**2. Non-Disclosure Order.** Pursuant to 18 U.S.C. § 2705(b), the Court finds that there is reason to believe that notification of the existence of this warrant will result in destruction of or tampering with evidence and/or flight from prosecution, or otherwise will seriously jeopardize an ongoing investigation.  Accordingly, it is hereby ordered that the Provider shall not disclose the existence of this Warrant and Order to the listed subscriber or to any other person for a period of one year from the date of this Order, subject to extension upon application to the Court if necessary, except that Provider may disclose this Warrant and Order to an attorney for Provider for the purpose of receiving legal advice.

**3. Return.** Upon receipt of records from the provider, the Investigative Agency executing this warrant shall return this Warrant and an Inventory of any records seized pursuant thereto, to the Magistrate Judge then on criminal duty in the U.S. District Court for the Southern District of New York.

**4. Sealing.** It is further ordered that this Warrant and Order, and the Affidavit upon which it was issued, be filed under seal, except that the Government may without further order of this Court serve the Warrant and Order on the Provider; provide copies of the Affidavit or Warrant and Order as need be to personnel assisting the Government in the investigation and prosecution of this matter; and disclose these materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

_____          _____

Date Issued                              Time Issued

_____

UNITED STATES MAGISTRATE JUDGE

2

**Attachment A**

**I. Subject Account and Execution of Warrant**

This warrant is directed to Meta Platforms, Inc. (the "Provider"), headquartered at 1 Meta Way, Menlo Park, CA 94025, and applies to all content and other information within the Provider's possession, custody, or control associated with the Instagram account @cuapartheiddivest (active on, but not limited to, March 13, 2025) (the "Subject Account").

A law enforcement officer will serve this warrant by transmitting it via email or another appropriate manner to the Provider. The Provider is directed to produce to the law enforcement officer an electronic copy of the information specified in Section II below. Upon receipt of the production, law enforcement personnel will review the information for items falling within the categories specified in Section III below.

**II. Information to be Produced by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, and including any messages, records, files, logs, or other information that has been deleted but is still available to Meta, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for each account or identifier listed in Attachment A:

    A.    All business records and subscriber information, in any form kept, pertaining to the account, including:

        1.    Identity and contact information (past and current), including full name, e-mail addresses, physical address, date of birth, phone numbers, gender, hometown, occupation, websites, and other personal identifiers;

        2.    All Instagram usernames (past and current) and the date and time each username was active, all associated Instagram and Facebook accounts

(including those linked by machine cookie), and all records or other information about connections with Facebook, third-party websites, and mobile apps (whether active, expired, or removed);

3. Length of service (including start date), types of services utilized, purchases, and means and sources of payment (including any credit card or bank account number) and billing records;

4. Devices used to login to or access the account, including all device identifiers, attributes, user agent strings, and information about networks and connections, cookies, operating systems, and apps and web browsers;

5. All advertising information, including advertising IDs, ad activity, and ad topic preferences;

6. Internet Protocol ("IP") addresses used to create, login, and use the account, including associated dates, times, and port numbers, from January 1, 2024, to present**;**

7. Privacy and account settings, including change history; and

8. Communications between Meta and any person regarding the account, including contacts with support services and records of actions taken;

B. All content (whether created, uploaded, or shared by or with the account), records, and other information relating to videos (including live videos and videos on IGTV), images, stories and archived stories, past and current bios and profiles, posts and archived posts, captions, tags, nametags, comments, mentions, likes, follows, followed hashtags, shares, invitations, and all associated logs and metadata, from January 1, 2024, to present;

C. All content, records, and other information relating to communications sent from or received by the account from January 1, 2024, to present, including but not limited to:

1. The content of all communications sent from or received by the account, including direct and group messages, and all associated multimedia and metadata, including deleted and draft content if available;

2. All records and other information about direct, group, and disappearing messages sent from or received by the account, including dates and times, methods, sources and destinations (including usernames and account numbers), and status (such as delivered, opened, replayed, screenshot);

3. All records and other information about group conversations and video chats, including dates and times, durations, invitations, and participants (including usernames, account numbers, and date and time of entry and exit); and

2

4.     All associated logs and metadata;

D.     All content, records, and other information relating to all other interactions between the account and other Instagram users from January 1, 2024, to present, including but not limited to:

1.     Interactions by other Instagram users with the account or its content, including posts, comments, likes, tags, follows (including unfollows, approved and denied follow requests, and blocks and unblocks), shares, invitations, and mentions;

2.     All users the account has followed (including the close friends list), unfollowed, blocked, unblocked, muted, restricted, or denied a request to follow, and of users who have followed, unfollowed, blocked, unblocked, muted, restricted, or denied a request to follow the account;

3.     All contacts and related sync information; and

4.     All associated logs and metadata;

E.     All records of searches performed by the account from January 1, 2024, to present; and

F.     All location information, including location history, login activity, information geotags, and related metadata from January 1, 2024, to present.

Meta is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

III. **Information to be seized by the government**

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. § 875(c) including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

A.     Evidence indicating how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the account owner;

B.     Evidence indicating the account owner's state of mind as it relates to the crime under investigation;

C.     The identity of the person(s) who created or used the account, including records that help reveal the whereabouts of such person(s).

3

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

# EXHIBIT 2

XP3sWcua                          SEALED

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   In the Matter of a Search Warrant
    Application to the CUAD Instagram        25 Mag. 997
4   Account.
                                            Telephone Conference
5   ------------------------------x

6                                           New York, N.Y.
                                            March 28, 2025
7                                           11:00 a.m.

8   Before:

9

10                    HON. SARAH NETBURN,

                                            U.S. Magistrate Judge
11

                          APPEARANCES
12

    ALEC C. WARD
13  U.S. Department of Justice
    Criminal Section, Civil Rights Division
14

15  Also Present:          ███████████████
                           ███████████████████, FBI
16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  Hi.  This is Judge Netburn.
 2              Good morning.
 3              Somebody's phone is cracking.  I wonder if before we
 4    get started we can just figure out whose phone that is.
 5              MR. WARD:  It began when the first court line joined,
 6    your Honor.
 7              THE COURT:  I can see who it --
 8              (Indiscernible overlap)
 9              THE COURT:  I can see which phone number is making the
10    noise, and it's one that's listed as anonymous.  So we'll
11    figure out who that is and ask that person to hang up and call
12    back.
13              Could everybody mute their phones.
14              MECHANICAL VOICE:  *Is now exiting.*
15              THE COURT:  All right.  There's a ████ number; that
16    is not the problem.  There's a ████ number; that is not the
17    problem.  There is my deputy and my chambers on the phone.
18    That is not the problem.  So whoever is the other person, maybe
19    it's the agent --
20              Yes.  OK.
21              MECHANICAL VOICE:  *Is now exiting.*
22              THE COURT:  OK.  I think that was our agent, so
23    obviously we want to get ████ back.  Let's give ████ an
24    opportunity to call back in; hopefully ████ line will be clear.
25              MR. WARD:  Yes, your Honor.  I'm going to send ████ a
```

XP3sWcua                        SEALED

```
 1    message right now.
 2                THE COURT:  Great.
 3                (Indiscernible overlap)
 4                THE COURT:  Thank you.
 5                MECHANICAL VOICE:  Is now joining.
 6                THE COURT:  I think ███ may have just joined us.
 7                ██████████ did you just join?
 8                ██████████ Hi, your Honor.  Yes.  This is ██████
 9    ██████
10                THE COURT:  Right.
11                OK.  That seems to be slightly better.  And I'll just
12    ask if everybody can mute their line unless they are speaking.
13                Again, if everyone could just mute their line --
14    ███████████, that's your phone.
15                ██████████ I apologize, your Honor.  (inaudible)
16                THE COURT:  OK.  Thank you.
17                MECHANICAL VOICE:  Is now exiting.
18                THE COURT:  OK.  Hopefully ███ can call back in.
19                And then if not, Mr. Ward, maybe you could just patch
20    ████ in.
21                MR. WARD:  Yes, I can.  I can attempt that (inaudible)
22    if ████ second line doesn't work.
23                THE COURT:  OK.  Thank you.  We'll just stand by for
24    one more second.
25                All right.  I think this is not going to work with ██████
```

1   ████  on this particular phone line.  Maybe, Mr. Ward, you can

2   call ██  and connect ████.

3              MR. WARD:  I'll try that now.

4              THE COURT:  OK.  Thank you.

5              Agent ████, you should just hang up.

6              Mr. Ward, any luck?

7              MECHANICAL VOICE:  *Is now exiting*.

8              *Is now joining.*

9              ███████:  Hi, your Honor.  This is ███████,

10  trying from a different phone.

11             THE COURT:  OK.  Terrific.

12             All right.  This is the matter of a search warrant

13  application to the CUAD Instagram account.  I have assigned it

14  a docket number.  That number is 25 Mag. 997.

15             Can I just ask for counsel to state their appearances,

16  please.

17             MR. WARD:  Good morning, your Honor.  Alec Ward, for

18  the government.  On the line with me is (inaudible) Fitzgerald,

19  who is the principal deputy chief of the civil rights division,

20  criminal section.  And we also, I believe, have ████████

21  from the FBI.

22             THE COURT:  Thank you.

23             OK.  This matter is on for the government's renewed

24  application for a warrant to search the contents and records of

25  an Instagram account as part of an investigation as to whether

XP3sWcua                          SEALED

```
 1    the user or users of the account have violated 18 U.S.C.

 2    Section 875(c), which makes it a crime to transmit in

 3    interstate commerce a communication that threatens to injure a

 4    person.

 5             In connection with this application, I have reviewed

 6    the affidavit of FBI Special Agent ████████; the transcript

 7    of the March 25, 2025, proceeding before district Judge John

 8    Koeltl.

 9             I'll just note for the record that the transcript

10    cover page states that it was held on January 25.  I want to

11    confirm with the government that that is a typo and that the

12    conference was actually held on Tuesday, March 25.

13             Is that correct?

14             MR. WARD:  Yes, your Honor.

15             THE COURT:  OK.

16             In addition, I've reviewed a March 27, 2025, email

17    from AUSA Alec Ward, which provided me with the agent affidavit

18    and the March 25 transcript and four case citations with brief

19    discussions.

20             Mr. Ward, is there anything else that you intended for

21    me to review for today's proceeding?

22             MR. WARD:  No, your Honor.

23             There was a brief submitted to Judge Koeltl.  It was

24    after that hearing, you may have seen in the transcript a

25    reference to that; that was submitted under the government's
```

XP3sWCua                    SEALED

1    misapprehension that this matter was ripe for district court

2    review and so largely focused on the review standard.  We're

3    not asking that the Court consider that brief, and so we

4    haven't submitted it.

5            THE COURT:  OK.

6            I'll note, first, that you and I spoke off the record

7    before this proceeding this morning to discuss procedural

8    matters, and I requested that you provide me with a letter

9    brief that informs the government's legal and factual position

10   in support of this warrant application.  You declined to file a

11   letter because, you said, it would be too burdensome to get it

12   cleared by your supervisors and instead indicated that you

13   would email me case citations, which you have done, and that

14   you would otherwise rely on oral advocacy.

15           As you just noted, in reviewing the transcript, Judge

16   Koeltl made repeated reference to a 20-page memo that was

17   submitted to him, and he believed I should consider it.  And at

18   the conclusion of that proceeding, you told Judge Koeltl that

19   you would provide that memorandum to me.  But as you just

20   stated, that memo has not been provided to me so I don't have

21   the benefit of that analysis.

22           As I indicated, I've asked our clerk of court to open

23   a sealed case under docket number 25 Mag. 997, and I've

24   directed that the prior warrant applications from March 15 and

25   March 16 be docketed and denied and that the transcript from

1    Judge Koeltl's proceeding also be docketed.

2              At the conclusion of this proceeding, I'll direct that

3    the renewed application before me, which I'm calling the second

4    amended warrant application, also be docketed along with the

5    transcript from this proceeding.  But I will ask that Mr. Ward

6    submit to my chambers a copy of that 20-page memorandum that

7    was previously submitted to Judge Koeltl so that it can be made

8    part of the record.  OK?

9              MR. WARD:  Yes, your Honor.  We will do that.

10              THE COURT:  OK.

11              All right.  Before we address the merits of the

12    application, I think it's important to cover some foundational

13    issues.  The application for a search warrant is brought

14    pursuant to Federal Rule of Criminal Procedure 41.  Rule 41(b)

15    provides a magistrate judge with authority to issue a warrant.

16    If a magistrate judge is not reasonably available, an

17    application can be brought to a judge of a state court of

18    record in the district.  Given how the Southern District of New

19    York assigns matters, for all practical purposes, the

20    magistrate judge will always be reasonably available.

21              Rule 41(d) provides that after receiving an affidavit

22    or other information, a magistrate judge must issue the warrant

23    if there is probable cause.

24              Rule 41 does not require that the Court first place a

25    federal law enforcement officer under oath before considering

XP3sWcua                        SEALED

1    the affidavit.

2              As a matter of practice, in this district, the law

3    enforcement officer is not placed under oath unless and until

4    the magistrate judge is satisfied that the affidavit

5    establishes probable cause and that the warrant should issue.

6              Only once the Court is satisfied that the affidavit

7    establishes probable cause does the Court place the officer

8    under oath and then sign the warrant.

9              Rule 41 does not require or even provide any mechanism

10   for a magistrate judge to issue a reasoned decision if the

11   judge determines that there is no probable cause to support the

12   issuance of a warrant.  Although it happens exceedingly

13   infrequently in our district, when a magistrate judge denies a

14   warrant application, the judge simply advises the presenting

15   AUSA that the Court has not found probable cause and that the

16   warrant application is denied.  The clerk's office notes that

17   the application has been denied; there's no on-the-record

18   ruling.  That is what happened in this case, which is

19   consistent with the manner and form practiced in this district

20   for at least more than a decade.

21             Rule 41 also does not provide any mechanism to appeal

22   from the denial of a warrant application.  In our district,

23   where a magistrate judge is not satisfied that the agent

24   affidavit establishes probable cause, the Court may permit the

25   agent to file an amended affidavit.  This is what happened in

XP3sWcua                        SEALED

1    this matter, where the AUSA filed the original warrant

2    application on Saturday, March 15, which the Court denied, and

3    then filed an amended warrant application on Sunday, March 16,

4    which the Court also denied.  So I'm now considering a second

5    amended warrant application, which was submitted to me

6    yesterday, Thursday, March 27.

7           Finally, during your proceeding with Judge Koeltl, you

8    indicated that if I denied the second amended warrant

9    application, you would seek an appeal under 28 U.S. Code

10   Section 636(b).

11          Section 636 considers the jurisdiction and authority

12   of a magistrate judge.  Section 636(b) refers to matters that

13   are referred to a magistrate judge by a district judge and sets

14   forth the standards of review by a district judge of a

15   magistrate judge's decision, depending on whether that decision

16   was case-dispositive or not.

17          This matter has not been referred to me by a district

18   judge, nor could it be, because Rule 41 expressly and

19   exclusively vests the authority to issue a warrant in a

20   magistrate judge or a state court judge.  So to the extent the

21   outcome of today's proceeding is adverse to the government and

22   you intend to appeal that decision, you must provide the Court

23   with some authority for such appeal, which I do not believe is

24   Section 636(b).

25          Moreover, because Rule 41 expressly vests authority to

XP3sWcua                    SEALED

1    issue a warrant with a magistrate judge, to the extent your

2    appeal is more properly viewed as an application for a warrant

3    to the district judge, you're directed to provide authority

4    from this circuit for a district judge to issue a warrant in

5    the first instance.

6           Finally, I direct that to the extent the government

7    submits any subsequent warrant applications for this Instagram

8    account to a different judge, whether that's a district judge,

9    a magistrate judge or a state court judge, it must provide a

10   copy of today's transcript to that judge.

11          Mr. Ward, do you wish to be heard with respect to any

12   of these procedural matters that I've just discussed?

13          MR. WARD:  Regarding the -- regarding the ripeness

14   issue of any review, to the extent it's available, I think

15   likely, understanding your Honor's representations about this

16   Court's regular practice, I would simply say there was no

17   disrespect or ill will intended by the government towards your

18   Honor's ruling.  It may simply have been a matter of our

19   unfamiliarity as an office that hasn't routinely practiced in

20   this district for the last 25 years, to my knowledge, with the

21   Court's regular practice.  And I'll just note there was no ill

22   will and disrespect intended towards this Court in the

23   government's assessment of what avenues were available to it at

24   the time.

25          We had reviewed with the Southern District of New York

1    procedural posture of this matter and weren't confident that

2    sufficient jurisdiction existed for review by the district

3    court based on the ruling that had been issued by your Honor.

4    We accept your representations entirely that that's the normal

5    practice in the district.  We apologize for any deviation.

6              THE COURT:  No disrespect whatsoever?

7              People are free to appeal where there is an avenue of

8    appeal available.  It was clear to me from the proceeding

9    before Judge Koeltl that he was particularly interested in

10   following all proper protocol and procedures, and in reviewing

11   this matter back to me, I thought it was worth making clear

12   that I am unaware of any mechanism that both requires any sort

13   of reasoned decision by a magistrate judge who determines that

14   there's not probable cause to justify the issuance of a warrant

15   or that there is any avenue of appeal from such denial.  And

16   certainly to the extent there is some avenue of appeal, it is

17   not Section 636(b), because this matter was never referred to

18   this Court by the district judge.  And so that statute would be

19   inapplicable.

20             (Indiscernible overlap)

21             MR. WARD:  Nothing further.

22             THE COURT:  Go ahead.

23             Oh, OK.

24             Now that we've covered some of the procedural issues

25   raised in the application, we can turn to the merits.  Although

XP3sWcua                          SEALED

```
 1    I've indicated there is no obligation that the Court first
 2    swear in the agent before considering the issue, because this
 3    issue appeared to be of concern to Judge Koeltl, I'll do so
 4    now.
 5                    ████████████  are you still with us?
 6                    ███████████   Yes, your Honor, I am.
 7            THE COURT:  OK.  I have an affidavit.  It seeks to
 8    search an Instagram account.  Can you give me the name of the
 9    Instagram account at issue here?
10                    ██████████    Yes, your Honor.  It's @CUAPARPHDIDDIDEST.
11            THE COURT:  Thank you.
12            All right.  I have your agent affidavit.  It was
13    submitted to me yesterday, March 27.
14            Do you have the same thing?
15                    ██████████    Yes, your Honor, I do.
16            THE COURT:  OK.  And I have your signature line on
17    page 26.  Is that what you have?
18                    ██████████    I have page 25, your Honor.
19            THE COURT:  OK.  And are you looking at a PDF page or
20    a page numbering?
21                    ██████████    I'm looking at a page numbering.
22            THE COURT:  Mr. Ward, please make sure that your agent
23    and I have the same document.
24            MR. WARD:  Yes, Judge.
25            I believe, ██████████, you may be looking -- what we're
```

XP3sWcua                    SEALED

1    calling, I suppose, the first amended application and the

2    second amended application are identical except for the

3    addition of two additional images.  ██████████, I believe you

4    may be looking at the first amended application.  I will

5    re-forward you the second amended application right now.  Just

6    noting that the only difference, I think, is in -- the

7    difference in pagination accounts for the space taken up by an

8    additional image.

9                ██████████:  OK.

10           THE COURT:  And I'll just confirm that the amended

11   agent affidavit that was submitted to me on March 16 does have

12   your signature line on page 25.  We're now considering the

13   second amended warrant application, submitted on March 27,

14   which has your signature line on page 26.  And as Mr. Ward

15   indicated, I believe there is just one additional post that is

16   added to this application, but I want to make sure that you are

17   swearing to the application that's being presented to me.

18               ██████████:  Yes.  Thank you, your Honor.  I'll let you

19   know as soon as I receive it.

20           Alec, did you send it already?

21           MR. WARD:  Yes.

22               ██████████:  OK.  I'm standing by to receive it.

23           OK.  Alec, I received your email.  Can you tell me

24   what paragraph the renewed image of that is?

25               MR. WARD:  The additional images, ██████████, are the

1  ones we reviewed in our call-in preparation for this hearing.

2  They're on pages -- the second image on page 13 of this

3  document and the top of page 17 of this document.

4  ███████████: Yes, your Honor.  I am familiar with these

5  posts and discussed these with Alec Ward.

6          THE COURT: OK.  Thank you.

7          Kindly raise your right hand, Agent ███████.

8          ███████████  Yes, your Honor.  It's raised.

9          THE COURT: Do you solemnly swear that the information

10  contained in this affidavit is true and complete, so help you

11  God?

12          ███████████: Yes, your Honor, I do.

13          THE COURT: OK.  And do you authorize me to sign this

14  electronically on your behalf?

15          ███████████  Yes, your Honor, I do.

16          THE COURT: OK.  I will go ahead and include your

17  signature and sign the agent affidavit for the second amended

18  search warrant application, and this will become part of the

19  record.

20          All right.  I understand, Mr. Ward, from this

21  application that the threat at issue in this case is the

22  statement, "Katrina Armstrong, you will not be allowed peace"

23  Is that correct?

24          MR. WARD: I would say alongside the transmission of

25  the image of the Columbia University president's residence

1    spattered with a substance simulating blood and marked with the

2    inverted triangle symbol, collectively, that transmission

3    constitutes the utterance under investigation.

4            THE COURT:  Understood.  Great.  And context does

5    matter.

6            In *United States v. Garnes*, 102 F.4th 628, which is a

7    Second Circuit decision from 2024, the Court of Appeals

8    explained that, "the literal threatening words may take on

9    greater or lesser seriousness from the additional statements

10   that surround them."

11           I'm also relying on *United States v. Segui*, 2009 WL

12   8487291, a citation from the Eastern District of New York from

13   December 2, 2019, where the court found that events in the

14   "days leading up to and the day after the threat would

15   constitute direct evidence as to whether an ordinary recipient

16   would interpret the communication as a threat."

17           I understand that the statement at issue here that you

18   attribute to CUAD is "Katrina Armstrong, you will not be

19   allowed peace," read in the context of the posting of this

20   image, which includes the inverted triangle, you believe that

21   that constitutes a threat.

22           Is that correct?

23           MR. WARD:  I think it may even be slightly more

24   nuanced than that under these circumstances, your Honor.

25           For the true-threats analysis, the purpose -- I don't

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

XP3sWCua                    SEALED

1    want the condition that the statement "you will not be allowed

2    peace" is sort of the absolute necessary condition.  I think

3    under the right circumstances -- obviously, the blood spatter

4    and the defacement of the residence are not transmissions in

5    interstate commerce; those were done face to face in Manhattan

6    by people with paint.  But I think under the right

7    circumstances it would be possible even for an uncaptioned

8    image of that threat if retransmitted with the intent to

9    intimidate, interfere or place a person in fear, with the

10   intent to communicate an expression of intent to commit

11   unlawful violence, the image itself could be sufficient to

12   present probable cause under these circumstances for the 875(c)

13   offense.  But I think here our contention is it's the image and

14   the -- the image and the caption taken together.

15         THE COURT:  The statute criminalizes communications,

16   right?  That's all that the statute criminalizes.  Agreed?

17         MR. WARD:  Yes.  Yes, your Honor.

18         THE COURT:  The case law, including very recent Second

19   Circuit case law, talks about how context matters.  And so I

20   understand that the application is that in the context of that

21   image, the statement "you will not be allowed peace" could be

22   interpreted as a true threat.  But the communication at issue

23   here is simply that statement, "you will not be allowed peace."

24   You're not arguing that the image is the communication.

25         MR. WARD:  I think we're arguing that the image

XP3sWcua                          SEALED

1    (inaudible) the communication, but under these circumstances,

2    the communication is the image alongside the statement.

3         Maybe an analogy to a more familiar fact pattern from

4    my office might help.  (inaudible) have routinely prosecuted --

5    I'm not saying that the conduct is exactly equivalent, but

6    symbolic -- in terms of symbolic threats -- my office has

7    routinely prosecuted, under various threat statutes, the

8    burning of crosses outside (inaudible) residences.  Were such

9    an event videotaped and posted online, (inaudible) would

10   (inaudible) but with, under certain (inaudible) suggesting an

11   intent to communicate that, to send that communication, that

12   video, to someone who would be threatened by it, I think we

13   would take the position under that case that the posting and

14   the transmission of the video itself could be a prosecutable

15   threat under 875(c) even in the absence of any words, text.

16        Likewise, in (inaudible) graffiti, which we've also

17   seen an uptick in lately, if (inaudible) graffiti is

18   photographed and transmitted to someone and without additional

19   verbal communication, written words, a commission, we would

20   take the position, could be communication of a threat to

21   injure.

22        THE COURT:  OK.  Understood.

23        I will consider the communication at issue to be the

24   statement "you will not be allowed peace" and the inverted

25   triangle that was depicted on the video.

1            In *Counterman v. Colorado*, which is a directly

2    relevant case from the Supreme Court, which I'll note you did

3    not cite to me in your email, it addressed what constitutes a

4    true threat:  "True threats are serious expressions conveying

5    that a speaker meant to commit an act of unlawful violence."

6            In that case as well as in *Elonis v. United States*,

7    which is a 2015 Supreme Court case, the Supreme Court clarified

8    that "the existence of a threat depends not on the mental state

9    of the author but on what the statement conveys to the person

10   on the other end."  In other words, the Supreme Court has

11   explained:  "Whether the speaker is aware of and intends to

12   convey the threatening aspect of the message is not part of

13   what makes a statement a threat.  Only when the statement is

14   understood as a true threat does it fall outside of the

15   protections of the First Amendment."

16           Mr. Ward, is there anything in the agent affidavit

17   that states how Ms. Armstrong has interpreted this statement?

18           MR. WARD:  There's not, your Honor.  And I don't -- I

19   don't dispute the relevancy of the reaction of the recipient.

20   And I think *Counterman* and *Elanis* and a long line of

21   true-threat cases establish that the reaction of the threat

22   recipient is highly relevant to the true-threats analysis.  I

23   think what -- I'm familiar with the *Counterman* case, and the

24   (inaudible) that the Supreme Court set in *Counterman* resolved

25   this predictive split about the *mens rea* out -- or the *mens rea*

XP3sWcua                        SEALED

1  requirement for (inaudible), including 875(c), and established

2  that the required minimum showing by the government is that the

3  communicator acted at least with reckless disregard as to

4  whether the communication would be taken as a threat.  That is,

5  I think, precisely the kind of evidence that there is probable

6  cause to believe this warrant, if issued, might develop.  We --

7  I will not represent to your Honor at this point that we

8  have -- we have evidence showing the communicator's state of

9  mind, but the warrant, if issued, I think, is highly likely to

10  provide relevant and admissible evidence on that point.

11         THE COURT:  OK.  But you have no information at this

12  stage in the investigation about how Ms. Armstrong interpreted

13  the statement, correct?

14         MR. WARD:  We have not had an opportunity to put that

15  question directly to Ms. Armstrong at this point.

16         THE COURT:  Have you spoken to her about this

17  application and about your threat concerns?

18         MR. WARD:  My understanding -- and this is

19  secondhand -- is that the FBI, upon learning of this post,

20  communicated with the president's office at Columbia, conveying

21  its belief that the threat should be taken seriously from a

22  security standpoint.  I do not know whether Ms. Armstrong

23  expressed feelings on that point, but I do know -- I've been

24  told by people who were involved in those conversations that

25  the FBI alerted the Columbia president's office that it

XP3sWcua                    SEALED

1   considered this as a threat.

2          THE COURT:  OK.  Thank you.

3          All right.  I don't need to go over the legal research

4   that I've done on my end to evaluate and consider these

5   applications.  I've certainly read the four cases that you

6   submitted to me.  I'll just state that I think some of your

7   representations were not fully, did not clearly represent what

8   the case law is, including your representation that the case

9   *Malik* stands for the proposition that the test is an objective

10  one, just like you included in your email to me.

11         As you've just indicated, the Supreme Court over the

12  last ten years has made clear that there's both an objective

13  and subjective element to the statute.  And there have been a

14  number of cases out of the Second Circuit making clear exactly

15  what sort of speech constitutes a true threat.  I cited to you

16  the *Garnes* case, which is just from last year, which makes

17  clear that words that may reflect heated rhetoric, in the

18  context in which they are made would not reasonably engender

19  fear, do not constitute a true threat.

20         I've reviewed the agent affidavit alongside of these

21  cases.  I understand the argument that's being presented and

22  the view that that statement of "there will be no peace"

23  alongside the symbol that is used, as the agent represents, by

24  Hamas as part of its propaganda, including to designate targets

25  for attack, but there's no evidence here that that symbol is

XP3sWcua                    SEALED

1    being used here in the United States to designate an act of

2    violence.

3            When I spoke with the AUSA in between the first and

4    the second applications, I asked that specific question,

5    whether there was any evidence indicating that that inverted

6    triangle was being used here in the United States specifically

7    as a call to violence or whether there's been any examples of

8    that triangle being identified and a subsequent act of violence

9    following.  And there hasn't been any presentation presented to

10   me demonstrating that.  In fact, the presentation seems that it

11   has been co-opted as part of the protest movement here, but as

12   to the specific issue of a threat of violence, the government

13   hasn't met its burden to establish that that symbol, in the

14   context here and in the context of the statement that the

15   president of Columbia University will not have peace, is a true

16   threat, as the law identifies.  And so I stand by my initial

17   position.  I do not believe the government has established

18   probable cause that the user of the Instagram account has

19   violated 18 U.S.C. Section 875(c), because it hasn't

20   established that a true threat was made.

21           That is my final decision.  As I indicated, to the

22   extent you believe an appeal is warranted, you must set forth a

23   legal basis for doing so.  Any subsequent application for a

24   warrant to search this Instagram account must include a copy of

25   this transcript for that court's consideration.

1          I will grant the government's request to seal this

2     transcript and the docket for 90 days in light of the potential

3     threat in continuing the investigation on the matter.

4     Obviously, to the extent you are submitting this transcript to

5     another court, as I've directed, you don't need to make an

6     application to unseal it for that purpose.

7          Any further applications, Mr. Ward?

8          MR. WARD:  Understanding your Honor's ruling, I'd like

9     to make a brief record on the government's position on a

10    procedural matter relevant to the true-threats analysis here,

11    with leave of Court, just for my record, since we are making a

12    transcript.

13         THE COURT:  OK.

14         MR. WARD:  The government submits that it's premature

15    for the Court to engage in a true-threats analysis at this

16    stage in the proceeding.  The test for whether a statement or a

17    writing constitutes a true threat is, it's nuanced, it's

18    contextual, highly fact-bound.  A wide range of circumstances

19    may bear on whether a given utterance or transmission satisfies

20    that legal standard.  When the government seeks a warrant to

21    investigate whether sufficient evidence exists to establish

22    that a statement that can rationally be perceived as a threat

23    is prosecutable or protected, it's our position that a court

24    reviewing a warrant in that posture need not, and indeed may

25    not, undertake to perform the highly fact-bound true-threats

1  analysis, and binding Second Circuit precedent reserves that

2  question for trial jury.

3        The government's position is that the First Amendment

4  protection for political hyperbole, abstract -- (inaudible)

5        It's the government's position that where a statement

6  can rationally be taken as threatening unlawful harm to a

7  particular person, the First Amendment's protection for

8  political hyperbole, abstract advocacy of violence -- here,

9  satire and sarcasm -- supply a constitutional defense available

10 at trial, not a legal immunity from investigation or

11 prosecution.

12       When the court, as here, reviews an application for a

13 search warrant to investigate a possible threat (inaudible) one

14 to decide whether the sworn representations in the application

15 establish probable cause to believe that a crime has been

16 committed, under the totality of the circumstances, and using

17 nonformalized fair probability assessments from probable cause

18 case law, the government submits that the application before

19 your Honor easily clears that low threshold and should be

20 granted.

21       THE COURT:  Thank you.  I appreciate your statements.

22       I obviously reviewed the cases that you submitted, and

23 those cases discuss the role of the judge and the jury at

24 trial.  Obviously, that's a different question than what's

25 presented before me here.  My analysis is to determine whether

XP3sWcua                    SEALED

1    or not there is probable cause to believe that a crime has been

2    committed.  For the reasons that I've stated, I don't think the

3    government has met its burden here.

4            I appreciate your record.

5            All right.

6            MR. WARD:  Understood.

7            THE COURT:  Anything further, Mr. Ward?

8            MR. WARD:  Not at this time from the government, your

9    Honor.

10           THE COURT:  OK.

11           All right.  As I indicated, this transcript will be

12   filed under seal.  I'll direct that the government order a copy

13   of the transcript and submit it to my chambers so I can make

14   sure that it is docketed on the case matter that has been

15   opened for this case.

16           Again, to the extent you believe that there is an

17   opportunity to file an appeal, such appeal should include a

18   copy of this transcript so that that judge understands what the

19   Court's ruling is.

20           All right.  Thank you, everybody.

21           We're adjourned.

22           (Adjourned)

23

24

25

# EXHIBIT 3

| From: | Ward, Alec (CRT) |
|---|---|
| To: | Sarah_Netburn ███████████    Netburn_NYSDChambers███████████ |
| Bcc: | Fitzgerald, Paige (CRT) |
| Subject: | RE: Previous SCA warrant |
| Date: | Thursday, March 27, 2025 10:02:00 AM |
| Attachments: | Transcript - March 25 Hearing before Judge Koeltl.pdf |
| | 20205.3.27 - Revised CUAD Instagram Search Warrant_to SN Chambers.pdf |

Dear Judge Netburn and Chambers,

Per my telephone conversation with the Court yesterday evening, the government will appear telephonically at 11:00 AM EST on Friday, September 28, to present the attached Amended Application for a Search Warrant.

Please find attached the following:

1. A transcript of the sealed hearing before District Judge Koeltl that occurred on March 25;

2. The government's application for a search warrant, identical to that presented to this Court on March 16, 2024, except for the addition of two further screenshots depicting posts described in the affidavit.

At the hearing, the government intends to argue primarily that, where a warrant application establishes probable cause of a statement that could rationally be taken as threatening bodily harm, binding Second Circuit precedent establishes that the question of whether the statement constitutes protected First Amendment speech or an unprotected "true threat" is properly an issue for a jury, not the court reviewing the warrant, to decide. In so arguing, the government will rely principally upon the following cases:

- *United States v. Hunt*, 82 F.4th 129, 135–37 (2d Cir. 2023), *cert. denied,* 144 S. Ct. 1396, 218 L. Ed. 2d 681 (2024) (holding that jury determinations whether a statement constitutes a true threat are not subject to review under the "constitutional fact doctrine" and noting that "the true threat standard spelled out in our cases constrains the role of judges and instead relies upon the sensibilities of ordinary people. In sum, the court is no better equipped than the jury—and is arguably less equipped—to answer whether a statement is a true threat.")

- *United States v. Malik*, 16 F.3d 45, 49 (2d Cir. 1994) ("Whether a given writing constitutes a threat is an issue of fact for the trial jury. *United States v. Lincoln*, 589 F.2d 379, 381–82 (8th Cir.1979). An absence of explicitly threatening language does not preclude the finding of a threat under section 876, *see United States v. Prochaska*, 222 F.2d 1 (7th Cir.), *cert. denied,* 350 U.S. 836, 76 S.Ct. 73, 100 L.Ed. 746 (1955), and, of course, a conditional threat—*e.g.,* "your money or your life"—is nonetheless a threat, *United States v. Schneider*, 910 F.2d 1569, 1570 (7th Cir.1990). The test is an objective one—namely, whether "an ordinary, reasonable recipient who is familiar with

the context of the letter would interpret it as a threat of injury." *United States v. Maisonet,* 484 F.2d 1356, 1358 (4th Cir.1973), *cert. denied,* 415 U.S. 933, 94 S.Ct. 1447, 39 L.Ed.2d 491 (1974).")

- <u>*United States v. Amor*</u>, 24 F.3d 432, 436 (2d Cir. 1994) ("In a prosecution for [threatening a witness in violation of 18 U.S.C. § 1513], "whether the statements made and acts engaged in amount to threatening conduct is a question of fact for the jury." *United States v. Paradis,* 802 F.2d 553, 563 (1st Cir.1986); *see also United States v. Carrier,* 672 F.2d 300, 306 (2d Cir.) (in prosecution under 18 U.S.C. § 871 for threat against President of the United States, "whether words used are a true threat is generally best left to the triers of fact"), *cert. denied,* 457 U.S. 1139, 102 S.Ct. 2972, 73 L.Ed.2d 1359 (1982)

- <u>*United States v. Carrier*</u>, 672 F.2d 300, 306 (2d Cir. 1982) ("whether words used are a true threat is generally best left to the triers of fact. Surrounding factual circumstances may not easily be required to be recounted in all indictments. The initial burden is on the government to prove a 'true' threat. Only where the factual proof is insufficient as a matter of law should the indictment be dismissed. In Watts the Supreme Court held that defendant's words "when taken in context, and regarding the expressly conditional nature of the statement and the reaction of the listeners" should not have gone to the jury. Most cases are within a broad expanse of varying fact patterns which may not be resolved as a matter of law, but should be left to a jury. Some of the factors a jury must weigh in considering the context in which the words were spoken include the kind of statement made, i.e., merely political hyperbole or specifically directed at the President; the place where it was made; to whom it was made; how it was spoken, i.e., plainly and unconditionally or in jest." (*citing United States v. Kelner*, 534 F.2d 1020 (2d Cir. 1976))).

Very respectfully,

Alec C. Ward
Trial Attorney | Criminal Section | Civil Rights Division
U.S. Department of Justice
Tel. ████████████████████

---

**From:** Sarah Netburn ████████████████████ >
**Sent:** Wednesday, March 26, 2025 4:44 PM
**To:** Ward, Alec (CRT) ████████████████
**Cc:** Phillips, Lauren (USANYS) ████████████████
**Subject:** [EXTERNAL] RE: Previous SCA warrant

Mr. Ward,

# EXHIBIT 4

XP3PKINSC                          SEALED

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   In the matter of the application

4   for Instagram Account

5   CUAPARTHEIDDIVEST

6                                          Telephone Conference

7   ------------------------------x

8                                          New York, N.Y.
                                           January 25, 2025
                                           2:00 p.m.
9

10  Before:

11                  HON. JOHN G. KOELTL,

12                                          District Judge

13                      APPEARANCES

14  MATTHEW D. PODOLSKY
         Acting United States Attorney for the
15       Southern District of New York
    LAUREN PHILLIPS
16       ALEC WARD
         PAIGE FITZGERALD
17       Assistant United States Attorneys

18  Also Present:

19  ████████████████

20

21

22

23

24

25

1          (Case called)

2          THE COURT:  Can I get the appearances on behalf of the

3  government, please?

4          MR. WARD:  Good afternoon, your Honor.  Alec Ward, for

5  the government.  Joining me on the line are Principal Deputy

6  Chief for the Civil Rights Division Criminal Section, Paige

7  Fitzgerald, and Assistant U.S. Attorney Lauren Phillips from

8  the Southern District of New York.

9          THE COURT:  Okay.

10          ██████████:  Good afternoon, your Honor.  This is ██████

11  ██████ with the FBI.

12          THE COURT:  Ah.  Thank you.

13          Is the reporter on the line?

14          (Pause)

15          THE COURT:  Okay.  Thank you.

16          At the outset, we had a conference yesterday.  I

17  failed to note that the transcript of the conference should be

18  sealed because it relates to a warrant application.

19          Similarly, the transcript of today's proceeding should

20  also be sealed because it relates to a warrant.

21          So I have reviewed the materials that were submitted

22  to me yesterday or, rather, on last Thursday evening, and which

23  were the subject of yesterday's conference.  And I have

24  received the materials today.

25          The cover email indicates that there were some changes

XP3PKINSC                    SEALED

 1   in the materials.

 2              So, could the government explain to me what the

 3   changes in the materials are?

 4              MR. WARD:  Yes, your Honor.  Alec Ward.

 5              Pursuant to the questions posed by the Court

 6   yesterday, the change to the substance of the warrant portion

 7   of our submission is confined to adding a paragraph to the

 8   warrant and nondisclosure order, specifying that at the time

 9   records are provided to the government by Meta, the warrant

10   recipient, those records should be returned to the criminal

11   duty magistrate on duty at the time of receipt.

12              Except for that, the submission you have before you —

13   and of course changing the Court's signatories, signature

14   block — is identical to that attached as Exhibit 2 to our

15   letter of March 20th.

16              We have made some discoveries in response to the

17   Court's inquiries yesterday about the posture of this matter

18   that change the nature of what we need to request at this

19   point, and I'm happy to address that as well.

20              We're also prepared to address the address of the

21   requested nondisclosure order.

22              I can do that in whatever order the Court prefers.

23              THE COURT:  Go ahead.  So, what's the change in terms

24   of procedural posture?

25              MR. WARD:  We, in our letter of March 20th, had been

XP3PKINSC                        SEALED

1   under the belief that a formal oral order had been issued to

2   the representative from the Southern District of New York, who

3   was kind enough to deliver our original application to the

4   magistrate for us.

5           In attempting to locate a sworn record in response to

6   your Honor's inquiries of yesterday, we discovered that the

7   affiant was never placed under oath, and, accordingly, no

8   formal oral order was issued.  What appears to have happened is

9   that the application was forwarded to the duty magistrate for

10  review.  The duty magistrate came back to our hosts at the U.S.

11  Attorney's Office with some questions.  Those were addressed in

12  the supplemental application submission, and then the duty

13  magistrate, Magistrate Netburn phoned, again, the host AUSA,

14  who was at that point just acting as an intermediary, and said

15  that, based on her review of the warrant -- she advised, on an

16  informal basis, that she was not going to sign it.

17          No hearing was held where our affiant, ████████, was

18  placed under oath.  There is, therefore, no formal oral order

19  denying the warrant for this Court to review.  And,

20  accordingly, we think, I think, need to withdraw our request

21  for review under the Federal Magistrates Act, under Section

22  636, because there is no order in place for this Court to

23  review.

24          Procedurally, today, I think our thought would be, we

25  have everyone here, including our affiant, and we are prepared

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    to present the warrant again to this Court for a probable-cause

2    ruling of first impression.  On the other hand, we want to be

3    deferential and respectful to this Court's ordinary protocols,

4    and we understand that the normal practice in this court would

5    be to seek a formal order from a magistrate.

6             So, although we're prepared to proceed with

7    presentation of the warrant to your Honor today, we defer to

8    your Honor's sound discretion as to procedurally how this ought

9    to be handled.

10            That said, we think, based on our conversations with

11    the Southern District, we would follow their practice of

12    returning the warrant application to the magistrate who has

13    already reviewed it, which would be Judge Netburn.  I think we

14    know what her order would be, and we would likely end up back

15    in front of your Honor in fairly short order on the same

16    posture.  As a prudential matter of not wasting judicial

17    resources and time, we're more than prepared to proceed with

18    submission of the warrant today.

19            THE COURT:  All right.  Well, that's very forthcoming.

20            Plainly, it is an unusual situation, and we should

21    follow the normal procedure.  So, you tell me that there has

22    been no formal decision by the magistrate judge rejecting the

23    warrant.  I assume, also, that you've never presented to the

24    magistrate judge the memo that you had presented to me, the

25    20-page memo, or so, explaining why you concluded that, in

XP3PKINSC                    SEALED

1    fact, there was probable cause, and that there was no justified

2    First Amendment objection to issuing the warrant.

3            Is that right?

4            MR. WARD:  That is correct, your Honor.  The March 15

5    and 16 locations that were attached respectively as Exhibits 2

6    and 1 to our letter of March 20th to your Honor have been

7    presented to the magistrate judge, but the cover letter

8    addressed to your Honor requesting review and the associated

9    legal arguments therein have not been presented to the

10   magistrate.

11           THE COURT:  It would seem to me that the better

12   practice would be to present all of those materials to the

13   magistrate judge, including your memo, so that the magistrate

14   judge would have the opportunity, in the first instance, to

15   make the decision.  And if the magistrate judge decides that

16   you failed to persuade her, then you could take the normal

17   appeal to the district court judge.

18           And, in fairness, I would think that this would go

19   again to Magistrate Judge Netburn, and even though I'm not

20   sitting in Part I anymore, again, in fairness, since I've gone

21   over these papers, any appeal would be taken to me as a

22   continuation of what I did or what I've been asked to do.  So,

23   I appreciate the fact that you've been forthcoming.

24           I have one other question for you, which was the issue

25   of the one year or the 90 days.

1          MR. WARD:  Yes, your Honor.

2          THE COURT:  I've reviewed the memos, the Department of

3   Justice memos, and the basis for the one year is 2705(b), which

4   doesn't specifically include a time limit.  So, the Department

5   of Justice says:  Okay, one year.  2705(b) refers to

6   2703(b)(1).  2705(a) does include a 90-day limit, and the

7   Department of Justice memo says, of course, an application

8   under 2705(b) has a limit of one year as a matter of prudence,

9   from the Department of Justice.

10         How do you distinguish 2705(a)?  What situations arise

11  under 2705(a) with the 90-day limit rather than 2705(b), which

12  doesn't include a time limit?

13         MR. WARD:  I had to research this myself last night,

14  your Honor, and if you'll indulge me in a little bit of

15  explanation, I've consulted with some of my colleagues who are

16  more knowledgeable, and I think I've wrapped my head around

17  this.

18         The Stored Communications Act, in 2703, provides for

19  three different forms of legal process whereby the government

20  can request or can demand information from a regulated

21  provider — subpoenas, ordinary Federal Rules of procedure

22  search warrant, and an intermediate form of process, which the

23  statute refers to as the court order; the Department calls them

24  2303(d) orders because that's the section that provides for

25  them, if there's an intermediate form of process whereby the

XP3PKINSC                        SEALED

1    standard is lower than probable cause but a court order is

2    still required and it allows the Department to demand more

3    information than we could with a subpoena but less than with a

4    search warrant.

5          Neither of those forms of process are at issue here.

6    We have opted to pursue the search warrant avenue, but the

7    statute permits the government to demand what the statute calls

8    content records with either a subpoena or a 2703(d) order.  The

9    department does not, as a matter of prudence and internal

10   policy, do that, but if it did, the statute requires that the

11   government itself, as opposed to the provider, give notice to

12   the person whose information is being sought.  That notice,

13   which comes from the government, as opposed to the computing

14   service provider, may be delayed under 2705(a)(1)(A) for what

15   the statute calls a court order.  That's the 2703(d)

16   intermediate order and (a)(1)(b), where it's a subpoena.

17         2703(b) specifies that where the government opts to

18   pursue the judicial search warrant procedure, the government

19   need not provide any notice to the person whose information is

20   sought from the regulated provider.  However, 2703 on its face

21   does not prohibit the provider from giving its customer notice

22   that it is providing information in connection with a search

23   warrant.  2705(b) provides for what's called a preclusion order

24   whereby the government can seek a court order precluding the

25   provider from notifying its own customer of the warrant, and

 1  that's what's sought here.  And that does not have the 90-day

 2  limitation on the period of delay.

 3           THE COURT:  Okay.  So, this is the direction to Meta

 4  not to notify for one year.

 5           Is there any provision under the warrant that requires

 6  the government to notify the ultimate owner of the records

 7  possessed by Meta?

 8           MR. WARD:  No, your Honor.  And I would point the

 9  Court to Section 2703(b)(1)(A), which states specifically that,

10  without required notice to the subscriber or customer, if the

11  governmental entity obtained the warrant issued using the

12  procedures described in the Federal Rules of Criminal

13  Procedure --

14           THE COURT:  Okay.  Hold on one second.

15           Okay.  Thank you.

16           Who is the Southern District assistant on the call?

17           MR. WARD:  AUSA Lauren Phillips.

18           THE COURT:  Okay.

19           So, Ms. Phillips, our regular procedure is that the

20  magistrate judge should be afforded, in the first instance, the

21  opportunity to either sign the warrant or decline to sign the

22  warrant.  And if the magistrate judge declines to sign the

23  warrant, then there would effectively be a de novo appeal to

24  me.

25           Is that right?

XP3PKINSC                    SEALED

1        MR. WARD:  Alec Ward again, your Honor.

2            The appeal to your Honor is not de novo at that point.

3    It's the form of review provided for by Section 636, which your

4    Honor may be more familiar with in the context of Civil Rule 72

5    or Criminal Rule 59.  It's clear-error review on findings of

6    fact and contrary-to-law review on legal reasoning and

7    conclusions of law.

8            THE COURT:  Okay.

9            Ms. Phillips, is all of that correct?

10            Are you still there?

11        MS. PHILLIPS:  Your Honor, I'm not sure if I'm in a

12    position to weigh in on that.  Our role is pretty limited to

13    walking through the warrant.

14            THE COURT:  Okay.

15            Well, the government has been forthcoming.  I don't

16    want to go through an unnecessary procedure.

17            On the other hand, the government tells me that the

18    magistrate judge doesn't appear to have had a final opportunity

19    to say no on the warrant, and certainly hasn't reviewed the

20    memo that the government prepared with respect to the warrant.

21    Again, I don't want to have to go through an unnecessary step;

22    on the other hand, I don't want to preclude the magistrate

23    judge from having the opportunity to make the decision.

24            So --

25        MR. WARD:  Alec Ward, again, your Honor.  I apologize.

1          I just want to be very clear on the factual record

2     here.  There's no question that the magistrate declined to sign

3     the warrant.  It may be a very technical point, but what did

4     not happen was the magistrate judge receiving a sworn

5     declaration or testimony from an affiant on the record and

6     issuing a formal oral order basically declining the

7     government's, in effect, motion.  She indicated that if

8     presented with the contents of the warrant that she was

9     presented and did read, she would deny the government's

10    application.

11          So, we do know — it's, I understand, a technical

12    point — we do know the merits point on the face of the second

13    warrant, but we do not have a formal oral order after receiving

14    sworn evidence.

15          Our position is, the reason it matters is because if

16    your Honor is to consider the warrant, the posture does change

17    the standard of review.  If you hear the warrant in the absence

18    of a formal order from the magistrate, you're hearing

19    essentially it as a matter of first impression on the probable

20    cause standard; whereas, if you're reviewing a magistrate's

21    order, that's in the more deferential — I'll call it, a

22    quasi-Rule 59 — posture with regard to findings of fact.

23          We defer to you on which of those you feel is more

24    prudent because it does affect the standard of review.

25          THE COURT:  Again, I think you're being very

XP3PKINSC                    SEALED

1    forthcoming.

2            It's important that proper procedures be followed, and

3    the proper procedure would be for the magistrate judge to make

4    the decision in the first instance.  And there's at least an

5    argument that the magistrate judge hasn't done that, even

6    though you believe that the magistrate judge's decision would

7    be to deny the warrant.  And you say it would change the

8    standard of review for me, and I certainly assumed that the

9    magistrate judge had, in fact, made the final decision in

10   rejecting the warrant.

11           You can make it perfectly clear to the magistrate

12   judge that it was unclear whether, faced with a full record, if

13   you will, the magistrate judge had decided to deny the warrant,

14   and, if so, then it would come to me.  That would appear to be

15   the most prudent way to proceed.  I don't want to cause any

16   unnecessary procedures.  On the other hand, I certainly don't

17   want to circumvent what would be the normal procedure.

18           You're also faced with an issue, which I leave to you:

19   There's an unsworn affidavit.  Normally, the affidavit gets

20   signed before or, under the rules, remotely before the judicial

21   officer from whom the relief is being sought.  So you would

22   normally take that to the magistrate judge for the agent to

23   swear the affidavit before the magistrate judge or remotely

24   before the magistrate judge, rather than bringing a signed

25   affidavit to the magistrate judge or the district court judge.

XP3PKINSC                    SEALED

1          So, what you will end up doing, I assume, is

2    presenting the package to the magistrate judge and explaining,

3    because it wasn't clear, that the magistrate judge had in fact

4    determined to deny the warrant, you want to present the

5    package, including, I assume, the memo that you otherwise

6    presented to me for the first time, have the agent sign, either

7    personally or remotely, before the magistrate judge, the

8    affidavit, and have a determination from the magistrate judge,

9    whether the magistrate judge is denying the warrant or not.

10          Perhaps the magistrate judge would be convinced by the

11   memo that you prepared, that was never presented to the

12   magistrate judge.  So, I don't mean to imply any decision on my

13   part, because I agree implicitly with what you said earlier,

14   which is there should be a decision, clear decision, by the

15   magistrate judge, whether the magistrate judge is signing or

16   not signing the warrant.

17          And I hope that's clear because I don't want to

18   misrepresent it in any way to the magistrate judge.  I'm not

19   suggesting you would deliberately do that, but I'm simply

20   trying to follow what I understand the regular practice is,

21   which is to make sure that you have a decision from the

22   magistrate judge based on all of the relevant information — the

23   affidavit by the agent, the memo that you've prepared — to get

24   a decision from the magistrate judge, which, if necessary,

25   would then be reviewed by the district court judge, without

XP3PKINSC                    SEALED

1    attempting to suggest what the district court judge would do.

2              MR. WARD:  I think that's entirely sensible, your

3    Honor.  And I appreciate the Court's care and thoughtfulness on

4    this issue and, again, regret the factual conclusion.

5              I think, out of candor, what I will be inclined to

6    represent to the magistrate is that, on review of the record,

7    such that it is, the government concluded, and your Honor

8    agreed, that the record wasn't sufficiently clear, as it stood,

9    for this Court to be confident exercising the power of review

10   under the review standard, and we'll present the application

11   again, we'll present the memorandum, and we'll ask for a clear

12   on-the-record ruling, with the understanding that if it's

13   adverse to the government, we'll return to your Honor for

14   review.

15             THE COURT:  Okay.

16             You need not explain what you would do in the case of

17   whatever the magistrate judge does.  I assume you would

18   carefully --

19             MR. WARD:  Understood, your Honor.

20             THE COURT:  -- carefully consider whatever the

21   magistrate judge does, and you would consider the next step.

22             And we've made a record of this conference, and you're

23   certainly welcome to show the transcript, if you will, to the

24   magistrate judge.  The transcript here will be sealed, but you

25   can get it from the court reporter, and it's certainly open to

XP3PKINSC                          SEALED

1    the lawyers for the government and certainly open to the

2    magistrate judge.

3                MR. WARD:  Thank you, your Honor.

4                THE COURT:  Okay.

5                I think that's it for me today.  Is that right?

6                MR. WARD:  I think so, your Honor.  I don't have

7    anything further for the government at this time.

8                THE COURT:  Okay.  Well, thank you.  Again, I

9    appreciate your candor.  Thank you.  Great.

10                MS. PHILLIPS:  Thank you, your Honor.

11                THE COURT:  Bye now.

12                MR. WARD:  Good afternoon, your Honor.

13                THE COURT:  Bye.

14                (Adjourned)

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 5



**U.S. Department of Justice**
950 Pennsylvania Avenue NW
Washington, D.C. 20530

March 20, 2025

Honorable John Koeltl
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Delivered Via Email
**REQUEST SEALING**

Dear Judge Koeltl:

Pursuant to 28 U.S.C. § 636(b)(1)(A), the United States Department of Justice respectfully asks this Court for review and reversal of Chief Magistrate Judge Netburn's denial of the Government's search warrant application submitted on March 15 and revised on March 16, 2025. Because Judge Netburn's ruling significantly impedes an ongoing investigation into credible threats of violence against an individual, prompt reversal is necessary. The Government respectfully requests that this letter be filed under seal as it relates to a non-public search warrant application submitted in connection with a covert investigation.

**I.    Introduction**

The United States seeks review and reversal of Chief Magistrate Judge Netburn's denial of the Government's application for a search warrant related to threats communicated via Instagram account @cuapartheiddivest. The magistrate judge's denial reflects critical misapplications of law, fundamentally misunderstanding the Fourth Amendment's probable cause standard and improperly applying First Amendment concerns.

Under well-settled law, probable cause exists where facts demonstrate a fair probability—not absolute certainty—that evidence of a crime will be found. Here, the magistrate judge erred by demanding a heightened evidentiary threshold more akin to proof beyond reasonable doubt, essentially requiring the Government to conclusively demonstrate now what it seeks evidence to determine:  that the symbolism and rhetoric used by the Target Account is a crime – a "true threat." – Such certainty is neither required nor appropriate at the warrant application stage.

Additionally, the court incorrectly invoked First Amendment concerns to deny the warrant, disregarding established precedent that true threats—statements that a reasonable person would interpret as serious expressions of intent to commit violence—fall categorically outside constitutional protection. The March 14, 2025, Instagram post at issue explicitly targeted Columbia University's President, Katrina Armstrong, directly naming her, using symbols associated with violent attacks, and depicting imagery suggestive of bloodshed. Viewed contextually alongside the group's established history of endorsing and engaging in violent conduct within the United States, this communication meets the threshold of a true threat under controlling Supreme Court and appellate precedent.

The magistrate judge's denial thus rests on a clear misinterpretation of the standards governing both probable cause and protected speech and is thus clearly erroneous and contrary to law. Because her ruling significantly impedes an ongoing investigation into credible threats of violence, immediate corrective action is warranted. The United States therefore respectfully urges this Court to reverse the magistrate judge's ruling, reaffirming the correct legal standards and authorizing the requested warrant to ensure the Government can appropriately investigate and mitigate these threats.

## II.    Factual Background

This case arises from an ongoing criminal investigation into threats communicated through Columbia University Apartheid Divest's ("CUAD") Instagram account @cuapartheiddivest (the "Target Account"). Specifically, on March 14, 2025, the Target

Account posted an image depicting Columbia University President Katrina Armstrong's residence defaced with a bright red substance resembling blood and marked with a black inverted triangle[1] and the words "FREE THEM ALL." The accompanying caption explicitly targeted President Armstrong, stating, among other things:

> the Columbia President's mansion has been redecorated. The people will not stand for Columbia University's shameless complicity in genocide! The University's repression has only bred more resistance, and Columbia has lit a flame it can't control. Katrina Armstrong you will not be allowed peace as you sic NYPD officers and ICE agents on your own students for opposing the genocide of the Palestinian people. WALKOUT AT 12:30PM. COLUMBIA MAIN GATES (Broadway/116).



This post, investigated as a potential violation of 18 U.S.C. § 875(c), forms the basis of the Government's probable cause assertion.

### III.     PROCEDURAL HISTORY

On March 15, 2025, the Government applied for a search warrant pursuant to the

---

[1] As described below, an inverted triangle is a symbol used by militants affiliated with the terrorist organization Hamas to designate targets for violence.

Electronic Communications Privacy Act ("ECPA")[2] and Federal Rule of Criminal Procedure 41, asserting probable cause to believe the Target Account had violated 18 U.S.C. § 875(c). A copy of the original affidavit is attached as Exhibit 1. The magistrate judge, acknowledging the probable cause determination as a "close call," requested further information on the symbolism and context of the posting. In short, the court asked for three things. First, she asked that the offending posts be placed in the body of the warrant rather than exhibits. Second, she sought more information about whether CUAD's posts advocated for violence *only* in the middle east, as opposed to in *also in the United States*. Third, she said Section 875(c) requires a threat to injure a person and that she did not read what CUAD wrote alongside the photograph to be a threat on its own because while she appreciated that the inverted triangle symbol is used by Hamas to designate structures and individuals as targets for violent attack, she wanted to know what evidence there was that the marker had the same meaning *in the United States*.

On March 16, 2025, the Government provided a supplemental application with the requested additional context and facts. A copy of the affidavit accompanying the supplemental application is attached here as Exhibit 2 and referred to here as "Search Warrant Affidavit" or "SW Affidavit." Despite the Government's thorough response to each of the judge's three requests, she ultimately denied the application concluding that she did not think there was probable cause to find that the post constituted a threat to a person under § 875; that the "no peace" language seemed to concern what the president was dealing with now (protests, etc.,); and that she was not comfortable saying that the upside-down triangle was a statement of violence. She further stated that she had been reviewing the First Amendment case law and said that this seemed like protected speech.

As detailed below, the supplemental application and this appeal fully address these issues, demonstrating probable cause under the totality of circumstances.

---

[2] 18 U.S.C. §§ 2701-2713

## IV.    LEGAL STANDARD

District courts review magistrate judges' denial of search warrants[3] under a "clearly erroneous or contrary to law" standard.[4] The "clearly erroneous" prong requires reversal where the reviewing court is left with a definite and firm conviction that a mistake has been committed.[5] Meanwhile, the "contrary to law" prong demands reversal if the magistrate judge has misinterpreted or misapplied relevant statutes, precedent, or constitutional principles.[6]

Here, this standard underscores the necessity of reversal, as the magistrate judge's denial rested on fundamental misapplications of the law regarding probable cause and First Amendment protections. Her decision erroneously heightened the probable cause standard and improperly shielded a credible threat under the guise of protected speech—errors precisely within the scope of this Court's corrective review under 28 U.S.C. § 636(b)(1)(A).

## V.    ARGUMENT

### A.    The Magistrate Judge Erred by Imposing an Unduly High Standard for Probable Cause

The Fourth Amendment explicitly mandates that warrants shall issue only "upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."[7] Probable cause exists when, considering the totality of the circumstances, law enforcement officials possess sufficient information or reliable facts that would lead a reasonably cautious person to conclude that an offense has been or is being committed.[8] Critically, courts evaluating probable cause must avoid isolating each suspicious fact in a vacuum. Instead, they must examine the collective weight of the circumstances

---

[3] *See Gomez v. United States*, 490 U.S. 858, 868 n.16 (1989) ("A table in a Committee Report listed the following as criminal pretrial matters handled by magistrates: arrest warrants, search warrants, bail hearings, preliminary examinations, removal hearings, post indictment arraignments, pretrial conferences, and pretrial motions.").

[4] 28 U.S.C. § 636(b)(1)(A) ("A judge of the court may reconsider any pretrial matter under this subparagraph (A) where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law."); *See, e.g., Matter of White Google Pixel 3 XL Cellphone in a Black Incipio Case*, 398 F. Supp. 3d 785, 788 (D. Idaho 2019) (holding that, under the Act, the district court had authority to review the magistrate's denial of a search warrant for biometric information).

[5] *Weiss v. La Suisse*, 161 F.Supp.2d 305, 320-21 (S.D. N.Y. 2001).

[6] *Id.*

[7] U.S. Const. amend. IV.

[8] *United States v. Patrick*, 899 F.2d 169, 171 (2d Cir. 1990).

presented.[9] The mere existence of potentially innocent explanations does not negate the presence of probable cause.[10]

The magistrate judge misapplied the standard for probable cause by demanding a level of certainty and clarity far beyond what the law requires. Specifically, she indicated that in order to obtain the requested warrant, the Government must provide more conclusive evidence directly linking CUAD's symbolism and rhetoric to imminent violent action within the United States, effectively requiring proof beyond reasonable doubt or the complete elimination of any innocent explanations.

This demand fundamentally misinterprets the governing standard. Probable cause does not require absolute certainty, nor must it exclude all innocent interpretations of suspicious facts. Rather, probable cause exists whenever the totality of circumstances establishes a fair probability—not absolute certainty—that a crime has been or is being committed. The Supreme Court has explicitly rejected the notion that probable cause is defeated simply because facts could also have an innocent explanation.

The magistrate judge essentially required that the Government conclusively prove that the inverted triangle symbol was a statement of intent to perpetrate violence, thereby improperly elevating the standard. The appropriate inquiry is whether the evidence presented—CUAD's documented advocacy of violence, explicit threats against President Armstrong, violent imagery, and escalating conduct—provided a reasonable basis for concluding that there is a fair probability that evidence of a crime will be found.[11] By applying a higher standard that exceeds probable cause, the court committed clear error and misapplied the law, requiring reversal.

---

[9] *Illinois v. Gates*, 462 U.S. 213, 230–31 (1983).
[10] See *United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985) ("The fact that an innocent explanation may be consistent with the facts as alleged . . . does not negate probable cause.").
[11] *Gates*, 462 U.S. at 238.

### B.    What Constitutes a True Threat?

Statements constituting "true threats" lie outside First Amendment protections and are subject to criminal prosecution.[12] Society has a compelling interest in "protecting individuals from the fear of violence, the disruption that fear engenders, and the possibility that the threatened violence will occur."[13] A true threat is a communication that a reasonable person would interpret as a serious expression of intent to commit unlawful violence against a particular individual or group.[14] Such threats do not include mere hyperbole, jest, or rhetorical excesses that lack genuine potential for violence.[15]

The presence of political or religious elements within a threat does not negate its status as a true threat. Rather, once a statement is found to be threatening, its accompanying rhetoric does not furnish a constitutional defense.[16] Critically, context matters significantly in evaluating true threats. In *United States v. Hart*,[17] for instance, the Eighth Circuit emphasized contextual factors by upholding a jury determination that placing a Ryder truck at abortion clinic entrances was a true threat of force, given the timing coinciding with the President's visit following the Oklahoma City bombing.

The Supreme Court has clarified the mental state required to establish a violation of federal threat statutes. In 2015, in *Elonis v. United States*, the U.S. Supreme Court held that the government must show the defendant intended the communication to be threatening or knew that it would be perceived as such.[18] Eight years later, in *Counterman v. Colorado*, the Supreme Court confirmed that the requisite mental state is satisfied by recklessness, meaning the

---

[12] *Counterman v. Colorado*, 600 U.S. 66, 69 (2023).
[13] *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992).
[14] *Virginia v. Black*, 538 U.S. 343, 359 (2003).
[15] *Watts v. United States*, 394 U.S. 705, 708 (1969).
[16] *See Heller v. Bedford Cent. Sch. Dist.*, 665 F. App'x 49, 52 (2d Cir. 2016) (statements that people in government deserved to die, and identifying airplanes as targets, were not simply "off-the-cuff political hyperbole written in the context of friendly social media banter."); *see also United States v. Rahman*, 189 F.3d 88, 117 (2d Cir. 1999) ("Notwithstanding that political speech and religious exercise are among the activities most jealously guarded by the First Amendment, one is not immunized from prosecution for such speech-based offenses merely because one commits them through the medium of political speech or religious preaching.")
[17] 212 F.3d 1067, 1072 (8th Cir. 2000).
[18] 575 U.S. 723 (2015).

defendant consciously disregarded a substantial risk that their communication would be viewed as threatening.[19]

### C.    Probable Cause Exists That Target Account Contains Evidence of a True Threat

The Target Account's Instagram post of March 14, 2025, including the accompanying photograph, contains specific details that, viewed in the context of CUAD's escalating pattern of conduct, would lead a reasonable person to fear imminent violence against Columbia University President Katrina Armstrong, the individual explicitly named and targeted in the post. The following key facts, drawn from the Search Warrant Affidavit, establish the threatening nature of the post and its broader context.

#### 1.    CUAD's Explicitly Endorses Violence, Including in the United States

CUAD, via the Target Account, has repeatedly endorsed violence as a legitimate means to achieve its objectives, extending beyond the Middle East to the U.S. context. On October 8, 2024, the Target Account posted an open letter stating, "we support liberation by any means necessary, including armed resistance," and "in the face of violence from the oppressor equipped with the most lethal military force on the planet, where you've exhausted all peaceful means of resolution, violence is the only path forward."[20] This rhetoric, paired with CUAD's self-description as "Westerners fighting for the total eradication of Western civilization,"[21] demonstrates an intent to pursue violent resistance domestically, not solely abroad. Their invocation of "Globalize the Intifada,"[22] which is a phrase tied to Hamas's violent campaign, further signals a call to export such violence globally, including to the United States.

#### 2.    CUAD Has a History of Intimidating and Violent Actions on U.S. Campuses

CUAD has claimed responsibility for a series of disruptive and aggressive acts at Columbia and Barnard, evidencing a pattern of intimidation and physical confrontation. These

---

[19] *Counterman*, 600 U.S. at 69.
[20] SW Affidavit ¶ 14.
[21] SW Affidavit ¶ 15.
[22] SW Affidavit ¶ 22.

include the January 21, 2025, classroom disruption by masked individuals distributing flyers with the inverted triangle and the phrase "THE ENEMY WILL NOT SEE TOMORROW;"[23] the February 26, 2025, forcible entry into Milbank Hall, injuring a security guard and leaving graffiti with inverted triangles and martyrdom rhetoric;[24] and the March 5, 2025, occupation of the Milstein Center, resulting in another injured guard and physical clashes with NYPD officers.[25] These incidents, all claimed by the Target Account, demonstrate CUAD's willingness to employ force and intimidation on U.S. soil.

### 3. The Inverted Triangle Is a Symbol of Imminent Violence in the U.S. Context

The March 14 post's photograph prominently features an inverted triangle—a symbol explicitly linked to Hamas's targeting of structures and individuals for violent attack.[26] The Search Warrant Affidavit details its use by Hamas's al-Qassam Brigades to mark targets in propaganda videos[27] and its adoption in U.S. campus protests, including by CUAD.[28] The Search Warrant Affidavit includes, among others, the following examples from Hamas propaganda:



*An inverted red triangle marking an Israeli tank as a target (Source: Echoroukonline.com, November 14, 2023)*

---

[23] SW Affidavit ¶¶ 16-17.
[24] SW Affidavit ¶¶ 18-20.
[25] SW Affidavit ¶¶ 24-25.
[26] SW Affidavit ¶¶ 10-11.
[27] SW Affidavit ¶ 10.
[28] SW Affidavit ¶¶ 12-14, 19.



*The triangle marking an Israeli tank before it is hit (Source: T.me/Qassambrigades, February 26, 2024)*



*Israeli soldiers marked by red triangles (Source: T.me/Qassambrigades, February 12, 2024)*

Notably, CUAD's own actions—e.g., the January 21 flyer and February 26 graffiti—pair the triangle with violent imagery and rhetoric, establishing its threatening connotation in this domestic context, not merely as a foreign symbol. Common sense demonstrates that any reasonable person, even more so a reasonable person with access to the internet, would interpret the inverted triangle as a target for violence.

### 4.    Direct Targeting of President Armstrong with Denial of Peace

The March 14 caption singles out "Katrina Armstrong," declaring, "you will not be allowed peace as you sic NYPD officers and ICE agents on your own students for opposing the

genocide of the Palestinian people."[29] This personalized warning, that attributes violent actions to Armstrong and is tied to her official residence, escalates beyond abstract criticism into a specific threat, particularly when read alongside CUAD's prior statements and actions. The fact that this threating communication was posted on a public facing social media account does not insulate it from scrutiny. [30]

### 5.    The Red Splatter Is a Visceral Threat of Harm

The photograph in the post at issue depicts President Armstrong's residence at 60 Morningside Drive defaced with a "bright red substance" resembling blood.[31] Paired with the inverted triangle and CUAD's violent rhetoric, this imagery evokes a reasonable inference of bloodshed, amplifying the post's menacing intent.

Taken together, these elements—the group's avowed support for violence in the U.S., its history of aggressive campus actions, the inverted triangle's established use as a marker of attack, the direct naming of President Armstrong with a denial of peace, and the blood-like splatter—form a mosaic that a reasonable person would interpret as a serious expression of intent to harm. This is not mere political hyperbole; it mirrors the contextual menace upheld as a true threat in *United States v. Hart*, where a Ryder truck's placement at abortion clinics, post-Oklahoma City bombing, was deemed threatening due to its symbolic weight. Here, the inverted triangle and red splatter carry similar gravity given CUAD's actions and Hamas's precedent.

Moreover, the Supreme Court's recklessness standard in *Counterman v. Colorado* is satisfied: CUAD consciously disregarded a substantial risk that this post would be perceived as threatening violence, evidenced by its prior use of the triangle in violent contexts and its explicit embrace of "armed resistance."[32] Whether this rises to a jury-worthy true threat is not the issue at

---

[29] SW Affidavit ¶ 8.
[30] *United States v. Kelner*, 534 F.2d 1020, 1023 (2d Cir. 1976) (holding statement was a threat despite the fact that it was made to the media during a press conference); *Planned Parenthood of Columbia/Willamette, Inc. v. American Coalition of Life Activists*, 290 F.3d 1058, 1086 (9th Cir. 2002) (finding true threats on "guilty" posters which had been "publicly distributed, but personally targeted."); *United States v. Morales*, 272 F.3d 284, 288 (5th Cir. 2001) (finding that statements made to a third party in an internet chat room were, nevertheless, true threats under 18 U.S.C. § 875(c));
[31] SW Affidavit ¶¶ 8-9.
[32] SW Affidavit ¶ 14

this stage—probable cause requires only a fair probability, not certainty.

Thus, the Government has established probable cause to believe that unknown persons associated with the Target Account violated 18 U.S.C. § 875(c) by transmitting this interstate threat. The magistrate judge's denial misapplied the probable cause standard by isolating the post's elements and demanding more conclusive evidence of U.S.-specific symbolism, rather than assessing the totality of circumstances.

### D. The Magistrate Judge's Decision Improperly Elevated First Amendment Concerns

The magistrate judge's denial rested in part on "First Amendment concerns," implying the March 14, 2025, Instagram post might be protected political speech. This misreads the law: true threats are categorically unprotected by the First Amendment due to society's compelling interest in preventing fear and violence.[33] A true threat is "a serious expression of an intent to commit an act of unlawful violence" against a specific target, distinguishable from hyperbole or abstract advocacy.[34] In *Watts v. United States*, the Supreme Court clarified this boundary.[35] There, an 18-year-old Vietnam War protestor stated at a 1966 rally, "If they ever make me carry a rifle the first man I want in my sights is L.B.J.," adding that he would refuse induction.[36] The Court deemed this protected speech, not a true threat, because it was expressly conditional ("if they ever make me"), uttered in a political debate, and met with laughter, signaling no serious intent.[37] The Court emphasized that "debate on public issues should be uninhibited, robust, and wide-open," tolerating "vehement, caustic" attacks unless they cross into credible threats.[38]

CUAD's post starkly contrasts with the speech at issue in *Watts*. Unlike Watts's hypothetical, conditional remark tied to an event he vowed to avoid, CUAD's caption ("Katrina Armstrong, you will not be allowed peace") is direct, immediate, and unqualified, targeting a specific individual with no contingency. Far from a political rally's spontaneous exchange, it

---

[33] *R.A.V.*, 505 U.S. at 388.
[34] *Virginia*, 538 U.S. at 359.
[35] 394 U.S. 705 (1969).
[36] *Id.* at 706.
[37] *Id.* at 707-08.
[38] *Id.* at 708.

accompanies an image of Armstrong's residence, defaced with blood-like splatter and an inverted triangle—a symbol CUAD itself has linked to violence in prior U.S. actions.[39] Where Watts's audience laughed, CUAD's post follows a pattern of aggressive acts—classroom disruptions, forcible entries that injured guards, and martyrdom graffiti—suggesting menace, not jest, hyperbole, or inflated rhetoric.[40] CUAD's endorsement of "armed resistance" and calls to "globalize the Intifada" further frame this as a serious threat, not "crude political opposition."[41] Thus, while *Watts* shields abstract dissent, CUAD's post, with its specificity and violent context, falls outside that protection.[42]

Nor does the First Amendment bar a warrant here. Determining a "true threat" is a jury question, not a magistrate's premature merits call.[43] The magistrate judge overstepped by seeking a higher standard of evidence than required to assess probable cause—a "fair probability" under the totality of circumstances.[44] Her First Amendment concern misapplied *Watts*, ignoring that even political speech loses protection when it conveys intent to cause imminent harm.[45] Crucially, "an application for a warrant authorizing the seizure of materials presumptively protected by the First Amendment should be evaluated under the same standard of probable cause used to review warrant applications generally."[46] The magistrate judge did not adhere to this well-established law.

## VI.    CONCLUSION

Judge Netburn's denial, by imposing an unduly high threshold and misreading the threat's context, was clearly erroneous and contrary to law. We urge this Court to reverse and issue the warrant, enabling investigation of this credible threat.

---

[39] SW Affidavit ¶¶ 8, 10, 16, 19.

[40] SW Affidavit ¶¶ 16-25.

[41] SW Affidavit ¶¶ 14, 22; cf. *Watts*, 394 U.S. at 708.

[42] Even assuming arguendo that the speech was protected, "[t]he First Amendment. . . does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993).

[43] *United States v. Stock*, 728 F.3d 287, 298 (3d Cir. 2013); *Syring*, 522 F. Supp. 2d at 134.

[44] *Illinois v. Gates*, 462 U.S. at 238.

[45] *See Heller*, 665 F. App'x at 52.

[46] *See New York v. P.J. Video, Inc.*, 475 U.S. 868, 875 (1986).

Respectfully submitted,


MAC WARNER
Deputy Assistant Attorney General
Civil Rights Division
United States Department of Justice


By:     _/s/ Alec C. Ward_____
        Alec C. Ward
        Trial Attorney
        United States Department of Justice
        Civil Rights Division, Criminal Section
        150 M St. NE Washington, DC 20002
        ███████████████████████

# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
INSTAGRAM ACCOUNT
@CUAPARTHEIDDIVEST THAT IS
STORED AT PREMISES CONTROLLED
BY META PLATFORMS, INC.

**TO BE FILED UNDER SEAL**

**AGENT AFFIDAVIT**

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**
**FOR STORED ELECTRONIC COMMUNICATIONS**

I, ▮▮▮▮▮▮, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for

information associated with a certain Instagram account that is stored at premises owned,

maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), an electronic

communications service and/or remote computing service provider headquartered in Menlo Park,

California.  The information to be searched is described in the following paragraphs and in

Attachment A to the proposed warrant.  This affidavit is made in support of an application for a

search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Meta to

disclose to the government copies of the information (including the content of communications)

further described in Section II of Attachment A.  Upon receipt of the information described in

Section II of Attachment A, government-authorized persons will review that information to

locate the items described in Section III of Attachment A.

2.



3.    This affidavit is based on my personal knowledge, information from other law enforcement officials, and documents reviewed during this investigation.  This affidavit contains information necessary to support this application.  It is not intended to include every fact observed by me or known to U.S. law enforcement personnel conducting this investigation.

4.    This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.    Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that a violation of 18 U.S.C. § 875(c) have been committed by unknown persons associated with the Instagram account @cuapartheiddivest (the "Target Account").  There is also probable cause to search the information described in Section I of Attachment A for evidence, instrumentalities, contraband, and/or fruits of these crimes further described in Section II of Attachment A.

## JURISDICTION

6.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

7.      I am investigating an alleged interstate transmission of threats to injure a person or persons.

8.      On March 14, 2025, the Instagram account @cuapartheiddivest (the "Target Account") posted an image of a building spattered with a bright red substance and marked in black spray paint with an inverted triangle and the words "FREE THEM ALL." The caption accompanying the post read: "anonymous submission: the Columbia President's mansion has been redecorated. The people will not stand for Columbia University's shameless complicity in genocide! The University's repression has only bred more resistance and Columbia has lit a flame it can't control. Katrina Armstrong you will not be allowed peace as you sic NYPD officers and ICE agents on your own students for opposing the genocide of the Palestinian people. WALKOUT AT 12:30PM. COLUMBIA MAIN GATES (Broadway/116)" A screen capture image of the image and caption ("the post") is included below as Figure 1.



9.     From my review of open-source materials on the Columbia University website, I know that Katrina Armstrong is the interim President of Columbia University. I know that the Columbia President's Mansion is located at 60 Morningside Drive, New York, New York 10027, within the Southern District of New York. From reviewing open-source Google Street View geo-located imaging data related to that address, I believe that the structure depicted in the post is, in fact, the south-facing façade of that address.

10.     Based on my training and experience, I know that an inverted triangle is a symbol that has been used by militants affiliated with the terrorist organization Hamas in the ongoing Israel-Hamas conflict to designate targets for attack.  Since the October 7, 2023 Hamas attack on Israel, in which approximately 1200 people were killed and approximately 250 people were taken hostage, Hamas's military wing, the Izz Al-Din Al-Qassam Brigades ("al-Qassam Brigades"), has regularly published videos from the fighting in Gaza in which Israeli military

forces about to be attacked are marked with a moving inverted red triangle[1]. The below

screenshots are examples from Hamas propaganda showing use of the inverted triangle:



*An inverted red triangle marking an Israeli tank as a target (Source: Echoroukonline.com, November 14, 2023)*



*The triangle marking an Israeli tank before it is hit (Source: T.me/Qassambrigades, February 26, 2024)*

---

[1] www.memri.org/reports/inverted-red-triangle-symbol-identified-hamas (last viewed March 15, 2025)



*Israeli soldiers marked by red triangles (Source: T.me/Qassambrigades, February 12, 2024)*

11.    I also know the inverted triangle is frequently used in pro-Hamas memes and graphics on social media. For example, the screenshot below from a February 21, 2024 post on X shows Abu Obaida, the spokesman for the al-Qassam Brigades, emerging from an inverted triangle:



6

12.     I also know the inverted triangle has been used in demonstrations on campuses in the United States.  The inverted triangle, as shown below, has been used on posters, and can also be made by individuals joining their fingers together to make the triangle symbol:

 

13.     From my review of public postings on the Target Account, I know that the Target Account purports to be the official Instagram account of Columbia University Apartheid Divest ("CUAD"). From review of the Target Account and from review of open-source media reports, in particular a November 14, 2023 op-ed in the Columbia Spectator student newspaper authored under CUAD's organizational byline, I know that CUAD is a student-run organization, that, in its own words, "work[s] toward achieving a liberated Palestine and the end of Israeli apartheid by urging Columbia to divest all economic and academic stakes in Israel."

14.     From my review of postings on the Target Account, I know that CUAD expressly endorses and advocates the use of violence in furtherance of its organizational objectives. Specifically, I have reviewed an October 8, 2024 post made by the Target Account which included the statements: "we support liberation by any means necessary, including armed resistance" and "in the face of violence from the oppressor equipped with the most lethal military force on the planet, where you've exhausted all peaceful means of resolution, violence is the only path forward." From reviewing open-source media reporting, including an October 1, 2024 Columbia Spectator article, I know that the Target Account made these statements as part of an open letter, posted to the Target Account, in support of a Columbia student named Khymani James, who had been disciplined by Columbia University for stating, during an Instagram live stream, that "Zionists don't deserve to live" and "Be grateful that I'm not just going out and murdering Zionists." Images of the open letter posted on the Target Account, taken on March 15, 2025, are included below:

## A Letter from CUAD Leadership to Khymani James and Our Comrades in Solidarity

Last spring, in the midst of the encampments, Columbia University Apartheid Divest (CUAD) posted a statement framed as an apology on behalf of Khymani James. It is of the utmost importance that we clear the record regarding this statement. The statement was written by several CUAD organizers, not Khymani, and does not represent Khymani or CUAD's values or political lines. However, all CUAD organizers were complicit in *not maintaining our political lines, keeping the statement public on our instagram, and in neglecting the mental and physical safety of Khymani.*

In light of this, we, as CUAD organizers, want to apologize first and foremost to Khymani. We caused irrevocable harm to you by contributing to the ostracization you experienced from your fellow students, fellow organizers, the media, and the public. **The anti-blackness and queerphobia that Khymani experienced, and continues to experience, from neo-liberals, neo-liberal media, and fascists is disgusting.** By issuing a so-called "apology," CUAD exposed Khymani to even more hatred from white supremacist and queerphobic liberals and fascists, along with the neo-liberal media. We deliberately misrepresented your experiences and your words, and *we let you down by purposefully playing into the media and the public's neo-liberal co-optation of our encampments and our movement for Palestinian liberation.*



We also want to issue a public apology to all those fighting for Palestinian liberation that we alienated by **compromising our values and tailoring our actions and narrative to the mainstream media**. As an organization, we set our movement back. We alienated members of our community, utilizing the same tactics the state uses to isolate organizers working to push the boundaries of what is acceptable. Who keeps us safe? We keep us safe. But in recent months, we have failed Khymani and others in keeping them safe. And for that, we sincerely apologize and will continue working towards holding ourselves accountable by **keeping true to our political lines, learning in public, refusing to treat one another as disposable, and not bending to neo-liberal media.**

## We support liberation by any means necessary, including armed resistance.

Part of our collective liberation includes recognizing that pandering to liberal media to make the movement for liberation palatable and digestible sets us back. *Everyday, neo-liberal media commits acts of violence against Palestinians by dehumanizing Palestinians as people who deserve to experience genocide, twisting narratives to frame Palestinian freedom fighters as terrorists, and neglecting to publicize the violent realities of Israeli apartheid and occupation.*





15.    I have also reviewed open-source media reports that included photographs of an image posted to the Target Account that is no longer publicly-viewable and that stated, in the context of a broad expression of support for a student movement in Bangladesh, that CUAD "is fighting for the total eradication of Western civilization." A screen-capture of the since-deleted post, as reported in an August 8, 2024 open-source news article on the website Campus Reform, is included below:



16.     On January 21, 2025, four masked individuals entered a "History of Modern Israel" class at Columbia University. Refusing the professor's requests to leave, the group handed out printed flyers while one member read a prepared statement, preventing the class from proceeding. According to open-source media reports and social media posts purporting to be authored by students present in the classroom at the time, one of the flyers that the group distributed consisted of a picture of three armed militants, wearing similar masks to those worn by the disruptors, and bearing the superimposed text "THE ENEMY WILL NOT SEE TOMORROW." The first "O" in the word "TOMORROW" was replaced by an inverted triangle, as shown here:

17.     On February 23, 2025, Barnard University announced that it would expel two students for their role in the January 21 class disruption. On the same day, CUAD took credit for the Jan 21 disruption in an Instagram post on the Target Account. The post contains a video of the event that is approximately 30 seconds long and contains sub-titles that read "Israel is backed by the world's most violent imperialist forces and they attempt to erase the truth from our collective consciousness. To make this occupation seem moral and okay. To make it seem like a world without Israel can't exist but we know it can and has. Hopefully we got here in time to go over the syllabus and we can find out what modern Israel even is… There are Palestinian grandmothers who are older than the state itself." A still shot of the video from the Target Account is shown here:



18.     On February 26, 2025, a group of masked individuals forced entry into Milbank Hall, a building at Barnard that includes the Dean's office and other administrative offices. A Barnard security employee sustained minor injuries while trying to block the group's entry to the building. The group staged a sit-in in the hallway outside the Dean's Office and circulated a written list of demands that included the recission of the two students expelled in connection with the January 21 class disruption. A photograph of the group is shown here:



19.    Before eventually leaving the building several hours after entering, unidentified members of the group vandalized the walls of the hallway they had been occupying. The graffiti included four upside-down triangles alongside Arabic script, as shown below:



20.     A preliminary translation of the Arabic text shown indicates the following:  The green ink to the left of the doors says "Free Palestine! Revolution! Revolution!" The green and black text written on the doors says "Oh martyr, relax/rest easy, relax/rest easy." I know from training and experience that individuals who carry out suicide bombing attacks or who die while fighting on behalf of a terrorist organization, such as Hamas, are often praised by the terrorist organization as "martyrs."

21.     A preliminary translation of the black text on the door surrounded by the four inverted triangles says, "Freedom has a red door that is knocked on by every stained/bloodied hand". Of note, this is a line from a poem written by Ahmed Shawqi, an Egyptian poet, in 1926. In January 2025, Al Jazeera broadcast a video of Yahya Sinwar reciting the line. Sinwar was one of the senior Hamas leaders who orchestrated the October 7, 2023 attack on Israel, and was charged via complaint in the Southern District of New York with numerous terrorism offenses

resulting in death[2]. In a September 3, 2024 press release, the Attorney General at the time said "The Justice Department has charged Yahya Sinwar and other senior leaders of Hamas for financing, directing, and overseeing a decades-long campaign to murder American citizens and endanger the national security of the United States[3]." Sinwar was killed in Gaza in October 2024.

22.     The photo above also shows the phrase "GLOBALIZE THE INTIFADA" in English. I know from training and experience "intifada" refers to Hamas's decades-long campaign of violence against Israel that has resulted in death and injury to hundreds of people. The phrase "GLOBALIZE THE INTIFADA" appears to be a call to use the same violence employed by Hamas in other regions of the world, including the United States.  As noted above in paragraph 14, the October 8, 2024 post to the Target Account includes the phrase "long live the intifada."

23.     The Target Account claimed credit for the February 26 event on behalf of CUAD on February 27.

24.     On March 5, 2025, a group of masked individuals forced entry into the lobby of the Milstein Center, a multi-use building at Barnard which includes the main college library. The group obstructed normal usage of the building facilities and refused administrators' directions to leave. Another security guard sustained minor injuries during the event. While inside, members of the group distributed more leaflets, one of which purported to be authored by the "Hamas Media Service" and to offer Hamas' justification for the October 7 terror attacks. Most of the

---

[2] ECF No. 2 1:24-mj-00438 (SDNY Feb 1, 2024)

[3] www.justice.gov/archives/opa/pr/justice-department-announces-terrorism-charges-agaisnt-senior-leaders-hamas

group left the building as SRG officers entered, and then reformed in the outdoor courtyard

outside the lobby. NYPD-SRG attempted to disperse this re-formed group, and a number of

physical confrontations between group members and SRG officers ensued, resulting in the arrest

of nine individuals.

25.     The Target Account took credit for the March 5 occupation in a post the same

day, as shown here:



26.     Based on these facts, I submit that there is probable cause to believe that the

Target Account's March 14, 2025, transmission of the above-described photograph and caption

constitutes interstate communication of a threat to injure, in violation of 18 U.S.C. § 875(c). The

Target Account purports to speak on behalf of a group that has expressly endorsed the use of

violence for the accomplishment of its stated goals. The post includes the inverted triangle

17

symbol, which is used by Hamas to designate structures and individuals as targets for violent

attack. In the post, the inverted triangle is displayed alongside a bright red substance applied to

the official residence of the Columbia president, who is designated by name in the post and

whom the post warns "will not be allowed peace."

## BACKGROUND CONCERNING INSTAGRAM[4]

27.    Instagram is a service owned by Meta, a United States company and a provider of

an electronic communications service as defined by 18 U.S.C. §§ 3127(1) and 2510.

Specifically, Instagram is a free-access social networking service, accessible through its website

and its mobile application, that allows subscribers to acquire and use Instagram accounts, like the

target account(s) listed in Attachment A, through which users can share messages, multimedia,

and other information with other Instagram users and the general public.

28.    Meta collects basic contact and personal identifying information from users

during the Instagram registration process.  This information, which can later be changed by the

user, may include the user's full name, birth date, gender, contact e-mail addresses, physical

address (including city, state, and zip code), telephone numbers, credit card or bank account

number, and other personal identifiers.  Meta keeps records of changes made to this information.

29.    Meta also collects and retains information about how each user accesses and uses

Instagram.  This includes information about the Internet Protocol ("IP") addresses used to create

---

[4] The information in this section is based on information published by Meta on its Instagram
website, including, but not limited to, the following webpages: "Privacy Policy,"
https://privacycenter.instagram.com/policy/; "Information for Law Enforcement,"
https://help.instagram.com/494561080557017; and "Help Center," https://help.instagram.com.

and use an account, unique identifiers and other information about devices and web browsers used to access an account, and session times and durations.

30.     Each Instagram account is identified by a unique username chosen by the user. Users can change their usernames whenever they choose but no two users can have the same usernames at the same time.  Instagram users can create multiple accounts and, if "added" to the primary account, can switch between the associated accounts on a device without having to repeatedly log-in and log-out.

31.     Instagram users can also connect their Instagram and Facebook accounts to utilize certain cross-platform features, and multiple Instagram accounts can be connected to a single Facebook account.  Instagram accounts can also be connected to certain third-party websites and mobile apps for similar functionality.  For example, an Instagram user can "tweet" an image uploaded to Instagram to a connected Twitter account or post it to a connected Facebook account, or transfer an image from Instagram to a connected image printing service.  Meta maintains records of changed Instagram usernames, associated Instagram accounts, and previous and current connections with accounts on Meta and third-party websites and mobile apps.

32.     Instagram users can "follow" other users to receive updates about their posts and to gain access that might otherwise be restricted by privacy settings (for example, users can choose whether their posts are visible to anyone or only to their followers).  Users can also "block" other users from viewing their posts and searching for their account, "mute" users to avoid seeing their posts, and "restrict" users to hide certain activity and prescreen their comments.  Instagram also allows users to create a "close friends list" for targeting certain communications and activities to a subset of followers.

19

33.      Users have several ways to search for friends and associates to follow on Instagram, such as by allowing Meta to access the contact lists on their devices to identify which contacts are Instagram users.  Meta retains this contact data unless deleted by the user and periodically syncs with the user's devices to capture changes and additions.  Users can similarly allow Meta to search an associated Facebook account for friends who are also Instagram users. Users can also manually search for friends or associates.

34.      Each Instagram user has a profile page where certain content they create and share ("posts") can be viewed either by the general public or only the user's followers, depending on privacy settings.  Users can customize their profile by adding their name, a photo, a short biography ("Bio"), and a website address.

35.      One of Instagram's primary features is the ability to create, edit, share, and interact with photos and short videos.  Users can upload photos or videos taken with or stored on their devices, to which they can apply filters and other visual effects, add a caption, enter the usernames of other users ("tag"), or add a location.  These appear as posts on the user's profile. Users can remove posts from their profiles by deleting or archiving them.  Archived posts can be reposted because, unlike deleted posts, they remain on Meta's servers.

36.      Users can interact with posts by liking them, adding or replying to comments, or sharing them within or outside of Instagram.  Users receive notification when they are tagged in a post by its creator or mentioned in a comment (users can "mention" others by adding their username to a comment followed by "@").  An Instagram post created by one user may appear on the profiles or feeds of other users depending on a number of factors, including privacy settings and which users were tagged or mentioned.

20

37.    An Instagram "story" is similar to a post but can be viewed by other users for only 24 hours.  Stories are automatically saved to the creator's "Stories Archive" and remain on Meta's servers unless manually deleted.  The usernames of those who viewed a story are visible to the story's creator until 48 hours after the story was posted.

38.    Instagram allows users to broadcast live video from their profiles.  Viewers can like and add comments to the video while it is live, but the video and any user interactions are removed from Instagram upon completion unless the creator chooses to send the video to IGTV, Instagram's long-form video app.

39.    Instagram Direct, Instagram's messaging service, allows users to send private messages to select individuals or groups.  These messages may include text, photos, videos, posts, videos, profiles, and other information.  Participants to a group conversation can name the group and send invitations to others to join.  Instagram users can send individual or group messages with "disappearing" photos or videos that can only be viewed by recipients once or twice, depending on settings.  Senders can't view their disappearing messages after they are sent but do have access to each message's status, which indicates whether it was delivered, opened, or replayed, and if the recipient took a screenshot.  Instagram Direct also enables users to video chat with each other directly or in groups.

40.    Instagram offers services such as Instagram Checkout and Facebook Pay for users to make purchases, donate money, and conduct other financial transactions within the Instagram platform as well as on Facebook and other associated websites and apps.  Instagram collects and retains payment information, billing records, and transactional and other information when these services are utilized.

41.     Instagram has a search function which allows users to search for accounts by username, user activity by location, and user activity by hashtag.  Hashtags, which are topical words or phrases preceded by a hash sign (#), can be added to posts to make them more easily searchable and can be "followed" to generate related updates from Instagram.  Meta retains records of a user's search history and followed hashtags.

42.     Meta collects and retains location information relating to the use of an Instagram account, including user-entered location tags and location information used by Meta to personalize and target advertisements.

43.     Meta uses information it gathers from its platforms and other sources about the demographics, interests, actions, and connections of its users to select and personalize ads, offers, and other sponsored content.  Meta maintains related records for Instagram users, including information about their perceived ad topic preferences, interactions with ads, and advertising identifiers.  This data can provide insights into a user's identity and activities, and it can also reveal potential sources of additional evidence.

44.     In some cases, Instagram users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

45.     For each Instagram user, Meta collects and retains the content and other records described above, sometimes even after it is changed by the user (including usernames, phone

numbers, email addresses, full names, privacy settings, email addresses, and profile bios and

links).

46.    In my training and experience, evidence of who was using Instagram and from

where, and evidence related to criminal activity of the kind described above, may be found in the

files and records described above.  This evidence may establish the "who, what, why, when,

where, and how" of the criminal conduct under investigation, thus enabling the United States to

establish and prove each element or, alternatively, to exclude the innocent from further

suspicion.  Specifically, the evidence may establish who authored and transmitted the posts

containing the above-discussed threatening statements.

47.    Specifically, the user's account activity, logs, stored electronic communications,

and other data retained by Meta can indicate who has used or controlled the account.  This "user

attribution" evidence is analogous to the search for "indicia of occupancy" while executing a

search warrant at a residence.  For example, subscriber information, messaging logs, photos, and

videos (and the data associated with the foregoing, such as date and time) may be evidence of

who used or controlled the account at a relevant time.  As an example, because every device has

unique hardware and software identifiers, and because every device that connects to the Internet

must use an IP address, IP address and device identifier information can help to identify which

computers or other devices were used to access the account.  Such information also allows

investigators to understand the geographic and chronological context of access, use, and events

relating to the crime under investigation.

48.    Account activity may also provide relevant insight into the account owner's state

of mind as it relates to the offenses under investigation.  For example, information on the account

may indicate the owner's motive and intent to commit a crime (e.g., information indicating a

plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

49.     Therefore, Meta's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Instagram.  In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## REQUEST FOR NON-DISCLOSURE AND SEALING

50.     The existence and scope of this ongoing criminal investigation is not publicly known.  As a result, premature public disclosure of this affidavit or the requested warrant could alert potential criminal targets that they are under investigation, causing them to destroy evidence, flee from prosecution, or otherwise seriously jeopardize the investigation.   Some of the evidence in this investigation is stored electronically.  If alerted to the existence of the warrant, the subjects under investigation could destroy that evidence, including information saved to their personal computers.  Pursuant to 18 U.S.C. § 2705(b), I therefore respectfully request that the Court direct the Provider not to notify any person of the existence of the warrant for a period of one year from issuance, subject to extension upon application to the Court, if necessary.

51.     For similar reasons, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise, except that the Government be permitted without further order of this Court to provide copies of the warrant and affidavit as need be to personnel assisting it in the investigation and prosecution of this matter,

24

and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

## **CONCLUSION**

52.     Based on the forgoing, I request that the Court issue the proposed search warrant.

53.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  The government will execute this warrant by serving the warrant on Meta.  Because the warrant will be served on Meta, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

_____
Special Agent
Federal Bureau of Investigation

Sworn to me through the transmission of this Affidavit by reliable electronic means, pursuant to Federal Rules of Criminal Procedure 41(d)(3) and 4.1, on _____, 2025

_____
Honorable Sarah Netburn
United States Magistrate Judge
Southern District of New York

25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN THE MATTER OF THE SEARCH
OF INFORMATION ASSOCIATED
WITH INSTAGRAM ACCOUNT
@CUAPARTHEIDDIVEST THAT IS
STORED AT PREMISES
CONTROLLED BY META
PLATFORMS, INC.

## SEARCH WARRANT AND NON-DISCLOSURE ORDER

TO:    Meta Platforms, Inc. ("Provider")

      Federal Bureau of Investigation ("Investigative Agency")

      **1. Warrant.** Upon an affidavit of ████████████████████ of the Federal Bureau of Investigation, and pursuant to the provisions of the Stored Communications Act, 18 U.S.C. § 2703(b)(1)(A) and § 2703(c)(1)(A), and the relevant provisions of Federal Rule of Criminal Procedure 41, the Court hereby finds there is probable cause to believe the Instagram account @cuapartheiddivest, maintained at premises controlled by Meta Platforms Inc., contains evidence, fruits, and instrumentalities of crime, all as specified in Attachment A hereto. Accordingly, the Provider is hereby directed to provide to the Investigative Agency, within 14 days of the date of service of this Warrant and Order, the records specified in Section II of Attachment A hereto, for subsequent review by law enforcement personnel as authorized in Section III of Attachment A. The Government is required to serve a copy of this Warrant and Order on the Provider within 14 days of the date of issuance. The Warrant and Order may be served via electronic transmission or any other means through which the Provider is capable of accepting service.

**2. Non-Disclosure Order.** Pursuant to 18 U.S.C. § 2705(b), the Court finds that there is reason to believe that notification of the existence of this warrant will result in destruction of or tampering with evidence and/or flight from prosecution, or otherwise will seriously jeopardize an ongoing investigation. Accordingly, it is hereby ordered that the Provider shall not disclose the existence of this Warrant and Order to the listed subscriber or to any other person for a period of one year from the date of this Order, subject to extension upon application to the Court if necessary, except that Provider may disclose this Warrant and Order to an attorney for Provider for the purpose of receiving legal advice.

**3. Sealing.** It is further ordered that this Warrant and Order, and the Affidavit upon which it was issued, be filed under seal, except that the Government may without further order of this Court serve the Warrant and Order on the Provider; provide copies of the Affidavit or Warrant and Order as need be to personnel assisting the Government in the investigation and prosecution of this matter; and disclose these materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

Dated: New York, New York

_____          _____

Date Issued                                    Time Issued

_____

UNITED STATES MAGISTRATE JUDGE

2

**Attachment A**

**I. Subject Account and Execution of Warrant**

This warrant is directed to Meta Platforms, Inc. (the "Provider"), headquartered at 1 Meta Way, Menlo Park, CA 94025, and applies to all content and other information within the Provider's possession, custody, or control associated with the Instagram account @cuapartheiddivest (active on, but not limited to, March 13, 2025) (the "Subject Account").

A law enforcement officer will serve this warrant by transmitting it via email or another appropriate manner to the Provider. The Provider is directed to produce to the law enforcement officer an electronic copy of the information specified in Section II below.  Upon receipt of the production, law enforcement personnel will review the information for items falling within the categories specified in Section III below.

**II. Information to be Produced by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, and including any messages, records, files, logs, or other information that has been deleted but is still available to Meta, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for each account or identifier listed in Attachment A:

    A.    All business records and subscriber information, in any form kept, pertaining to the account, including:

        1.    Identity and contact information (past and current), including full name, e-mail addresses, physical address, date of birth, phone numbers, gender, hometown, occupation, websites, and other personal identifiers;

        2.    All Instagram usernames (past and current) and the date and time each username was active, all associated Instagram and Facebook accounts

(including those linked by machine cookie), and all records or other information about connections with Facebook, third-party websites, and mobile apps (whether active, expired, or removed);

3.    Length of service (including start date), types of services utilized, purchases, and means and sources of payment (including any credit card or bank account number) and billing records;

4.    Devices used to login to or access the account, including all device identifiers, attributes, user agent strings, and information about networks and connections, cookies, operating systems, and apps and web browsers;

5.    All advertising information, including advertising IDs, ad activity, and ad topic preferences;

6.    Internet Protocol ("IP") addresses used to create, login, and use the account, including associated dates, times, and port numbers, from January 1, 2024, to present**;**

7.    Privacy and account settings, including change history; and

8.    Communications between Meta and any person regarding the account, including contacts with support services and records of actions taken;

B.    All content (whether created, uploaded, or shared by or with the account), records, and other information relating to videos (including live videos and videos on IGTV), images, stories and archived stories, past and current bios and profiles, posts and archived posts, captions, tags, nametags, comments, mentions, likes, follows, followed hashtags, shares, invitations, and all associated logs and metadata, from January 1, 2024, to present;

C.    All content, records, and other information relating to communications sent from or received by the account from January 1, 2024, to present, including but not limited to:

1.    The content of all communications sent from or received by the account, including direct and group messages, and all associated multimedia and metadata, including deleted and draft content if available;

2.    All records and other information about direct, group, and disappearing messages sent from or received by the account, including dates and times, methods, sources and destinations (including usernames and account numbers), and status (such as delivered, opened, replayed, screenshot);

3.    All records and other information about group conversations and video chats, including dates and times, durations, invitations, and participants (including usernames, account numbers, and date and time of entry and exit); and

2

        4.       All associated logs and metadata;

D.      All content, records, and other information relating to all other interactions between the account and other Instagram users from January 1, 2024, to present, including but not limited to:

        1.       Interactions by other Instagram users with the account or its content, including posts, comments, likes, tags, follows (including unfollows, approved and denied follow requests, and blocks and unblocks), shares, invitations, and mentions;

        2.       All users the account has followed (including the close friends list), unfollowed, blocked, unblocked, muted, restricted, or denied a request to follow, and of users who have followed, unfollowed, blocked, unblocked, muted, restricted, or denied a request to follow the account;

        3.       All contacts and related sync information; and

        4.       All associated logs and metadata;

E.      All records of searches performed by the account from January 1, 2024, to present; and

F.      All location information, including location history, login activity, information geotags, and related metadata from January 1, 2024, to present.

Meta is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

### III. Information to be seized by the government

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. § 875(c) including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

A.      Evidence indicating how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the account owner;

B.      Evidence indicating the account owner's state of mind as it relates to the crime under investigation;

C.      The identity of the person(s) who created or used the account, including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
INSTAGRAM ACCOUNT
@CUAPARTHEIDDIVEST THAT IS
STORED AT PREMISES CONTROLLED
BY META PLATFORMS, INC.

**TO BE FILED UNDER SEAL**

**AGENT AFFIDAVIT**

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**
**FOR STORED ELECTRONIC COMMUNICATIONS**

I, ██████, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.        I make this affidavit in support of an application for a search warrant for

information associated with a certain Instagram account that is stored at premises owned,

maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), an electronic

communications service and/or remote computing service provider headquartered in Menlo Park,

California.  The information to be searched is described in the following paragraphs and in

Attachment A to the proposed warrant.  This affidavit is made in support of an application for a

search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Meta to

disclose to the government copies of the information (including the content of communications)

further described in Section II of Attachment A.  Upon receipt of the information described in

Section II of Attachment A, government-authorized persons will review that information to

locate the items described in Section III of Attachment A.

2.    

3.      This affidavit is based on my personal knowledge, information from other law enforcement officials, and documents reviewed during this investigation.  This affidavit contains information necessary to support this application.  It is not intended to include every fact observed by me or known to U.S. law enforcement personnel conducting this investigation.

4.      This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that a violation of 18 U.S.C. § 875(c) have been committed by unknown persons associated with the Instagram account @cuapartheiddivest (the "Target Account").  There is also probable cause to search the information described in Section I of Attachment A for evidence, instrumentalities, contraband, and/or fruits of these crimes further described in Section II of Attachment A.

## JURISDICTION

6.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

7.      I am investigating and an alleged interstate transmission of threats to injure a person or persons.

8.      On March 14, 2025, the Instagram account @cuapartheiddivest (the "Target Account") posted an image of a building spattered with a bright red substance and marked in black spray paint with an inverted triangle and the words "FREE THEM ALL." The caption accompanying the post read: "anonymous submission: the Columbia President's mansion has been redecorated. The people will not stand for Columbia University's shameless complicity in genocide! The University's repression has only bred more resistance and Columbia has lit a flame it can't control. Katrina Armstrong you will not be allowed peace as you sic NYPD officers and ICE agents on your own students for opposing the genocide of the Palestinian people. WALKOUT AT 12:30PM. COLUMBIA MAIN GATES (Broadway/116)" A screen capture image of the image and caption ("the post") is included below as Figure 1.



9. From my review of open-source materials on the Columbia University website, I know that Katrina Armstrong is the interim President of Columbia University. I know that the Columbia President's Mansion is located at 60 Morningside Drive, New York, New York 10027, within the Southern District of New York. From reviewing open-source Google Street View geo-located imaging data related to that address, I believe that the structure depicted in the post is, in fact, the south-facing façade of that address.

10. Based on my training and experience, I know that a spray-painted inverted triangle is a symbol that has been used by militants affiliated with the terrorist organization Hamas in the ongoing Israel-Hamas conflict to designate homes and buildings as targets for attack.

11. From my review of public postings on the Target Account, I know that the Target Account purports to be the official Instagram account of Columbia University Apartheid Divest ("CUAD"). From review of the Target Account and from review of open-source media reports,

4

in particular a November 14, 2023 op-ed in the Columbia Spectator student newspaper authored

under CUAD's organizational byline, I know that CUAD is a student-run organization, that, in

its own words, "work[s] toward achieving a liberated Palestine and the end of Israeli apartheid

by urging Columbia to divest all economic and academic stakes in Israel."

12.    From my review of postings on the Target Account, I know that CUAD expressly

endorses and advocates the use of violence in furtherance of its organizational objectives.

Specifically, I have reviewed an October 8, 2024 post made by the Target Account which

included the statements: "we support liberation by any means necessary, including armed

resistance" and "in the face of violence from the oppressor equipped with the most lethal military

force on the planet, where you've exhausted all peaceful means of resolution, violence is the

only path forward." From reviewing open-source media reporting, including an October 1, 2024

Columbia Spectator article, I know that the Target Account made these statements as part of an

open letter, posted to the Target Account, in support of a Columbia student named Khymani

James, who had been disciplined by Columbia University for stating, during an Instagram live

stream, that "Zionists don't deserve to live" and "Be grateful that I'm not just going out and

murdering Zionists."

13.    I have also reviewed open-source media reports that included photographs of an

image posted to the Target Account that is no longer publicly-viewable and that stated, in the

context of a broad expression of support for a student movement in Bangladesh, that CUAD "is

fighting for the total eradication of Western civilization."

14.    From reviewing public posts on the Target Account and various open-source

media reports, I also know that the Target Account has taken credit, on behalf of CUAD, for

organizing several disruptive events, during which individuals engaged in allegedly assaultive

conduct. For example, from reviewing a February 27, 2025 article in the Barnard Bulletin (the student newspaper of Barnard College), I know that, on February 26, 2025, a group of masked individuals forced entry into a Barnard College administration building, allegedly causing injury by means of physical assault to a Barnard College employee who attempted to block them from entering. I also know, from review of a March 5, 2025, article in the Columbia Spectator, that on March 5, 2025, a group of masked individuals entered a multi-purpose building at Barnard College and interfered with the normal use of that building, refusing instructions from Barnard College officials to disperse. While inside, members of the group distributed paper leaflets purporting to be authored by the Hamas Media Office which purported to articulate reasons why the October 7, 2023 mass killings of Israeli civilians were morally justified. When officers of the New York Police Department arrived to remove the group, members of the group physically resisted police efforts to disperse it, resulting in the arrest of nine individuals on charges of "obstructing government administration." From reviewing public posts on the Target Account, I know that the Target Account took credit, on behalf of CUAD, for organizing and carrying out these events.

15.    Based on these facts, I submit that there is probable cause to believe that the Target Account's March 14, 2025, transmission of the above-described photograph and caption constitutes interstate communication of a threat to injure, in violation of 18 U.S.C. § 875(c). The Target Account purports to speak on behalf of a group that has expressly endorsed the use of violence for the accomplishment of its stated goals. The post includes the inverted triangle symbol, which is used by Hamas to designate structures as targets for violent attack. In the post, the inverted triangle is displayed alongside a bright red substance applied to the official residence

of the Columbia president, who is designated by name in the post and whom the post warns "will not be allowed peace."

## BACKGROUND CONCERNING INSTAGRAM[1]

16.     Instagram is a service owned by Meta, a United States company and a provider of an electronic communications service as defined by 18 U.S.C. §§ 3127(1) and 2510. Specifically, Instagram is a free-access social networking service, accessible through its website and its mobile application, that allows subscribers to acquire and use Instagram accounts, like the target account(s) listed in Attachment A, through which users can share messages, multimedia, and other information with other Instagram users and the general public.

17.     Meta collects basic contact and personal identifying information from users during the Instagram registration process.  This information, which can later be changed by the user, may include the user's full name, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, credit card or bank account number, and other personal identifiers.  Meta keeps records of changes made to this information.

18.     Meta also collects and retains information about how each user accesses and uses Instagram.  This includes information about the Internet Protocol ("IP") addresses used to create and use an account, unique identifiers and other information about devices and web browsers used to access an account, and session times and durations.

---

[1] The information in this section is based on information published by Meta on its Instagram website, including, but not limited to, the following webpages: "Privacy Policy," https://privacycenter.instagram.com/policy/; "Information for Law Enforcement," https://help.instagram.com/494561080557017; and "Help Center," https://help.instagram.com.

19.     Each Instagram account is identified by a unique username chosen by the user. Users can change their usernames whenever they choose but no two users can have the same usernames at the same time.  Instagram users can create multiple accounts and, if "added" to the primary account, can switch between the associated accounts on a device without having to repeatedly log-in and log-out.

20.     Instagram users can also connect their Instagram and Facebook accounts to utilize certain cross-platform features, and multiple Instagram accounts can be connected to a single Facebook account.  Instagram accounts can also be connected to certain third-party websites and mobile apps for similar functionality.  For example, an Instagram user can "tweet" an image uploaded to Instagram to a connected Twitter account or post it to a connected Facebook account, or transfer an image from Instagram to a connected image printing service.  Meta maintains records of changed Instagram usernames, associated Instagram accounts, and previous and current connections with accounts on Meta and third-party websites and mobile apps.

21.     Instagram users can "follow" other users to receive updates about their posts and to gain access that might otherwise be restricted by privacy settings (for example, users can choose whether their posts are visible to anyone or only to their followers).  Users can also "block" other users from viewing their posts and searching for their account, "mute" users to avoid seeing their posts, and "restrict" users to hide certain activity and prescreen their comments.  Instagram also allows users to create a "close friends list" for targeting certain communications and activities to a subset of followers.

22.     Users have several ways to search for friends and associates to follow on Instagram, such as by allowing Meta to access the contact lists on their devices to identify which contacts are Instagram users.  Meta retains this contact data unless deleted by the user and

periodically syncs with the user's devices to capture changes and additions.  Users can similarly

allow Meta to search an associated Facebook account for friends who are also Instagram users.

Users can also manually search for friends or associates.

23.    Each Instagram user has a profile page where certain content they create and

share ("posts") can be viewed either by the general public or only the user's followers,

depending on privacy settings.  Users can customize their profile by adding their name, a photo,

a short biography ("Bio"), and a website address.

24.    One of Instagram's primary features is the ability to create, edit, share, and

interact with photos and short videos.  Users can upload photos or videos taken with or stored on

their devices, to which they can apply filters and other visual effects, add a caption, enter the

usernames of other users ("tag"), or add a location.  These appear as posts on the user's profile.

Users can remove posts from their profiles by deleting or archiving them.  Archived posts can be

reposted because, unlike deleted posts, they remain on Meta's servers.

25.    Users can interact with posts by liking them, adding or replying to comments, or

sharing them within or outside of Instagram.  Users receive notification when they are tagged in

a post by its creator or mentioned in a comment (users can "mention" others by adding their

username to a comment followed by "@").  An Instagram post created by one user may appear

on the profiles or feeds of other users depending on a number of factors, including privacy

settings and which users were tagged or mentioned.

26.    An Instagram "story" is similar to a post but can be viewed by other users for only

24 hours.  Stories are automatically saved to the creator's "Stories Archive" and remain on

Meta's servers unless manually deleted.  The usernames of those who viewed a story are visible

to the story's creator until 48 hours after the story was posted.

27. Instagram allows users to broadcast live video from their profiles. Viewers can like and add comments to the video while it is live, but the video and any user interactions are removed from Instagram upon completion unless the creator chooses to send the video to IGTV, Instagram's long-form video app.

28. Instagram Direct, Instagram's messaging service, allows users to send private messages to select individuals or groups. These messages may include text, photos, videos, posts, videos, profiles, and other information. Participants to a group conversation can name the group and send invitations to others to join. Instagram users can send individual or group messages with "disappearing" photos or videos that can only be viewed by recipients once or twice, depending on settings. Senders can't view their disappearing messages after they are sent but do have access to each message's status, which indicates whether it was delivered, opened, or replayed, and if the recipient took a screenshot. Instagram Direct also enables users to video chat with each other directly or in groups.

29. Instagram offers services such as Instagram Checkout and Facebook Pay for users to make purchases, donate money, and conduct other financial transactions within the Instagram platform as well as on Facebook and other associated websites and apps. Instagram collects and retains payment information, billing records, and transactional and other information when these services are utilized.

30. Instagram has a search function which allows users to search for accounts by username, user activity by location, and user activity by hashtag. Hashtags, which are topical words or phrases preceded by a hash sign (#), can be added to posts to make them more easily searchable and can be "followed" to generate related updates from Instagram. Meta retains records of a user's search history and followed hashtags.

10

31.     Meta collects and retains location information relating to the use of an Instagram account, including user-entered location tags and location information used by Meta to personalize and target advertisements.

32.     Meta uses information it gathers from its platforms and other sources about the demographics, interests, actions, and connections of its users to select and personalize ads, offers, and other sponsored content.  Meta maintains related records for Instagram users, including information about their perceived ad topic preferences, interactions with ads, and advertising identifiers.  This data can provide insights into a user's identity and activities, and it can also reveal potential sources of additional evidence.

33.     In some cases, Instagram users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

34.     For each Instagram user, Meta collects and retains the content and other records described above, sometimes even after it is changed by the user (including usernames, phone numbers, email addresses, full names, privacy settings, email addresses, and profile bios and links).

35.     In my training and experience, evidence of who was using Instagram and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above.  This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to

11

establish and prove each element or, alternatively, to exclude the innocent from further suspicion. Specifically, the evidence may establish who authored and transmitted the posts containing the above-discussed threatening statements.

36.    Specifically, the user's account activity, logs, stored electronic communications, and other data retained by Meta can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, messaging logs, photos, and videos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

37.    Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

38.    Therefore, Meta's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Instagram. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

12

## REQUEST FOR NON-DISCLOSURE AND SEALING

39.     The existence and scope of this ongoing criminal investigation is not publicly

known.  As a result, premature public disclosure of this affidavit or the requested warrant could

alert potential criminal targets that they are under investigation, causing them to destroy

evidence, flee from prosecution, or otherwise seriously jeopardize the investigation.   Some of

the evidence in this investigation is stored electronically.  If alerted to the existence of the

warrant, the subjects under investigation could destroy that evidence, including information

saved to their personal computers.  Pursuant to 18 U.S.C. § 2705(b), I therefore respectfully

request that the Court direct the Provider not to notify any person of the existence of the warrant

for a period of one year from issuance, subject to extension upon application to the Court, if

necessary.

40.     For similar reasons, I respectfully request that this affidavit and all papers

submitted herewith be maintained under seal until the Court orders otherwise, except that the

Government be permitted without further order of this Court to provide copies of the warrant and

affidavit as need be to personnel assisting it in the investigation and prosecution of this matter,

and to disclose those materials as necessary to comply with discovery and disclosure obligations

in any prosecutions related to this matter.

## CONCLUSION

41.     Based on the forgoing, I request that the Court issue the proposed search warrant.

42.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not

required for the service or execution of this warrant.  The government will execute this warrant

by serving the warrant on Meta.  Because the warrant will be served on Meta, who will then

compile the requested records at a time convenient to it, reasonable cause exists to permit the

execution of the requested warrant at any time in the day or night.

Respectfully submitted,

_____

Special Agent
Federal Bureau of Investigation

Sworn to me through the transmission of this Affidavit by reliable electronic means,
pursuant to Federal Rules of Criminal Procedure 41(d)(3) and 4.1,
on _____, 2025

_____
Honorable Sarah Netburn
United States Magistrate Judge
Southern District of New York

14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
IN THE MATTER OF THE SEARCH
OF INFORMATION ASSOCIATED
WITH INSTAGRAM ACCOUNT
@CUAPARTHEIDDIVEST THAT IS
STORED AT PREMISES
CONTROLLED BY META
PLATFORMS, INC.
```

## SEARCH WARRANT AND NON-DISCLOSURE ORDER

TO:    Meta Platforms, Inc. ("Provider")

    Federal Bureau of Investigation ("Investigative Agency")

    **1. Warrant.** Upon an affidavit of ███████████████████ of the Federal

Bureau of Investigation, and pursuant to the provisions of the Stored Communications Act, 18

U.S.C. § 2703(b)(1)(A) and § 2703(c)(1)(A), and the relevant provisions of Federal Rule of

Criminal Procedure 41, the Court hereby finds there is probable cause to believe the Instagram

account @cuapartheiddivest, maintained at premises controlled by Meta Platforms Inc., contains

evidence, fruits, and instrumentalities of crime, all as specified in Attachment A hereto.

Accordingly, the Provider is hereby directed to provide to the Investigative Agency, within 14

days of the date of service of this Warrant and Order, the records specified in Section II of

Attachment A hereto, for subsequent review by law enforcement personnel as authorized in

Section III of Attachment A.  The Government is required to serve a copy of this Warrant and

Order on the Provider within 14 days of the date of issuance.  The Warrant and Order may be

served via electronic transmission or any other means through which the Provider is capable of

accepting service.

**2. Non-Disclosure Order.** Pursuant to 18 U.S.C. § 2705(b), the Court finds that there is reason to believe that notification of the existence of this warrant will result in destruction of or tampering with evidence and/or flight from prosecution, or otherwise will seriously jeopardize an ongoing investigation. Accordingly, it is hereby ordered that the Provider shall not disclose the existence of this Warrant and Order to the listed subscriber or to any other person for a period of one year from the date of this Order, subject to extension upon application to the Court if necessary, except that Provider may disclose this Warrant and Order to an attorney for Provider for the purpose of receiving legal advice.

**3. Sealing.** It is further ordered that this Warrant and Order, and the Affidavit upon which it was issued, be filed under seal, except that the Government may without further order of this Court serve the Warrant and Order on the Provider; provide copies of the Affidavit or Warrant and Order as need be to personnel assisting the Government in the investigation and prosecution of this matter; and disclose these materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

Dated: New York, New York

_____          _____

Date Issued                                          Time Issued

_____

UNITED STATES MAGISTRATE JUDGE

2

**Attachment A**

**I. Subject Account and Execution of Warrant**

This warrant is directed to Meta Platforms, Inc. (the "Provider"), headquartered at 1 Meta Way, Menlo Park, CA 94025, and applies to all content and other information within the Provider's possession, custody, or control associated with the Instagram account @cuapartheiddivest (active on, but not limited to, March 13, 2025) (the "Subject Account").

A law enforcement officer will serve this warrant by transmitting it via email or another appropriate manner to the Provider. The Provider is directed to produce to the law enforcement officer an electronic copy of the information specified in Section II below. Upon receipt of the production, law enforcement personnel will review the information for items falling within the categories specified in Section III below.

**II. Information to be Produced by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, and including any messages, records, files, logs, or other information that has been deleted but is still available to Meta, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for each account or identifier listed in Attachment A:

    A.    All business records and subscriber information, in any form kept, pertaining to the account, including:

        1.    Identity and contact information (past and current), including full name, e-mail addresses, physical address, date of birth, phone numbers, gender, hometown, occupation, websites, and other personal identifiers;

        2.    All Instagram usernames (past and current) and the date and time each username was active, all associated Instagram and Facebook accounts

(including those linked by machine cookie), and all records or other information about connections with Facebook, third-party websites, and mobile apps (whether active, expired, or removed);

3.      Length of service (including start date), types of services utilized, purchases, and means and sources of payment (including any credit card or bank account number) and billing records;

4.      Devices used to login to or access the account, including all device identifiers, attributes, user agent strings, and information about networks and connections, cookies, operating systems, and apps and web browsers;

5.      All advertising information, including advertising IDs, ad activity, and ad topic preferences;

6.      Internet Protocol ("IP") addresses used to create, login, and use the account, including associated dates, times, and port numbers, from January 1, 2024, to present**;**

7.      Privacy and account settings, including change history; and

8.      Communications between Meta and any person regarding the account, including contacts with support services and records of actions taken;

B.      All content (whether created, uploaded, or shared by or with the account), records, and other information relating to videos (including live videos and videos on IGTV), images, stories and archived stories, past and current bios and profiles, posts and archived posts, captions, tags, nametags, comments, mentions, likes, follows, followed hashtags, shares, invitations, and all associated logs and metadata, from January 1, 2024, to present;

C.      All content, records, and other information relating to communications sent from or received by the account from January 1, 2024, to present, including but not limited to:

1.      The content of all communications sent from or received by the account, including direct and group messages, and all associated multimedia and metadata, including deleted and draft content if available;

2.      All records and other information about direct, group, and disappearing messages sent from or received by the account, including dates and times, methods, sources and destinations (including usernames and account numbers), and status (such as delivered, opened, replayed, screenshot);

3.      All records and other information about group conversations and video chats, including dates and times, durations, invitations, and participants (including usernames, account numbers, and date and time of entry and exit); and

2

4.      All associated logs and metadata;

D.      All content, records, and other information relating to all other interactions between the account and other Instagram users from January 1, 2024, to present, including but not limited to:

    1.      Interactions by other Instagram users with the account or its content, including posts, comments, likes, tags, follows (including unfollows, approved and denied follow requests, and blocks and unblocks), shares, invitations, and mentions;

    2.      All users the account has followed (including the close friends list), unfollowed, blocked, unblocked, muted, restricted, or denied a request to follow, and of users who have followed, unfollowed, blocked, unblocked, muted, restricted, or denied a request to follow the account;

    3.      All contacts and related sync information; and

    4.      All associated logs and metadata;

E.      All records of searches performed by the account from January 1, 2024, to present; and

F.      All location information, including location history, login activity, information geotags, and related metadata from January 1, 2024, to present.

Meta is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

III. **Information to be seized by the government**

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. § 875(c) including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

A.      Evidence indicating how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the account owner;

B.      Evidence indicating the account owner's state of mind as it relates to the crime under investigation;

C.      The identity of the person(s) who created or used the account, including records that help reveal the whereabouts of such person(s).

3

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.