# Exhibit I

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

IN THE MATTER OF A SEARCH
WARRANT APPLICATION TO THE
CUAD INSTAGRAM ACCOUNT,

                                          25 MJ 997 (JGK)

------------------------------x
                                          New York, N.Y.
                                          April 14, 2025
                                          3:30 p.m.
Before:

             HON. JOHN G. KOELTL,

                                          District Judge


MATTHEW D. PODOLSKY
     United States Attorney for the
     Southern District of New York
BY:  ALEC WARD
     PAIGE FITZGERALD
ASSISTANT UNITED STATES ATTORNEYS

Also Present: ████████████████████████████████, FBI
```

1     (Case called)
2     THE COURT:  Who's on the line for the government?
3     MR. WARD:  Good afternoon, your Honor. Alec Ward for
4  the government.  Joining me on the call is Page Fitzgerald
5  Principal Deputy Chief Civil Rights Division Criminal Section,
6  and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ from the FBI.
7     THE COURT:  All right.  We have a reporter on the
8  line, correct?
9     THE REPORTER:  Yes, your Honor.
10    THE COURT:  Anyone else on the line?  No.  All right.
11 Well, I've reviewed the papers, and I'm prepared to rule.  I
12 should add just as a matter of procedure.  The papers that were
13 submitted to me again didn't include a signed affidavit from
14 the agent or a signed declaration, but I've reviewed the
15 transcript before the magistrate judge on March 28th, and it
16 indicates that the agent did swear to the affidavit and the
17 magistrate indicated that in the record.  So even though it
18 wasn't submitted to me, that affidavit must be in the record,
19 so I'm prepared to proceed on that basis.
20    So, the Government has filed an application pursuant
21 to 28 U.S.C. § 636(b) to review and reverse a determination by
22 Chief Magistrate Judge Netburn denying a second amended
23 application for a search warrant pursuant to the Stored
24 Communications Act, 18 U.S.C. § 2703. The Government claims
25 that the chief magistrate judge's decision was clearly

erroneous and contrary to law. Alternatively, the Government asks the Court to issue the search warrant itself.  The initial question is whether the Government has the right to seek review by this Court of the denial of the search warrant by the chief magistrate judge. In her ruling, the chief magistrate judge expressed doubt that Rule 41 of the Federal

Rules of Criminal Procedure and 28 U.S.C. § 636(b) permit review of her denial. But numerous district courts have reviewed a magistrate judge's denial of a search warrant application under 28 U.S.C. § 636(b), including applications for a search warrant under the Stored Communications Act. See, e.g., *Matter of Search of Info. Associated with [redacted]@mac.com*, 13 F. Supp. 3d 157, 2162 (D.D.C. 2014); *Matter of White Google Pixel 3 XL Cellphone in a Black Incipio Case*, 398 F. Supp. 3d 785, 788 (*D. Idaho* 2019); *In the Matter of Search of Info. Associated with Email Addresses Stored at Premises Controlled by the Microsoft Corp.*, 212 F. Supp. 3d 1023, 1029-30 (D. Kan. 2016).

And no case has been brought to the Court's attention where a court in the Second Circuit has held that the Government could not appeal from a magistrate judge's denial of a search warrant application.

Indeed, in all respects, Article III judges retain "continuing, plenary responsibility for the administration of the judicial business of the United States," *Pacemaker*

1  *Diagnostic Clinic of Am., Inc. v. Instromedix, Inc.*, 725 F.2d
2  537, 546 (9th Cir. 1984) (en banc) (Kennedy, J.); see also
3  *United States v. Lopez*, 710 F. Supp. 3d 849, 853-54 (D. Nev.
4  2024) (determining that although § 636(a) provided no statutory
5  procedure for review, the district court's plenary authority
6  permitted review of the magistrate judge's probable cause
7  determination).
8      Courts have disagreed on whether magistrate judges
9  adjudicate search warrants under § 636(b)(1)(A) or § 636(b)(3).
10 Compare [redacted]@mac.com, 13 F. Supp. 3d at 162, with Matter
11 of the Search of Twenty-Six (26) Digit. Devices & Mobile Device
12 Extractions, No. 21-sw-233, 2022 WL 998896, at *6
13 (D.D.C  Mar. 14, 2022). Because § 636(b)(1)(A) provides
14 magistrate judges with broad authority to handle most
15 nondispositive pretrial matters, the better view is that search
16 warrants fall under § 636(b)(1)(A). That section provides that
17 "[a] judge of the court may reconsider any pretrial matter
18 under this subparagraph" where the applicant shows "that the
19 magistrate judge's order is clearly erroneous or contrary to
20 law." § 636(b)(1)(A). Even if search warrants fall under §
21 636(b)(3), for purposes of review under § 636(b)(3), courts in
22 this Circuit "have borrowed both the dispositive-nondispositive
23 distinction and the review procedures of subsection (b)(1)."
24 *United States v. Warshay*, No. 98-cv-1245, 1998 WL 767138, at *3
25 (E.D.N.Y. Aug.  4, 1998); see also *N.L.R.B. v. Frazier*, 966

1    F.2d 812, 816 (3d Cir. 1992). And search warrant applications
2    under the Stored Communications Act are nondispositive. *See*
3    *[redacted]@mac.com*, 13 F. Supp. 3d at 162. Indeed, in this
4    case, the Government has asked the Court to review the Chief
5    Magistrate Judge's determination under the "clearly erroneous
6    or contrary to law" standard."A factual finding is clearly
7    erroneous only if although there is evidence to support it, the
8    reviewing court on the entire evidence is left with the
9    definite and firm conviction that a mistake has been
10   committed." See *Ortega v. Duncan*, 333 F.3d 102, 106-07 (2d Cir.
11   2003). "An order is contrary to law when it fails to apply or
12   misapplies relevant statutes, case law or rules of procedure."
13   *Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*, 444 F.
14   Supp. 3d 484, 487 (S.D.N.Y. 2020).

15   "[C]ourts in this Circuit have routinely applied a
16   clear error standard of review to a magistrate judge's
17   nondispositive pretrial order even when the appellate standard
18   of review for the underlying questions of law would be de
19   novo." *Progress Bulk Carriers v. am. S.S. Owners Mut. Prot. &*
20   *Indem. Ass'n*, 2 F. Supp. 3d 499, 502 (S.D.N.Y. 2014).  The
21   Chief Magistrate Judge expressed doubt that § 636(b)(1)(A)
22   could be used to review her determination because the Court had
23   not designated the Chief Magistrate Judge to hear and determine
24   this matter. The Chief Magistrate Judge also noted that Federal
25   Rule of Criminal Procedure 41 addresses the ability of

magistrate judges to issue warrants, not the ability of district judges to issue warrants. And, as the Chief Magistrate Judge recognized, this Court's procedures indicate that warrants are to be presented to a magistrate judge in the first instance.  But Rule 41 also authorizes district court judges to issue warrants. See 18 U.S.C. § 3102; Fed. R. Crim. P. 41(b); Fed. R.

Crim. P. 1(c) ("When these rules authorize a magistrate judge to act, any other federal judge may also act."). And in any event, "Rule 41 does not define the extent of the court's power to issue a search warrant." *United States v. Villegas*, 899 F.2d 1324, 1333-35 (2d Cir. 1990). As the Court of Appeals for the Second Circuit has noted, assuming no statutory prohibition, district court judges have the inherent ability to issue warrants within the Fourth Amendment's guardrails. Id.

It would be remarkable if there was no ability to review the denial of a warrant, rare as those denials may be, and there is no court decision brought to this Court's attention which has so held. As for the argument that § 636(b)(1)(A) is not an appropriate vehicle for review because the warrant has not been specifically referred to the Chief Magistrate Judge for a determination, this Court's local rules indicate that warrant applications are assigned to magistrate judges in the first instance. See Local Cr. Rule 59.1; Local

1    Civil Rule 72.1(a)
2         ("A full-time or part-time magistrate judge may be
3    assigned any duty allowed by law to be performed by a
4    magistrate judge."); Rules for the Division of Business Among
5    District Judges, S.D.N.Y., Rule 3(d)(2), Criminal Proceedings
6    in Part I ("The judge presiding in Part I shall: Hear and
7    determine appeals from orders of a magistrate judge in cases
8    that have not yet been assigned to a district judge."). In any
9    event, even if § 636(b)(3) applied, review under the "clearly
10   erroneous or contrary to law" standard would be proper. See
11   *Warshay*, 1998 WL 767138, at *3.
12        Finally, as noted above, a district court judge has
13   the power under both Rule 41 and inherently to issue warrants.
14   The Government, in the alternative, has asked this Court to
15   issue the warrant in the first instance. But given the practice
16   in this District, the Court would refer that request to the
17   Chief Magistrate Judge, and any denial of the warrant could
18   then be reviewed by this Court under the "clearly erroneous or
19   contrary to law" standard. That referral would be an exercise
20   in futility because the Chief Magistrate Judge has already
21   denied the application.
22        This simply illustrates the conclusion that this Court
23   has the ability to review the Chief Magistrate Judge's denial
24   of the warrant pursuant to 28 U.S.C. § 636(b)(1)(A) to
25   determine whether that determination was "clearly erroneous or

1    contrary to law."

2           The warrant in this case sought a wide range of
3    documents from January 1, 2024, related to stored
4    communications to obtain evidence of a violation of 18 U.S.C. §
5    875(c). Section 875(c) provides: "Whoever transmits in
6    interstate or foreign commerce any communication containing any
7    threat . . . to injure the person of another, shall be fined
8    under this title or imprisoned not more than five years, or
9    both." 18 U.S.C. § 875(c). The statute requires that "a
10   communication be transmitted and that the communication contain
11   a threat." *Elonis v. United States*, 575 U.S. 723, 732 (2015).
12   Whether a communication is a "true threat" turns on "whether an
13   ordinary, reasonable recipient who is familiar with the context
14   of the communication would interpret it as a threat of injury."
15   *United States v. Turner*, 720 F.3d 411, 420 (2d Cir. 2013); see
16   also *United States v. Sovie*, 122 F.3d 122, 125 (2d Cir. 1997)
17   (explaining that determining whether a communication is a "true
18   threat" in the context of § 875(c) calls for an objective
19   inquiry).

20          There is also a subjective component to the § 875(c)
21   analysis. Although the statute does not specify a mental state
22   requirement, the Supreme Court has held that "the mental state
23   requirement in Section 875(c) is satisfied if the defendant
24   transmits a communication for the purpose of issuing a threat,
25   or with knowledge that the communication will be viewed as a

threat." *Elonis*, 575 U.S. at 740. Although the Supreme Court in *Elonis* declined to address whether recklessness would suffice, see id., the Court has subsequently held that recklessness is sufficient and that therefore the Government must show that the defendant at least "consciously disregarded a substantial risk that his communications would be viewed as threatening violence." *Counterman v. Colorado*, 600 U.S. 66, 69 (2023); see also *United States v. Garnes*, 102 F.4th 628, 636-37 (2d Cir. 2024) (applying Counterman in the § 875(c) context).

Context matters. Words that are literally threatening "may take on greater or lesser seriousness from the additional statements that surround them." *Garnes*, 102 F.4th at 637. Circumstances surrounding the communication and events that occur close in time are relevant to the analysis. *United States v. Hunt*, 82 F.4th 129, 137 (2d Cir. 2023), cert. denied, 144 S. Ct. 1396 (2024); see also *United States v. Segui*, No. 19-cr-188, 2019 WL 8587291, at *7 (E.D.N.Y. Dec. 2, 2019) ("[E]vents in the days leading up to, and the day after, the threat . . . [are] highly relevant to the objective test as to whether an ordinary recipient would interpret the communication as a threat. . . ."). At issue is an "anonymous submission" posted on Instagram by the Instagram account @cuapartheiddivest on March 14, 2025—a month ago. The Instagram post included a photo of the residence of the then-President of Columbia University defaced with the phrase "FREE THEM ALL" and an

inverted triangle together with red paint that the Government contends simulated blood. The gist of the post was to complain about Columbia University's alleged "shameless complicity in genocide," stating that "Columbia has lit a flame it can't control." The caption accompanying the photo in the post said: "Katrina Armstrong you will not be allowed peace as you sic NYPD officers and ICE agents on your own students for opposing the genocide of the Palestinian people." The post then announced: "WALKOUT AT 12:30 PM. COLUMBIA MAIN GATES (Broadway/116)." The Chief Magistrate Judge found that the Government had failed to establish probable cause that this was a "true threat" in violation of § 875(c). The Government argues that the Chief Magistrate Judge concentrated on the inverted triangle in the photograph and the portion of the post that said, "you will not be allowed peace," and in particular did not consider the significance of the statement on the wall of the then-President's residence and the red paint on the wall. Taken together, the Government contends that the evidence submitted to the Chief Magistrate Judge was more than sufficient to show probable cause that a violation of § 875(c) had been committed.  The Court could not find that there was clear error in the chief magistrate judge's concentration on the inverted triangle and the specific statement directed to then-President Armstrong.

Those were arguably the two most important factors on

which the Government had relied to show a true threat. The Government spent most of the agent's affidavit explaining the significance of the inverted triangle to Hamas, but the Government was unable to show that the symbol had a specific threatening meaning in the United States such that an ordinary reasonable recipient of the communication, familiar with the context, would interpret it as a threat. The specific threat to the then-President was "you will not be allowed peace," and the Chief Magistrate Judge reasonably concluded that that statement was not a threat of violence.

Finally, the chief magistrate judge did not ignore the fact that there was a statement on the wall of the then-President's residence. The chief magistrate judge specifically addressed the inverted triangle on the wall. The case that the Government cites noting the importance of threats on a home included specific threats of violence in violation of § 875(c). See *Turner*, 720 F.3d at 421-23 (describing the defendant's statements as an "extended discussion of killing" three judges). There were no such explicit threats in the Instagram post about what was written on the wall on then-President Armstrong's residence.

The Government also argues that it was error for the chief magistrate judge to inquire whether then-President Armstrong had complained about the post. The Government represented that it was not aware that the then-President had

complained, although Government agents had warned Columbia about the post. The President's reaction to the post is certainly relevant and therefore it was not error for the Chief Magistrate Judge to inquire. Although not dispositive, the reaction to the post by knowledgeable people is a relevant consideration, and there is no evidence that members of the Columbia community viewed the post as a true threat. See *Watts v. United States*, 394 U.S. 705, 708 (1969) (stressing "the reaction of the listeners," among other factors, in holding that a rally attendee's statement was "a kind of very crude offensive method of stating a political opposition to the President" that was not a true threat); *Garnes*, 102 F.4th at 640 (concluding that evidence bearing on "the effect of [the] alleged threats on the listeners" was "substantially probative" of whether the defendant's statements were true threats); *United States v. Malik*, 16 F.3d 45, 50 (2d Cir. 1994) (noting that the "recipients' states of minds and their reactions" supplied "highly probative evidence" that the alleged threats constituted true threats).

Taking the entire post into account, and considering the context of the post, the Chief Magistrate Judge did not err in finding that there was not probable cause to conclude that the entire post was a true threat. Although the writing on the wall was reprehensible, there are statutes that cover such vandalism. However, for purposes of § 875(c), the issue is

whether the post contained a threat of violence. The Chief Magistrate Judge explained why there was no evidence that the inverted triangle painted on the wall contained such a message, and the Government has not adequately responded to that. As for the explicit message on the wall—"FREE THEM ALL"—that phrase does not convey a threat, nor is there any reason to conclude that the red paint was intended to convey a purported threat. The accompanying text also does not contain an explicit or implicit threat of violence. It contains political opposition to Columbia's policy and says that Columbia "has lit a flame it can't control." It then says that the then-President "will not be allowed peace," which can reasonably be understood as the continuation of demonstrations, an interpretation that is supported by the fact that the post ends with scheduling a demonstration at Columbia's main gates.

In short, the Chief Magistrate Judge's denial of the warrant was not clearly erroneous or contrary to law. The application to reverse the determination is therefore denied. So ordered.

I have an additional request.  First of all this involves a continuing investigation, so therefore the transcript is sealed.  The government of course has access to the transcript.  The chief magistrate judge should also be provided a copy of the decision, both as a matter of courtesy, and because it involves an issue with respect to court

1  administration in this district, even though it's under seal.
2  So the government should order an expedited transcript and
3  provide it to the chief magistrate judge.  All right.
4           MR. WARD:  Yes, your Honor.  Understood.  The
5  government will do so.
6           THE COURT:  Okay.  Great.  Anything further?
7           MR. WARD:  Not at this time, your Honor.  Thank you
8  for your time.
9           THE COURT:  Okay.  Thank you all.  By now.
10          (Adjourned)